LAW OFFICES OF BASTIAN & DINI
ROBERT L. BASTIAN, JR., [SBN 170121]
MARINA R. DINI [SBN 169176]
9025 Wilshire Blvd., Penthouse Suite
Beverly Hills, CA 90211
Telephone: (310) 789-1955
Facsimile:  (310) 822-1989

Attorneys for Plaintiff
ERNST & HAAS MANAGEMENT COMPANY, INC.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNST & HAAS MANAGEMENT COMPANY, INC., <br><br> Plaintiff, <br><br> v. <br><br> HISCOX, INC.; and DOES 1 through 10, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DAMAGES** <br><br> **1. Breach of Contract;** <br><br> **2. Breach of Implied Covenant of Good Faith and Fair Dealing;** <br><br> **3. Tortious Breach of Implied Covenant of Good Faith and Fair Dealing;** <br><br> **4. Bad Faith;** <br><br> **5. Unfair Trade Practices.** <br><br> **DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.      This is an insurance bad faith action brought by an insured business against its insurer for its failure to provide coverage for a $200,000 loss caused by a covered event of computer fraud. The underlying facts are essentially undisputed. The core dispute is, rather, this plaintiff insured's assertion that it is covered under the relatively broad pertinent language of the 2012 -- 2013 commercial policy which it purchased and renewed each year thereafter. By contrast, the defendant insurer contends that narrower updated language

contained in the 2018 – 2019 and 2019 – 2020 iterations of the policy excludes coverage. In turn, plaintiff contends, the "new" language in both constitutes an unlawful reduction or "skinnying down" of coverage for which defendant is otherwise, under California law, required to, but failed to provide separate notice to the insured before invoking such language to deny coverage. Plaintiff is, therefore, entitled to coverage for its claim.

2.    Under 28 U.S.C. § 1332, this District Court has diversity jurisdiction over this matter because the plaintiff is a California corporation, the defendant is a Delaware corporation, and the amount in question exceeds $75,000.

## PARTIES

3.    Plaintiff ERNST & HAAS MANAGEMENT CO., INC. is a professional full-service Long Beach property management company, currently managing rentals throughout the Long Beach Area, and whose office is located at 4120 Atlantic Avenue, Long Beach CA, 90807. It is licensed in California, Corporate No. C2112016, and is in good standing.

4.    David Lee Haas is the Chief Executive Officer, Secretary, Chief Financial Officer, and Managing Director of plaintiff ERNST & HAAS MANAGEMENT CO., INC. He signed the subject insurance contracts on behalf of plaintiff ERNST & HAAS MANAGEMENT CO., INC. [*hereinafter* ERNST & HAAS]

5.    Defendant HISCOX, INC. [*hereinafter* HISCOX] is an Insurance Company, incorporated in Delaware, whose corporate offices are in New York, registered with the California Secretary of State, California Business Number C2813729, and doing business in the State of California.

6.    Plaintiff is ignorant of the true names and capacities of those defendants named as Does, but allege that each said Doe defendant was in some intentional or negligent manner responsible for its injuries. Plaintiff will amend its complaint to allege the true names and capacities of said defendants when

they become known, together with appropriate charging allegations.

## THE SUBJECT INSURANCE CONTRACT

7.     A true and correct copy of the original insurance policy which is the subject of this claim, C-Suite, Commercial Crime Insurance Policy, Policy Number: UC21253080.12, 30 pp., is attached hereto as **Exhibit 1**, and incorporated by reference. Plaintiff entered into this contract to cover the policy period of 01/18/2012 to 01/18/2013. Every year since then through the time of the covered event, plaintiff has renewed the coverage. For reasons explained herein, the pertinent policy language that controls regarding whether the subject event is covered under this policy is contained in **Exhibit 1**.

8.     A true and correct copy of the most recent iteration of the policy is attached hereto as **Exhibit 2**, 33 pp., and incorporated by reference. The Policy Number is UC21253080.19. The Policy Period was 01/18/2019 to 01/18/2020. A true and correct copy of the related "Crime Coverage Part" is attached hereto as **Exhibit 3**, 23 pp., and incorporated by reference.

## JURISDICTION AND VENUE

9.     Plaintiff, by and through David Lee Haas, entered into the subject insurance policy attached as **Exhibits 1, 2** and **3** in Long Beach, California, making the United States District Court, Central District of California, the proper venue in California.

## ADDITIONAL FACTUAL ALLEGATIONS REGARDING THE "EVENT"

10.     On March 12, 2019, Krystale Allen ["Allen"], ERNST & HAAS' Accounts Payable Clerk, received an email from someone whom she thought was David Haas, Managing Broker of ERNST & HAAS ["Real David"], but was actually an unknown person[s] pretending to be him ["Fake David"].

11.     The email attached an invoice for $50,000 to be sent to Zang Investments, LLC. Allen processed the payment by wire transfer, with the payment going to an account at Fifth Third Bank.

12.     On March 18, 2019, Allen received a second email from Fake David, this time with an invoice attached for $150,000, also to be sent to Zang Investments, LLC. Fake David requested that the payment to be made in the same manner as the prior payment completed by Allen. Allen processed the payment.

13.     On March 20, 2019, Allen received a third request from Fake David, this time requesting a payment of $470,000 to Zang Investments, LLC. At this point, Allen became concerned as to the authenticity of the request and forwarded the email to Real David asking him if the request was legitimate. Real David then called Allen and told her that the email had not been sent by him.

14.     At this point, Allen realized the fraud and that the prior emails were likewise also fraudulent. Allen called immediately ERNST & HAAS' bank, Farmers & Merchants Bank, informed it of the fraud, and asked for the wires to be stopped. The bank said that the wires had already been sent and could not be recalled.

15.     When Allen discovered what had happened, she began crying and shaking. An incident report written by Annette Martin, ERNST & HAAS' Operations Manager, stated the following:

> [Martin] reminded her that E&H do not sent out wire transfers – who trained you regarding wire transfers? [Her response was no.] Have you done one before? [Her response was no.]Also, asked why didn't she speak with [Martin] regarding such emails? Couldn't you pick up the phone and contact [Real David] since these requests were out of protocol? Employee was visibly shaken and distraught, could not answer any other questions other than "I don't know."

ERNST & HAAS determined that the fraudster was using an email address that

was similar to, but different from, Real David's actual email address. The fraudulent party used the address of dhaas@ernsthas.com, while Real David's email address is dhaas@ernstandhaas.com.

16.     The Insured had expressed concerns that Allen may be connected with the loss, stating as follows:

> I'm not in a position to make allegations that Krystale embezzled funds from our company, however the circumstances are curious. She had been with our company for approximately 5 months and was very familiar with our protocols for funds disbursement, yet she by-passed all standard procedures and sent funds to an unknown out of state bank account without any accounting. When asked, she did not have any answer whatsoever as to why she did not follow known procedures and practices. We have never issued payment in this manner, or for such large amounts in the past, so it raises concerns. Within days of this incident she left the company on leave and has not returned.

17.     ERNST & HAAS claims a total loss amount of $200,000 representing the first wire in the amount of $50,000 and the second wire in the amount of $150,000. On its proof of loss form, the Insured described the loss as "Email was compromised and funds were wired to fraudulent account." ERNST & HAAS reported the matter to the Long Beach Police Department and to the Internet Crime Complaint Center.

18.     In its written report to law enforcement, and in the written recall request to the bank, the Insured described the loss as resulting from an email hack and compromise.

## DENIAL OF THE CLAIM

19.    On June 10, 2019, the insurer, defendant HISCOX denied the claim. A true and correct copy of the denial letter, 7 pp., is attached as **Exhibit 4**, and incorporated by reference.

20.    The pertinent gist of HISCOX's reason for denying the claim in the June 10, 2019 correspondence is that coverage is excluded under language found in Insuring Agreement D(2), Funds Transfer:

> **Funds transfer fraud** does not include any transfer, payment, or delivery of **money** or **securities** which required **you, your employees, your executive employees**, or others on your behalf to take any action in order the complete the transfer, payment, or delivery of such **money** or **securities**.

[Emphasis in original]

21.    After plaintiff continued to challenge the denial, defendant HISCOX doubled down on its reliance on the 2019 – 2020 contract in correspondence, dated December 20, 2019, a true and correct copy whereof is attached as **Exhibit 5**. In that letter, HISCOX blames plaintiff for not updating its policy:

> **The Insured Did Not Purchase The Coverage That Could Have Afforded Coverage For This Loss**
>
> The real issue here is that the Insured did not purchase the coverage that could have provided coverage for this loss. Insuring Agreement D(3) of the Policy, Cyber Deception, typically affords coverage in situations similar to the loss at issue here—where an Insured is tricked into sending money to a fraudulent party. Insuring Agreement D(3) provides coverage, in part, for a loss of money resulting directly from cyber deception. Cyber deception means the intentional deception of an

employee by a person falsely purporting to be an employee of the Insured through a confidence trick communicated by email which results in the Insured's transfer of money. Insuring Agreement D(3) was written specifically to provide coverage in situations where, as here, an employee is tricked into making a transfer of money. The Insured could have purchased this coverage, but did not. While it is unfortunate that the Insured did not buy this coverage, this is not the fault of Hiscox. The Insured cannot now rewrite the Policy to fix the ills caused by its own decision.

22. In subsequent correspondence between the parties on the subject of coverage, plaintiff pointed out that this exclusionary language does not appear in the original insurance contract [**Exhibit 1**] and that defendant HISCOX never gave notice to its insured, plaintiff ERNST & HAAS, of such a reduction in coverage. A true and correct copy of that correspondence, dated February 4, 2020, is attached hereto as **Exhibit 6**, and incorporated by reference.

23. This letter points out that the pertinent language for purposes of coverage is found in the 2012 policy which states in pertinent part:

**Coverage D: Computer and Funds Transfer Fraud**

**(1) Computer Fraud**

We will pay for loss of or damage to Money, Securities and/or Other Property resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the Premises or Banking Premises: (i) to a person (other than a Messenger) outside those Premises or Banking Premises; or (ii) to a place outside those Premises or Banking Premises.

"Coverage D" of page 4 of 24 of policy form CRI P001 CW (06/10), issued to ERNST & HAAS, coverage commencing January 18, 2012. [Emphasis in original]

24.     The coverage stated in "Coverage D" is clear. It is what ERNST & HAAS purchased in 2012 and continued to renew. It covers ERNST & HAAS' loss.

25.     The limited definition of computer fraud, found on page 11 of 17 of policy form CSUCRI P0001A CW (07/17) [**Exhibit 3**, p. 78 of 119], which HISCOX cited as the basis of HISCOX's denial, is nowhere found in the policy issued in 2012. Nor is there a separate "section D(3)" separately describing "cyber fraud," or setting forth the basis for distinct broader coverage if the insurer so chooses.[1]

26.     California law is clear that an "insurer when renewing a policy may not change the terms of the policy, without first  notifying the insured ...." *Zito v. Firemen's Ins. Co.* (1973) 36 Cal.App.3d 277, 282; that the insurer is bound by a greater coverage in an earlier policy when a renewal policy is issued but the insured is not notified of the specific reduction in coverage, *Industrial Indem. Co. v. Ind. Acc. Com.* (1949) 34 Cal.2d 500, 506; *Sorensen v. Farmers Ins. Exch.* (1976) 56 Cal.App.3d 328, 333; and an "insurer when renewing a policy may not change the terms of the policy, without first notifying the insured ...." *Zito v. Firemen's Ins. Co.* (1973) 36 Cal.App.3d 277, 282.

27.     Further, when an insurance company changes, reduces, or limits the coverage or benefits of a policy upon renewal, the notice of such change must "be provided in a 'plain, clear and conspicuous writing'." *Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649, 663. To be conspicuous, the notice must be "displayed or presented" in a way that it would be "noticed" by a reasonable

---

[1]     The definition of "cyber" is: "of, relating to, or involving computers or computer networks (such as the Internet)." https://www.merriam-webster.com/dictionary/cyber [last visited 4/3/20]

person. *Broberg v. Guardian Life Ins. Co. of Am*. (2009) 171 Cal.App.4th 912, 922-23. Examples of conspicuous notice "includes . . . a heading in capitals . . . larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size . . ." *Id*. at 923. Moreover, the notice of reduction in coverage must be "specific." *Davis v. United Services Auto Ass'n* (1990) 223 Cal.App.3d 1322, 1332. "**[A] general admonition to read the policy for changes is insufficient."** *Ibid*. [Emphasis added] The failure to provide "adequate notice" renders the attempted reduction or limitation in coverage "ineffective." *Id*. at 1333.

28.     The definition of Funds Transfer Fraud found in Insuring Agreement D(2) of the 2019 – 2020 contract constitutes a material change in the terms of, and reduction of coverage from the original contract which plaintiff ERNST & HAAS purchased from defendant HISCOX in 2012. Since 2012, defendant HISCOX has not given its insured, plaintiff ERNST & HAAS, any notice of the change remotely compliant with California law on the subject, much less notice in "plain, clear and conspicuous writing."   As such, the reduction in coverage is, under California law, "ineffective."

29.     When plaintiff called defendant's attention to this flaw in its justification for denying coverage, defendant countered, in a correspondence dated March 4, 2020, a true and correct copy whereof is attached as **Exhibit 7,** and incorporated by reference herein, by misdirecting attention to still other new language in the year-earlier policy of 2018 – 2019, instead of addressing the 2012 – 2013 policy, a copy of which plaintiff had provided defendant in the prior correspondence. When plaintiff subsequently called defendant's attention to the flaw in referring to the 2018 – 2019 iteration of the policy rather than the 2012 – 2013, defendant countered in correspondence dated March 13, 2020, a true and correct copy where is attached as **Exhibit 8**, by adding a new gloss that the new language [the definition in D(2) of the 2019 – 2020 policy] was "merely a

clarification," not a reduction or "skinnying down" of coverage of the 2012 ‑‑ 2013 policy.

30.     Not only is it not plaintiff's fault for not selecting and paying for additional "D(3)" coverage, as defendant has alleged,  defendant cannot explain how plaintiff could have possibly known in 2012 – 2013, absent some other intervening act of notice between then and 2019, that, in 2019, it would have to pay extra for distinct D(3) coverage, as D(3) coverage did not even exist in 2012. There was no separate section separately defining cyber fraud as something distinct from computer fraud.  Nor was there distinct D(2) language which expressly excluded as an insurable event situations where an employee approves the electronic transfer as the result of cyber deception. These distinctions did not even exist when the insured entered into the original contract. Defendant HISCOX appears to be assuming that the insurer did not have to comply with the notice requirements of California law and that a mere general admonition to read the policy for changes is sufficient to justify the changes. It isn't.

31.     In addition to willfully denying [indeed failing to address] that the factual basis of plaintiff's claim that language in the 2012 ‑‑ 2013 policy is controlling, defendant HISCOX has invented a new category for language added to a policy for which it implicitly claims it does not have to provide notice to its insureds under California law. But the classification defies reasonable rules of construction. Defendant HISCOX states that the new language merely provides "clarification," *i.e.,* it doesn't add or subtract, it merely clarifies. But "clarification" implies preceding language that needs additional expression to clarify. That implies an ambiguity. Under familiar principles of contract interpretation, particularly insurance contracts, such ambiguities should be resolved against the drafting party insurer.

32.     On the other hand, if the language is interpreted as mere surplusage, as defendant now would have it, such interpretation cuts against the rule of

interpretation that additionally inserted words should be preferentially interpreted to have meaning. Stated alternatively, the new language the insured added [*i.e.*, D(2) and D(3)]obviously is not mere surplusage. Rather, it has meaning -- it is intended to expressly reduce/skinny down the insured's coverage from what it was in, *inter alia*, the 2012 -- 13 contract. Employing either rule of construction, the coverage limitations and changes imposed either in the 2018 – 2019 or 2019 – 2020 iterations cannot be read into the 2012 – 2013 contract *ex post facto* to deny coverage. Rather, the 2012 – 2013 contract should be interpreted and applied as it is written, *i.e.*, to provide coverage.

33.   In sum, the insured, plaintiff ERNST & HAAS, has presented a loss that is covered under D(1) of the policy it purchased for 2012 – 2013. Since then, plaintiff has renewed its policy annually. The exclusionary and additional language D(2) and D(3) that defendant HISCOX has asserted into later iterations of the 2012 – 2013 policy, including the 2018 – 2019 iteration, was added without giving express notice to the insured as required by California law and, therefore, cannot provide a lawful basis for excluding or denying coverage.

34.   Further, the following acts of defendant HISCOX: [1] rewriting coverage to  define cyber deception as a separate form of Computer and Funds Transfer Fraud; [2] adding policy language that excludes a transfer resulting from cyber deception as covered under the prior Computer and Funds Transfer Fraud section; [3] failing to give  the insured express notice that its coverage had been altered and that it would have to pay extra for coverage for potential claims made under the new cyber deception category; and [4] blaming the insured for not electing the new coverage when renewing is a paradigmatic example of, under California law, an insurer unlawfully "skinnying down" coverage in bad faith, meriting the relief plaintiff requests herein as follows.

///

**FIRST CAUSE OF ACTION**

**[Breach of Contract]**

**By Plaintiff against all Defendants**

35.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as though said paragraphs were fully set forth herein.

36.     There is a valid and existing insurance agreement between plaintiff and defendant HISCOX. A true and correct copy whereof is attached as **Exhibits 1, 2** and **3.**

37.     Plaintiff performed or was excused from performance under the agreement.

38.     Defendant breached the agreement by, *inter alia,* refusing to properly compensate Plaintiff.

39.     Plaintiff sustained damages as a result of Defendant HISCOX's breach of the agreement.

40.     Plaintiff has been required to retain the services of attorneys to commence this action and is entitled to contractual and/or statutory attorneys' fees and costs.

**SECOND CAUSE OF ACTION**

**[Contractual Breach of the Implied Covenant**

**of Good Faith and Fair Dealing]**

**By Plaintiff against all Defendants**

41.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as though said paragraphs were fully set forth herein.

42.     There is implied in every contract a covenant of good faith and fair dealing. Plaintiff and defendant entered into a valid and existing insurance agreement.

43.     Defendant owed plaintiff a duty of good faith and fair dealing. Defendant breached its duty of good faith and fair dealing by, *inter alia*, refusing to properly compensate plaintiff.

44.     Plaintiff sustained damages as a result of defendant's breach of the implied covenant of good faith and fair dealing.

45.     Plaintiff has been required to retain the services of attorneys to commence this action and is entitled to contractual and/or statutory attorneys' fees and costs.

**THIRD CAUSE OF ACTION**

**[Tortious Breach of the Implied Covenant of**

**Good Faith and Fair Dealing]**

**By Plaintiff against all Defendants**

46.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as though said paragraphs were fully set forth herein.

47.     There is implied in every contract a covenant of good faith and fair dealing.

48.     Plaintiff and defendant entered into a valid and existing insurance agreement which included coverage for the loss plaintiff incurred.

49.     Defendant owed plaintiff a duty of good faith and fair dealing. As an insurer, defendant owed plaintiff a fiduciary-like duty and there was a special element of reliance by plaintiff.

50.     Defendant breached its duty of good faith and fair dealing by, *inter alia*, refusing to properly compensate plaintiff for its loss.

51.     Plaintiff sustained damages as a result of defendant's breach of the implied covenant of good faith and fair dealing.

52.     Plaintiff is further entitled to punitive damages in an amount to be proved at trial as a result of defendant's breach of the implied covenant of good

faith and fair dealing because the denial and refusal to provide coverage for the loss was carried out in an oppressive, fraudulent, malicious, vexatious, deliberate, cold, callous or intentional manner, or in conscious disregard of plaintiff's protected rights, in order to injure and damage plaintiff.

53.    Plaintiff has been required to retain the services of attorneys to commence this action and is entitled to contractual and/or statutory attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### [Bad Faith]

### By Plaintiff against all Defendants

54.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as though said paragraphs were fully set forth herein.

55.    The acts and omissions of defendant as complained of herein, and yet to be discovered in this matter, constitute bad faith.

56.    Plaintiff sustained damages as a result of defendant's bad faith.

57.    Plaintiff is further entitled to punitive damages in an amount to be proved at trial, as a result of defendant's bad faith because the denial and refusal to provide coverage for the loss was carried out in an oppressive, fraudulent, malicious, vexatious, deliberate, cold, callous or intentional manner, or in conscious disregard of plaintiff's protected rights, in order to injure and damage plaintiff. Plaintiff is further entitled to punitive damages as a result of defendant's bad faith.

58.    Plaintiff has been required to retain the services of attorneys to commence this action and is entitled to attorneys' fees and costs.

///

---

**COMPLAINT FOR DAMAGES**

**FIFTH CAUSE OF ACTION**

**[Unfair Trade Practices]**

**By Plaintiff against all Defendants**

59.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as though said paragraphs were fully set forth herein. Defendant has engaged in unfair trade practices, including defendant's failure to properly settle plaintiff's claim.

60.     Plaintiff sustained damages in excess of the policy limits as a result of defendant's unfair trade practices, which include unreasonable interpretation of the relevant policy provisions, delay in approving coverage, and intentionally skinnying down coverage in way designed to escape the attention of brokers and insureds, and in contravention of California law prohibiting the practice.

61.     Plaintiff is further entitled to punitive damages in an amount to be proved at trial as a result of defendant's unfair trade practices because the denial and refusal to provide coverage for the loss, including the referral to the California Department of Insurance was carried out in an oppressive, fraudulent, malicious, vexatious, deliberate, cold, callous or intentional manner, or in conscious disregard of plaintiff's protected rights, in order to injure and damage plaintiff. Plaintiff is further entitled to punitive damages as a result of defendant's bad faith.

62.     Plaintiff has been required to retain the services of attorneys to commence this action and is entitled to contractual and/or statutory attorneys' fees and costs.

* * *

1    WHEREFORE, plaintiff prays for judgment against the above-named

2    defendant and each of them, jointly and severally, as follows:

3        For general damages in an amount in excess of the policy limits;

4        For special damages in an amount in excess of the policy limits;

5        For punitive damages in an amount to be determined at trial;

6        For reasonable attorneys' fees and costs of suit;

7        For interest at the statutory rate; and

8        For such other and further relief as the Court deems just and proper.

9

10   DATED:      May 1, 2020            LAW OFFICES OF
                                        BASTIAN & DINI
11
                                        /s/ *Robert L. Bastian, Jr.*
12                                      ROBERT L. BASTIAN, JR.,
                                        MARINA R. DINI
13                                      Attorneys for Plaintiff
                                        ERNST & HAAS
14                                      MANAGEMENT COMPANY

15                        **DEMAND FOR JURY TRIAL**

16

17       Plaintiff hereby demands a jury trial.

18
     DATED:      May 1, 2020            LAW OFFICES OF
19                                      BASTIAN & DINI

20                                      /s/ *Robert L. Bastian, Jr.*
                                        ROBERT L. BASTIAN, JR.,
21                                      MARINA R. DINI
                                        Attorneys for Plaintiff
22                                      ERNST & HAAS
                                        MANAGEMENT COMPANY
23

24

25

26

27

28

---

**COMPLAINT FOR DAMAGES**

The "Original"  insurance policy, entitled
C-Suite, Commercial Crime Insurance Policy,
Policy Number: UC21253080.12, 30 pages

**EXHIBIT 1**       Complaint page 17 of 119



# DECLARATIONS

# HISCOX

**Hiscox Insurance Company**

233 North Michigan Ave., Suite 1840 Chicago, Illinois 60601

**Policy Number: UC21253080.12**

| Broker No.: | US 0000215 | Broker Name: | RT Specialty, LLC (Irvine CA) |
|---|---|---|---|
| Policy No.: | UC21253080.12 | Broker Address: | 2603 Main Street Ste 800 |
| Renewal of: | New | | Irvine, California 92614 |

**Commercial Crime Insurance Policy**

| | |
|---|---|
| **Named Insured:** | Ernst & Haas Management Company Inc. |
| **Mailing Address:** | 4000 Long Beach Blvd<br>Long Beach, California 90807-2617 |
| **Policy Period:** | 01/18/2012 to 01/18/2013<br>12:01 A.M. at Your mailing address shown above |

| Insuring Agreements | Limit of Insurance (Per Occurrence) | Deductible Amount (Per Occurrence) |
|---|---|---|
| **Coverage A: Fidelity** | | |
| (1) Employee Theft | $ 250,000 | $ 5,000 |
| (2) ERISA (Limit Applies Per Plan) | Not Covered | N/A |
| (3) Clients' Property | $ 250,000 | $ 5,000 |
| (4) Vendor Theft | Not Covered | N/A |
| **Coverage B: Forgery or Alteration** | | |
| (1) Checks | $ 250,000 | $ 5,000 |
| (2) Credit, Debit or Charge Cards | $ 250,000 | $ 5,000 |
| (3) Personal Accounts | Not Covered | N/A |
| **Coverage C: Inside and Outside the Premises** | | |
| (1) Inside the Premises | $ 250,000 | $ 5,000 |
| (2) Outside the Premises | $ 250,000 | $ 5,000 |
| **Coverage D: Computer and Funds Transfer Fraud** | | |
| (1) Computer Fraud | $ 250,000 | $ 5,000 |
| (2) Funds Transfer Fraud | $ 250,000 | $ 5,000 |
| **Coverage E: Money Orders and Counterfeit Money** | $ 250,000 | $ 5,000 |
| **Coverage F: Telephone Toll Fraud** | Not Covered | N/A |
| **Coverage G: Identity Fraud Expense** | Not Covered | N/A |
| **Coverage H: Virus and Licensing Violations** | | |
| (1) Virus Restoration | Not Covered | N/A |
| (2) Licensing Violation Fines and Penalties | Not Covered | N/A |
| **Coverage I: Expense** | Not Covered | N/A |

Coverage is provided only if an amount is shown opposite an Insuring Agreement. If the amount is left blank or "Not Covered" is inserted, such Insuring Agreement and any other reference thereto in this policy is deleted.



# HISCOX

**DECLARATIONS**

Hiscox Insurance Company

233 North Michigan Ave., Suite 1840 Chicago, Illinois 60601

**Policy Number: UC21253080.12**

**Endorsements Forming Part Of This Policy When Issued:**

(1) E9703.1. California Amendatory Endorsement

**Cancellation Of Prior Insurance Issued By Us:**

By acceptance of this Policy you give us notice cancelling prior policy Nos.
N/A ; the cancellation to be effective at the time this Policy becomes effective.

**Total Premium:**     $ 1,580.00

**Notice of Claim to:**     **Hiscox**
**Attn: Crime & Fidelity Claims Dept.**
**520 Madison Avenue, 32nd Floor New York, NY 10022**
**Email - d&oclaims@hiscox.com**
**Fax - 212-922-9652**

IN WITNESS WHEREOF, the Insurer indicated above has caused this Policy to be signed by its President and Secretary, but this Policy shall not be effective unless also signed by our duly authorized representative.

President

Secretary

Authorized Representative

01/18/2012

Date

Hiscox Insurance Company Inc
357 Main Street
Armonk, New York 10504

---



## Crime Insurance
Policy Form

**Various provisions in this policy restrict coverage.  Read the entire policy carefully to determine rights, duties and what is or is not covered.  Those words (other than the words in the captions) which are printed in Boldface are defined in the Policy.**

In return for the payment of premium, subject to all the terms and conditions of this policy, and in reliance upon the statements made by **You** in the Application, which forms a part of this Policy, **We** agree with **You** to provide the insurance as stated in this policy:

**I. Insuring Agreements**

Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations and applies to loss that **You** sustain resulting directly from an **Occurrence** taking place at any time which is **Discovered** by **You** or an **Executive Employee** during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period To Discover Loss Condition:

**Coverage A:  Fidelity**

(1)  Employee Theft

**We** will pay for loss of or damage to **Money**, **Securities** and **Other Property** resulting directly from **Theft** and/or **Forgery** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

(2)  ERISA

**We** will pay, directly to an **Employee Benefit Plan**, for loss of or damage to **Money**, **Securities** and **Other Property** resulting directly from fraudulent or dishonest acts committed by a **Fiduciary** of any **Employee Benefit Plan**, whether identified or not, acting alone or in collusion with other persons.

The Limit of Insurance shown in the Declarations for Coverage A(2) ERISA shall apply to each and every **Employee Benefit Plan** sustaining such loss or damage. In the event of an **Occurrence** involving both Coverage A(1) Employee Theft and Coverage A(2) ERISA, the Limit of Insurance shown in the Declarations for Coverage A(2) shall be in addition to the Limit of Insurance shown for Coverage A(1) Employee Theft.

If the Limit of Insurance for Coverage A(2) ERISA no longer complies with the minimum amount of coverage required for such **Employee Benefit Plan(s)** under ERISA (unless the Limit of Insurance no longer complies due to investment in non-qualified assets), but which would have complied at the time the Policy was issued, **We** agree to increase the Coverage A(2) ERISA Limit of Insurance with regard to such **Employee Benefit Plan(s)** so as to equal the minimum amount of coverage required under ERISA.

The Deductible Amount does not apply to Coverage A(2) ERISA.

(3)  Clients' Property

**We** will pay for loss of or damage to **Money**, **Securities** and **Other Property** sustained

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



## Crime Insurance
Policy Form

by **Your Client** resulting directly from **Theft** and/or **Forgery** committed by an identified **Employee**, acting alone or in collusion with other persons, including an **Employee** in collusion with an **Employee** of **Your Client**.

(4)  Vendor Theft

**We** will pay for loss of or damage to **Money**, **Securities** and **Other Property** resulting directly from **Theft** committed by an identified **Employee** of **Your Vendor** (other than one with an ownership interest of greater than 25% in the **Vendor**) acting alone or in collusion with other persons.

This coverage shall only apply to the amount of loss **You** cannot recover under the contract with the **Vendor** and from any insurance or indemnity carried by, or for the benefit of the **Vendor** or customers of the **Vendor**.

The Limit of Insurance shown for Coverage A(4) Vendor Theft shall be part of, not in addition to, the Limit of Insurance shown for Coverage A(1) Employee Theft.

The following Condition applies to Coverage A and all subparts:

   (i)   All subparts of Coverage A terminate as to any **Employee** as soon as an **Executive Employee** not in collusion with the **Employee** learns of **Theft**, **Forgery** or any other dishonest act committed by the **Employee**:

      (1)   after becoming employed by You; or

      (2)   if such **Theft**, **Forgery** or dishonest act exceeded $10,000, before becoming employed by **You**.

**Coverage B:  Forgery or Alteration**

(1)  Checks

**We** will pay for loss resulting directly from **Forgery** or alteration of checks, drafts, promissory notes, convenience checks, HELOC checks, or similar written promises, orders or directions to pay a sum certain in **Money** that are:

      (i)   Made or drawn by or drawn upon **You**; or

      (ii)  Made or drawn by one acting as **Your** agent;

or that are purported to have been so made or drawn.

(2)  Credit, Debit or Charge Cards

**We** will pay for loss resulting directly from **Forgery** or alteration of written instruments required in conjunction with any credit, debit, convenience, stored-value or charge card issued to **You** or any **Employee** for business purposes as long as **You** or the **Employee** have complied fully with the provisions, conditions or other terms under which the credit, debit, convenience, stored-value or charge card was issued.

(3)  Personal Accounts

**We** will pay for loss resulting directly from **Forgery** or alteration of checks, drafts, promissory notes, convenience checks, HELOC checks, or similar written promises,

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



# Crime Insurance
## Policy Form

orders or directions to pay a sum certain in **Money** that are made or drawn by or drawn upon a personal account of an **Executive Employee** or that are purported to have been so made or drawn.

The following Conditions apply to Coverage B and all subparts:

(i) A substitute check as defined in the Check Clearing for the 21st Century Act shall be treated the same as the original it replaced;

(ii) **S**ignatures that are produced or reproduced electronically, mechanically or by other means shall be treated the same as handwritten signatures;

(iii) **You** must include with **Your** proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss;

(iv) If **You** are sued for refusing to pay any instrument covered above on the basis that it has been forged or altered, and **You** have **Our** written consent to defend against the suit, **We** will pay for any reasonable legal expenses that **You** incur and pay in that defence.  The amount that **We** will pay is in addition to the Limit of Insurance applicable to this Insuring Agreement.  The Deductible Amount does not apply to legal expenses paid under this paragraph.

**Coverage C:  Inside and Outside the Premises**

(1) Inside the Premises

(i) **We** will pay for loss of **Money** and **Securities** inside the **Premises** or **Banking Premises**:

(1) resulting directly from **Theft** committed by a person present inside such **Premises** or **Banking Premises**; or

(2) resulting directly from disappearance or destruction.

(ii) **We** will pay for loss of or damage to **Other Property**:

(1) inside the **Premises** resulting directly from an actual or attempted **Robbery** of a **Custodian**; or

(2) inside the **Premises** in a safe or vault resulting directly from an actual or attempted **Safe Burglary**.

(iii) **We** will pay for loss from damage to the **Premises** or its exterior resulting directly from an act covered by paragraph (i**)** or (ii) if **You** are the owner of the **Premises** or are liable for damage to it.

(iv) **We** will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the **Premises** resulting directly from an actual or attempted **Theft** of or unlawful entry into those containers.

(2) Outside the Premises

(i) **We** will pay for loss of **Money** and **Securities** outside the **Premises** in the

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



## Crime Insurance
Policy Form

care and custody of a **Messenger** or an armored motor vehicle company resulting directly from **Theft**, disappearance or destruction

(ii) **We** will pay for loss of or damage to **Other Property** outside the **Premises** in the care and custody of a **Messenger** or an armored motor vehicle company resulting directly from an actual or attempted **Robbery**.

The following Condition applies to Coverage C and all subparts:

**We** will only pay:

(i) for the amount of loss **You** cannot recover under **Your** contract with the armored motor vehicle company and from any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

(ii) up to $10,000 for any one **Occurrence** of loss or damage to:

(1) precious metals, precious or semi-precious stones, pearls, furs or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles.

(2) Manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

### Coverage D:  Computer and Funds Transfer Fraud

(1)  Computer Fraud

**We** will pay for loss of or damage to **Money**, **Securities** and/or **Other Property** resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the **Premises** or **Banking Premises**:

(i) to a person (other than a **Messenger**) outside those **Premises** or **Banking Premises**; or

(ii) to a place outside those **Premises** or **Banking Premises**.

**We** will only pay up to $10,000 for any one **Occurrence** of loss or damage to manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

(2)  Funds Transfer Fraud

**We** will pay for loss of **Money** and **Securities** resulting directly from a **Fraudulent Instruction** directing a financial institution to transfer, pay or deliver **Money** and **Securities** from **Your Transfer Account**.

### Coverage E:  Money Orders and Counterfeit Money

**We** will pay for loss resulting directly from **Your** having accepted in good faith, in exchange for merchandise, **Money** or services:

(i) money orders issued by any post office, express company or bank that are not paid upon presentation; or

(ii) **Counterfeit Money** that is acquired during the regular course of business.

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



## Crime Insurance
Policy Form

### Coverage F:  Telephone Toll Fraud

**We** will pay for loss from long distance telephone charges incurred by **You** resulting directly from fraudulent use or fraudulent manipulation of an **Account Code** or **System Password** required to gain access into **Your Voice Computer System**, provided such loss did not result from the failure to:

(i)   install and maintain in operating condition a call disconnect feature to terminate a caller's access after three unsuccessful attempts to enter an **Account Code**;

(ii)  incorporate a **System Password**; or

(iii) change a **System Password** every 60 days.

**We** will only pay for loss resulting from toll call charges made on telephone lines directly controlled by one **Voice Computer System** occurring for a period of not more than 30 days inclusive of the date on which the first such toll call charges were made.

### Coverage G:  Identity Fraud Expense

**We** will pay for **Identity Fraud Expenses** incurred by **You** or any **Executive Employee** resulting directly from **Identity Fraud**.

### Coverage H:  Virus and Licensing Violations

(1)  Virus Restoration

**We** will pay for costs that **You** incur to restore or replace damaged or destroyed **Electronic Data** or **Computer Programs** stored within **Your Computer System** resulting directly from:

(i)   a virus directed solely against **You** designed to damage or destroy **Electronic Data** or **Computer Programs** and introduced maliciously by a natural person; or

(ii)  vandalism by a person who has gained unauthorized access to **Your Computer System**;

including reasonable costs that **You** incur to restore **Your Computer System** to the level of operational capability that existed before the virus or vandalism occurred.

(2)  Licensing Violation Fines and Penalties

**We** will pay for fines and penalties that **You** incur resulting directly from the unauthorized reproduction of computer software by an **Employee**, in violation of a licensing agreement with a third party vendor, provided the unauthorized reproduction is done:

(i)   without **Your** or an **Executive Employee's** knowledge;

(ii)  without the knowledge of any other person having responsibility for compliance with the terms of the software licensing agreement;

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



## Crime Insurance
Policy Form

and **You** are legally liable for the loss.

**Coverage I:  Expense**

**We** will reimburse **You** for reasonable costs, fees or other expenses that **You** incur and pay to an independent accounting, auditing or other service (which is not a **Client**) used to determine the existence or amount of loss covered under this insurance with **Our** prior written consent.

Any expense payable to **You** is only applicable to a covered loss which exceeds the Deductible Amount subject to such covered loss.

Any expense payable to **You** is part of, not in addition to, the Limit of Insurance subject to such covered loss.

**II. Definitions**

A.  **Account Code** means a confidential and protected string of characters that identifies or authenticates a person and permits that person to gain access to **Your Voice Computer System** for the purpose of making long distance toll calls or utilizing voice mail box messaging capabilities or similar functional features of the system.

B.  **Banking Premises** means the interior of that portion of any building occupied by a financial institution or similar safe depository including a night depository chute, ATM machine owned by such financial institution (wherever located) or safe of such institution.

C.  **Client** means any entity to which **You** provide goods or services under a written agreement.

D.  **Computer Programs** means a set of related electronic instructions which direct the operations and functions of a computer or devices connected to it which enable the computer or devices to receive, process, store, retrieve or send **Electronic Data**.

E.  **Computer System** means:

(i)  computers and related peripheral components;

(ii)  systems and applications software;

(iii)  terminal devices; and

(iv)  related communications networks;

by which **Electronic Data** is received, processed, stored, retrieved or sent.

F.  **Counterfeit Money** means an imitation of **Money** that is intended to deceive and to be taken as genuine.

G.  **Custodian** means **You**, or any of **Your** partners or **Members**, or any **Employee** while having care and custody of property inside the **Premises**, excluding any person while acting as a **Watchperson** or janitor unless such person is also an **Employee**.

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



## Crime Insurance
Policy Form

H.  **Discover** or **Discovered** means the time when **You** or an **Executive Employee** first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this Policy has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

Discover or **Discovered** also means the time when **You** or an **Executive Employee** first receive notice of an actual or potential claim in which it is alleged that **You** are liable to a third party under circumstances which, if true, would constitute a loss under this Policy.

I.  **Electronic Data** means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, DVDs, Blu-ray Discs, flash drives, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment.

J.  **Employee** means any:

(i)   natural person:

(1)  while in **Your** service and for the first 60 days immediately after termination of service, unless such termination is due to **Theft**, **Forgery** or any other dishonest act committed by the **Employee**;

(2)  who **You** compensate directly by salary, wages or commissions; and

(3)  who **You** have the right to direct and control while performing services for **You**;

(ii)  temporary **Employee**;

(iii)  natural person who is leased to **You**;

(iv)  natural person who is a former **Employee**, partner, **Member**, **Manager**, director or trustee retained as a consultant while performing services for **You**;

(v)  natural person who is a guest student or intern;

(vi)  of **Your Managers**, directors or trustees while performing acts within the usual duties of an **Employee**;

(vii)  non-compensated officer;

(viii)  volunteer;

(ix)  committee member;

(x)  **Employee** on military, disability, family medical or similar leave; and

(xi)  **Fiduciary**, but only as respects Coverage A(2) ERISA;

**Employee** does not mean any agent (regardless of whether or not there is a written agreement as specified in the definition of **Vendor**), broker, factor, commission merchant, consignee, independent contractor or representative or

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



# Crime Insurance
## Policy Form

person of the same general character not specified above.

K. **Employee Benefit Plan** means any welfare or pension benefit plan that is sponsored by **You** whether or not such plan is subject to the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto.

L. **Executive Employee** means **Your** proprietor, natural person partner, member of the board of directors, member of the board of trustees, **Member**, **Manager**, officer and any **Employee** in a risk management, general counsel, insurance or human resources department or function.

   (i) Solely with respect to Coverage A(2) ERISA, **Executive Employee** shall also include a **Fiduciary**.

   (ii) Solely with respect to Coverage G Identity Fraud Expense, **Executive Employee** shall also include any spouse, child under the age of 18 or relative living in the household of any **Executive Employee**.

M. **Fiduciary** means any natural person who is a trustee, officer, **Employee**, administrator or manager, except an administrator or manager who is an independent contractor of any **Employee Benefit Plan**; and a director or trustee of **Yours** while that person is engaged in handling **Money**, **Securities** or **Other Property** of any **Employee Benefit Plan**.

N. **Forgery** means the signing of the name of another person or organization with the intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

O. **Fraudulent Instruction** means

   (i) an electronic, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by **You**, but which was in fact fraudulently transmitted by someone else without **Your** knowledge or consent;

   (ii) a written instruction (other than those described in Coverage B) issued by **You**, which was forged or altered by someone other than **You** without **Your** knowledge or consent, or which purports to have been issued by **You**, but was in fact fraudulently issued without **Your** knowledge or consent; or

   (iii) an electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by **You** which purports to have been transmitted by an **Employee** but which was in fact fraudulently transmitted by someone else without **Your** or the **Employee's** knowledge or consent.

P. **Identity Fraud** means the act of knowingly transferring or using, without lawful authority, a means of identification of **Your** business or any covered individual with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



## Crime Insurance
Policy Form

Q. **Identity Fraud Expenses** means:

(i)     advertising and public relations expenses incurred by **You** to restore **Your** business reputation as a result of an **Identity Fraud**;

(ii)    costs incurred by **You** or any covered individual for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies;

(iii)   costs incurred by **You** or any covered individual for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors;

(iv)    costs incurred by **You** or any covered individual for obtaining credit reports;

(v)     lost income incurred by **You** or any covered individual resulting from time taken off work to complete fraud affidavits, meet with or talk to law enforcement agencies, credit agencies and/or legal counsel, up to a maximum payment of $250 per day.  Total payment for lost income is not to exceed $10,000 or the Limit of Insurance shown in the Declarations, whichever is less;

(vi)    loan application fees, incurred by **You** or any covered individual for reapplying for a loan when the original application is rejected solely because the lender received incorrect credit information;

(vii)   reasonable attorney fees to:

(1)    defend lawsuits brought against **You** by merchants, vendors, suppliers, financial institutions or their collection agencies;

(2)    remove any criminal or civil judgements wrongly entered against **You**; and

(3)    challenge the accuracy or completeness of any information in a consumer credit report for **You**;

(viii)  charges incurred by **You** or any covered individual for long distance telephone calls to merchants, vendors, suppliers, customers, law enforcement agencies, financial institutions or similar credit grantors, or credit agencies to report or discuss an actual **Identity Fraud**; and any other reasonable expenses incurred by **You** or any covered individual with **Our** written consent.

R. **Manager** means a person serving in a directorial capacity for a limited liability company.

S. **Member** means an owner of a limited liability company represented by its membership interest, who also may serve as a **Manager**.

T. **Messenger** means **You**, or a relative of **Yours**, or any of **Your** partners or **Members**, or any **Employee** while having care and custody of property outside the **Premises**.

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



# Crime Insurance
Policy Form

U. **Money** means:

    (i)    currency, coins, and bank notes in current use anywhere in the world and having a face value;

    (ii)   bullion; and

    (iii)  traveller's checks, register checks and money orders held for sale to the public.

V. **Occurrence** means:

    (i)    Under Coverage A Fidelity and H(2) Fines and Penalties:

        (1)   an individual act;

        (2)   the combined total of all separate acts whether or not related; or

        (3)   a series of acts whether or not related;

        committed by an **Employee**, **Fiduciary** or **Vendor Employee** acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, before such Policy Period or both.

    (ii)   Under Coverage B Forgery or Alteration:

        (1)   an individual act;

        (2)   the combined total of all separate acts whether or not related; or

        (3)   a series of acts whether or not related;

        committed by a person acting alone or in collusion with other persons, involving one or more instruments, during the Policy Period shown in the Declarations, before such Policy Period or both.

    (iii)  Under Coverage H(1) Virus Restoration paragraph (i):  As respects a virus, all covered costs incurred by **You** between the time the damage or destruction is **Discovered** and the time **Your Computer System** is restored to the level of operational capability that existed before the virus occurred.  Recurrence of the same virus after **Your Computer System** has been restored shall constitute a separate occurrence.

    (iv)  Under all other coverages:

        (1)   an individual act or event;

        (2)   the combined total of all separate acts or events whether or not related; or

        (3)   a series of acts or events whether or not related;

        committed by a person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, before such Policy Period or both.

W. **Other Property** means any tangible property other than **Money** and **Securities**

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



## Crime Insurance
Policy Form

that has intrinsic value.  **Other Property** does not include **Computer Programs**, **Electronic Data** or any property specifically excluded under this Policy.

X.   **Premises** means the interior of that portion of any building **You** occupy in conducting **Your** business.

Y.   **Robbery** means the unlawful taking of property from the care and custody of a person by one who has:

   (i)   caused or threatened to cause that person bodily harm; or

   (ii)  committed an obviously unlawful act witnessed by that person.

Z.   **Safe Burglary** means the unlawful taking of:

   (i)   Property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

   (ii)  A safe or vault from inside the **Premises**.

AA. **Securities** means negotiable or nonnegotiable instruments or contracts representing either **Money** or property and includes:

   (i)   tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use;

   (ii)  casino chips issued by **You**; and

   (iii) evidences of debt issued in connection with credit or charge cards, which cards are not issued by **You**;

but does not include **Money**.

BB. **Subsidiary** means any corporation or limited liability company in which, on or prior to the effective date of this policy, **You** own or control directly, or through one or more **Subsidiaries**, more than fifty percent (50%) of the outstanding securities or voting rights representing the right to elect or appoint such entity's board of directors, board of trustees, board of managers or a functional equivalent.

CC. **System Administration** means the performance of any security function including, but not limited to:

   (i)   defining authorized persons to access the system;

   (ii)  adding, deleting or changing **Account Codes** or passwords;

   (iii) installing or deleting any system option which directs telephone call routing or adds, drops or moves telephone lines; or

   (iv) any other activity allowed by a hardware or software-based system option that has been incorporated by a manufacturer or a vendor into a **Voice Computer System** provided the system is not intended for the sole use of the manufacturer or vendor.

DD. **System Maintenance** means performing hardware and software installation,

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



## Crime Insurance
Policy Form

diagnostic and correction and similar activities that are performed in the usual custom and practice by a manufacturer or vendor to establish or maintain the basic operational functionality of a **Voice Computer System**.

EE. **System Password** means a confidential and protected string of characters that identifies or authenticates a person and permits that person to gain access to **Your Voice Computer System** to perform **System Administration** or **System Maintenance** or a component thereof.

FF. **Theft** means the unlawful taking of property to the deprivation of the Insured. Solely with respect to Coverage A(3) Clients' Property, **Theft** shall mean the unlawful taking of property to the deprivation of a **Client**.

GG.      **Transfer Account** means an account maintained by **You** at a financial institution from which **You** can initiate the transfer, payment or delivery of **Money** or **Securities**:

(i)   by means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly through an electronic funds transfer system; or

(ii)  by means or written instructions (other than those described in Coverage B) establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

HH. **Vendor** means an entity that provides a service to **You** under a written agreement which includes a requirement to provide Crime or Fidelity insurance covering **Your** property in the care, custody and control of the **Vendor** and/or its **Employees** for a limit equal to or greater than that shown in the Declarations of this Policy under Coverage A(1) Employee Theft.  If such agreement is not valid or collectable then this Policy will respond only to that portion of loss which would have been excess of such requirement.

However, **Vendor** does not include any financial institution, asset manager, broker, dealer or armored motor vehicle company.

II. **Voice Computer System** means a computer system installed in one location which functions as a private branch exchange (PBX), voice mail processor, automated call attendant or provides a similar capability used for the direction or routing of telephone calls in a voice communications network.

JJ. **Watchperson** means any person retained by **You** specifically to have care and custody of property inside the **Premises** and who has no other duties.  However, **Watchperson** does not include an **Employee**.

KK. **We**, **Us** or **Our** means the insurance company shown in the Declarations.

LL. **You** or **Your** means:

(i)   the Named Insured shown in the Declarations;

(ii)  any **Subsidiary** thereof; and

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



**Crime Insurance**
Policy Form

(iii)  solely with respect to Coverage A(2) ERISA, any **Employee Benefit Plan**.

**III. Exclusions**

This Policy does not cover:

A.  **Acts Committed by You, Your Partners or Your Members**

Loss resulting from **Theft** or any other dishonest act committed by:

(i)   **You**; or

(ii)  any of **Your** partners or **Members**;

whether acting alone or in collusion with other persons.

B.  **Acts of Employees Learned of by You Prior to the Policy Period**

Loss caused by an **Employee** if the **Employee** had also committed **Theft**, **Forgery** or any other dishonest act prior to the effective date of this Policy and **You** or an **Executive Employee** not in collusion with the **Employee**, learned of that **Theft, Forgery** or dishonest act prior to the Policy Period shown in the Declarations.

However, this provision shall not apply if the **Theft**, **Forgery** or other dishonest act occurred prior to the **Employee** becoming **Your Employee** and the amount of such act did not exceed $10,000.

C.  **Acts of Employees, Managers, Directors, Trustees or Representatives**

Loss resulting from **Theft**, **Forgery** or any other dishonest act committed by any of **Your Employees**, **Managers**, directors, trustees or authorized representatives:

(i)   whether acting alone or in collusion with other persons; or

(ii)  while performing services for **You** or otherwise;

except when covered under Coverage A Fidelity and H Virus and Licensing Violations.

D.  **Confidential Information**

Loss resulting from:

(i)   the unauthorized disclosure of **Your** confidential information including, but not limited to, patents, trade secrets, processing methods or customer lists; or

(ii)  the unauthorized use or disclosure of confidential information of another person or entity which is held by **You** including, but not limited to, financial information, personal information, credit card information or similar non-public information.

E.  **Governmental Action**

Loss resulting from seizure or destruction of property by order of governmental authority.

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



## Crime Insurance
Policy Form

F. **Indirect Loss**

Loss that is an indirect result of an **Occurrence** covered by this Policy including, but not limited to, loss resulting from:

(i)   **Your** inability to realize income that **You** would have realized had there been no loss of or damage to **Money**, **Securities** or **Other Property**.

(ii)  payment of damages of any type for which **You** are legally liable.  But, **We** will pay compensatory damages arising directly from a loss covered under this Policy.

(iii) payment of costs, fees or other expenses **You** incur in establishing the existence or the amount of loss under this Policy except when covered under Coverage I Expense.

G. **Legal Fees, Costs and Expenses**

Fees, costs and expenses incurred by **You** which are related to any legal action, except when covered under Coverage B Forgery or Alteration or Coverage G Identity Fraud Expense.

H. **Nuclear Hazard**

Loss or damage resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

I. **War or Military Action**

Loss or damage resulting from:

(i)   war, including undeclared or civil war;

(ii)  warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(iii) insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

Coverage A Fidelity does not cover:

J. **Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(i)   an inventory computation; or

(ii)  a profit and loss computation.

However, where **You** establish wholly apart from such computations that **You** have sustained a loss, then **You** may offer **Your** inventory records and actual physical count of inventory in support of the amount of loss claimed.

K. **Trading**

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



## Crime Insurance
### Policy Form

Loss resulting from trading, whether in **Your** name or in a genuine or fictitious account.  Provided, however, that this exclusion shall not apply to direct losses caused by **Theft** and/or **Forgery** which result in improper financial gain to an **Employee** (direct losses as used herein shall mean only the amount of improper financial gain to such **Employee**, which shall not include salary, commissions, fees or other compensation, including, but not limited to promotions and raises associated with employment, paid by **You** to such **Employee**).

Coverage C Inside and Outside the Premises does not cover:

L.  **Accounting or Arithmetical Errors or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

M.  **Exchanges or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

N.  **Fire**

Loss or damage resulting from fire, however caused, except:

(i)   Loss of or damage to **Money** and **Securities**; and

(ii)  Loss from damage to a safe or vault.

O.  **Kidnap, Ransom and Extortion**

Loss of **Money**, **Securities** or **Other Property** resulting directly or indirectly from kidnap, extortion or ransom payments surrendered to any person as a result of a threat, including, but not limited to a threat of bodily harm, property damage, denial of service, virus or other malicious instruction, product contamination and/or dissemination of confidential information.

P.  **Money Operated Devices**

Loss of property contained in any money operated device unless the amount of **Money** deposited in it is recorded by a continuous recording instrument in the device.

Q.  **Motor Vehicles or Equipment and Accessories**

Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

R.  **Vandalism**

Loss from damage to the **Premises** or its exterior, or to any safe, vault, cash register, cash box, cash drawer or **Other Property** by vandalism or malicious mischief.

S.  **Voluntary Parting of Title to or Possession of Property**

Loss resulting from **Your**, or anyone acting on **Your** express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



## Crime Insurance
### Policy Form

of any property.

Coverage D Computer and Funds Transfer Fraud does not cover:

T. **Credit Card Transactions**

Loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

U. **Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(i)   an inventory computation; or

(ii)   a profit and loss computation.

However, where **You** establish wholly apart from such computations that **You** have sustained a loss, then **You** may offer **Your** inventory records and actual physical count of inventory in support of the amount of loss claimed.

Coverage H Virus and Licensing Violations does not cover:

V. **Errors or Omissions**

Loss resulting from errors or omissions in the design, programming or processing of **Computer Programs** or **Electronic Data**.

W. **Fraudulent Preparation or Input**

Loss resulting from the fraudulent preparation or input of **Electronic Data** or **Computer Programs.**

**IV.  Limit of Insurance**

The most **We** will pay for all loss resulting directly from an **Occurrence** is the applicable Limit of Insurance shown in the Declarations.

If any loss is covered under more than one Coverage, the most **We** will pay for such loss shall not exceed the largest Limit of Insurance available under any one of those Coverages.  However, this provision does not apply to Coverage A(2) ERISA.

**V.  Deductible**

**We** will not pay for loss resulting directly from an **Occurrence** unless the amount of loss exceeds the Deductible Amount shown in the Declarations.  **We** will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance.

**VI.  Conditions**

Conditions applicable to all Coverages:

A. **Additional Premises or Employees**

If, while this Policy is in force, **You** establish any additional **Premises** or hire additional **Employees**, other than through consolidation or merger with, or

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



## Crime Insurance
Policy Form

purchase or acquisition of assets or liabilities of, another entity, such **Premises** and **Employees** shall automatically be covered under this Policy. Notice to **Us** of an increase in the number of **Premises** or **Employees** need not be given and no additional premium need be paid for the remainder of the Policy Period shown in the Declarations.

**B. Cancellation**

(i)   The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to **Us** advance written notice of cancellation.

(ii)   **We** may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(1)   15 days before the effective date of cancellation if **We** cancel for non-payment of premium; or

(2)   60 days before the effective date of cancellation if **We** cancel for any other reason.

(iii)   **We** will mail or deliver **Our** notice to the first Named Insured's last mailing address known to **Us**.

(iv)   Notice of cancellation will state the effective date of cancellation. The Policy Period will end on that date.

(v)   If this policy is cancelled, **We** will send the first Named Insured any premium refund due. If **We** cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if **We** have not made or offered a refund.

(vi)   If notice is mailed, proof of mailing will be sufficient proof of notice.

**C. Changes**

This Policy contains all the agreements between **You** and **Us** concerning the insurance afforded. The First Named Insured shown in the Declarations is authorized to make changes in the terms of this Policy with **Our** consent. This Policy's terms can be amended or waived only by endorsement issued by **Us** and made a part of this Policy.

**D. Concealment, Misrepresentation or Fraud**

This Policy is void in any case of fraud by **You** as it relates to this Policy at any time. It is also void if **You**, at any time, intentionally conceal or misrepresent a material fact concerning:

(i)   this Policy;

(ii)   the property covered under this Policy;

(iii)   **Your** interest in the property covered under this Policy; or

(iv)   a claim under this Policy.

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



# Crime Insurance
## Policy Form

E. **Consolidation – Merger or Acquisition**

(i) Except as provided in Paragraph (ii), if **You** consolidate or merge with, or purchase or acquire the assets or liabilities of, another entity:

    (1) **You** must give **Us** written notice as soon as possible and obtain **Our** written consent to extend the coverage provided by this Policy to such consolidated or merged entity or such purchased or acquired assets or liabilities. **We** may condition **Our** consent by requiring payment of an additional premium; but

    (2) For the first 90 days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, the coverage provided by this Policy shall apply to such consolidated or merged entity or such purchased or acquired assets or liabilities, provided that all **Occurrences** causing or contributing to a loss involving such consolidation, merger or purchase or acquisition of assets or liabilities, must take place after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities.

(ii) For entities **You** acquire in which **You** own greater than fifty percent (50%) of the voting stock or voting rights, coverage under this Policy shall automatically become effective on the date of such acquisition with no additional premium required, provided:

    (1) All **Occurrences** causing or contributing to a loss involving the acquired entity must take place after the effective date of such acquisition; and

    (2) The assets of the acquired entity do not exceed thirty five percent (35%) of **Your** total assets as reflected in **Your** most recent calendar quarter consolidated financial statements immediately preceding the effective date of the Policy.

F. **Cooperation**

**You** must cooperate with **Us** in all matters pertaining to this Policy as stated in its terms and conditions.

G. **Duties in the Event of Loss**

After **You** or an **Executive Employee Discovers** a loss or a situation that may result in loss of or damage to **Money**, **Securities** or **Other Property** that, in **Your** best estimate, exceeds 50% of the Deductible Amount shown in the Declarations, **You** must:

(i) notify **Us** as soon as practicable and in no event later than 90 days after **Discovery**. If **You** have reason to believe that any loss (except for loss covered under Coverage A Fidelity) involves a violation of law, **You** must also notify the local law enforcement authorities.

(ii) submit to examination under oath at **Our** request and give **Us** a signed statement of **Your** answers.

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



## Crime Insurance
Policy Form

    (iii) produce for **Our** examination all pertinent records.

    (iv) give **Us** a detailed, sworn proof of loss within 120 days.

    (v) cooperate with **Us** in the investigation and settlement of any claim.

    **You** must send **Us**, within 60 days after **Our** request, receipts, bills or other records that support any claim for **Identity Fraud Expenses** covered under Coverage G Identity Fraud Expense.

H. **Examination of Your Books and Records**

    **We** may examine and audit **Your** books and records as they relate to this Policy at any time during the Policy Period shown in the Declarations and up to 3 years afterward.

I. **Extended Period to Discover Loss**

    **We** will pay for loss **You** sustained prior to the effective date of cancellation of this Policy, which is **Discovered** by **You** or an **Executive Employee**:

    (i) No later than 60 days from the date of that cancellation.  However, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by **You**, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

    (ii) No later than 1 year from the date of that cancellation with regard to any **Employee Benefit Plans** under Coverage A(2) ERISA.

J. **Inspections and Surveys**

    (i) **We** have the right to:

        (1) Make inspections and surveys at any time;

        (2) Give **You** reports on the conditions **We** find; and

        (3) Recommend changes.

    (ii) **We** are not obligated to make any inspections, surveys, reports or recommendations and any such actions **We** do undertake relate only to insurability and the premiums to be charged.  **We** do not make safety inspections.  **We** do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public.  And **We** do not warrant that conditions:

        (1) Are safe or healthful; or

        (2) Comply with laws, regulations, codes or standards.

    (iii) This condition applies not only to **Us**, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

K. **Joint Insured**

    (i) The first Named Insured will act for itself and for every other Insured for all

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.

CRI P001 CW (06/10)



## Crime Insurance
Policy Form

purposes of this Policy.  If the first Named Insured ceases to be covered, then the largest **Subsidiary**, by asset size, will become the first Named Insured.

(ii) If any Insured, or partner, **Member** or officer of that Insured has knowledge of any information relevant to this Policy, that knowledge is considered knowledge of every Insured.

(iii) An **Employee** of any Insured is considered an **Employee** of every Insured.

(iv) If this Policy or any of its coverages is cancelled as to any Insured, loss sustained by that Insured is covered only if it is **Discovered** by **You** or an **Executive Employee**:

    (1) No later than 60 days from the date of that cancellation.  However, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by that Insured, whether from **Us** or another insurer, replacing in whole or in part the coverage afforded under this Policy, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

    (2) No later than 1 year from the date of that cancellation with regard to any **Employee Benefit Plan(s)** covered under Coverage A(2) ERISA.

(v) **We** will not pay more for loss sustained by more than one Insured than the amount **We** would pay if all such loss had been sustained by one Insured except as provided in Coverage A(2) ERISA.

(vi) Payment by **Us** to the first Named Insured for loss sustained by any Insured, other than an **Employee Benefit Plan**, shall fully release **Us** on account of such loss.  Payment by **Us** to any **Employee Benefit Plan(s)** for loss sustained by any **Employee Benefit Plan(s)**, shall fully release **Us** on account of such loss.

L. **Legal Action Against Us**

**You** may not bring any legal action against **Us** involving loss:

(i) unless **You** have complied with all the terms of this Policy;

(ii) until 90 days after **You** have filed proof of loss with **Us**; and

(iii) unless brought within 2 years from the date **You** or an **Executive Employee Discovered** the loss.

If any limitation in this Condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

M. **Liberalization**

If **We** adopt any revision that would broaden the coverage under this Policy without additional premium within 45 days prior to or during the Policy Period shown in the Declarations, the broadened coverage will immediately apply to this Policy.

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



# Crime Insurance
## Policy Form

N. **Other Insurance**

If other valid and collectible insurance is available to **You** for loss covered under this policy, **We** will only pay for the amount of loss that exceeds the Limit of Insurance and Deductible Amount of that other insurance, whether **You** can collect on it or not.  **Our** payment for loss is subject to the terms and conditions of this Policy.

However, if loss covered under this policy is subject to a Deductible, **We** will reduce the Deductible Amount shown in the Declarations by the sum total of all such other insurance plus any Deductible Amount applicable to that other insurance.

O. **Ownership of Property; Interests Covered**

With respect to Coverage A(1) Employee Theft and A(4) Vendor Theft, the property covered under this Policy is limited to property that **You** own or lease;

With respect to Coverage A(3) Clients' Property, the property covered under this Policy is limited to property:

(i)   that **Your Client** owns or leases; or

(ii)  that **Your Client** holds for others whether or not **Your Client** is legally liable for the loss of such property.

With respect to all other coverages, the property covered under this Policy is limited to property:

(i)   that **You** own or lease; or

(ii)  that **You** hold for others whether or not **You** are legally liable for the loss of such property.

However, this Policy is for **Your** benefit only.  It provides no rights or benefits to any other person or organization.  Any claim for loss that is covered under this Policy must be presented by **You**.

P. **Policy Bridge – Discovery Replacing Loss Sustained**

If this Policy replaces insurance that provided **You** with an extended period of time after cancellation in which to discover loss and which did not terminate at the time this Policy became effective:

(i)   **We** will not pay for any loss that occurred during the Policy Period of that prior insurance which is **Discovered** by **You** or an **Executive Employee** during the extended period to **Discover** loss, unless the amount of loss exceeds the Limit of Insurance and Deductible Amount of that prior insurance.  In that case, **We** will pay for the excess loss subject to the terms and conditions of this Policy.

(ii)  However, any payment **We** make for the excess loss will not be greater than the difference between the Limit of Insurance and Deductible Amount of that prior insurance and the Limit of Insurance shown in the Declarations.  **We** will

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



## Crime Insurance
Policy Form

not apply the Deductible Amount shown in the Declarations to this excess loss.

**Q. Premiums**

The first Named Insured shown in the Declarations:

(i)   is responsible for the payment of all premiums; and

(ii)  will be the payee for any return premiums **We** pay.

**R. Records**

**You** must keep records of all property covered under this Policy so that **We** can verify the amount of any loss.

**S. Recoveries**

(i)   Any recoveries, whether effected before or after any payment under this Policy, whether made by **Us** or **You**, shall be applied net of the expense of such recovery:

   (1)  First, to **You** in satisfaction of **Your** covered loss in excess of the amount paid under this Policy;

   (2)  Second, to **Us** in satisfaction of amounts paid in settlement of **Your** claim;

   (3)  Third, to **You** in satisfaction of any Deductible Amount; and

   (4)  Fourth, to **You** in satisfaction of any loss not covered under this Policy.

(ii)  Recoveries do not include any recovery:

   (1)  From insurance, suretyship, reinsurance, security or indemnity taken for **Our** benefit; or

   (2)  Of original **Securities** after duplicates of them have been issued.

**T. Territory**

Where legally permissible, this Policy covers loss that **You** sustain resulting directly from an **Occurrence** taking place anywhere in the world.

**U. Transfer of Your Rights and Duties Under This Policy**

**Your** rights and duties under this Policy may not be transferred without **Our** written consent except in the case of death of an individual Named Insured.

If **You** die, **Your** rights and duties will be transferred to **Your** legal representative but only while acting within the scope of duties as **Your** legal representative. Until **Your** legal representative is appointed, anyone having proper temporary custody of **Your** property will have **Your** rights and duties but only with respect to that property.

**V. Transfer of Your Rights of Recovery Against Others to Us**

**You** must transfer to **Us** all **Your** rights of recovery against any person or

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



# Crime Insurance
Policy Form

organization for any loss **You** sustain and for which **We** have paid or settled. **You** must also do everything necessary to secure those rights and do nothing after loss to impair them.

W. **Valuation – Settlement**

(i) The value of any loss for purposes of coverage under this Policy shall be determined as follows:

(1) Loss of **Money** but only up to and including its face value. **We** will, at **Your** option, pay for loss of **Money** issued by any country other than the United States of America:

(i) At face value in the **Money** issued by that country; or

(ii) In the United States of America dollar equivalent determined by the rate of exchange published in The Wall Street Journal on the day the loss was **Discovered**.

(2) Loss of **Securities** but only up to and including their face value at the close of business on the day the loss was **Discovered**. At **Our** option, **We** may:

(i) Pay the market value of such **Securities** or replace them in kind, in which event **You** must assign to **Us** all **Your** rights, title and interest in and to those **Securities**; or

(ii) Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**. However, **We** will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

a. market value of the **Securities** at the close of business on the day the loss was **Discovered**; or

b. the Limit of Insurance applicable to the **Securities**.

(3) Loss of or damage to **Other Property** or loss from damage to the **Premises** or its exterior for the replacement cost of the property without deduction for depreciation. However, **We** will not pay more than the least of the following:

(i) The cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose;

(ii) The amount **You** actually spend that is necessary to repair or replace the lost or damaged property; or

(iii) The Limit of Insurance applicable to the lost or damaged property.

With regard to paragraph (i) through (iii) above, **We** will not pay on a replacement cost basis for any loss or damage:

a. Until the lost or damaged property is actually repaired or

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.



## Crime Insurance
Policy Form

replaced; and

b.  Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, **We** will pay on an actual cash value basis.

(ii) **We** will, at **Our** option, settle loss or damage to property other than **Money**:

(1)  In the **Money** of the country in which the loss or damage occurred; or

(2)  In the United States of America dollar equivalent of the **Money** of the country in which the loss or damage occurred determined by the rate of exchange published in The Wall Street Journal on the day the loss was **Discovered**.

(iii) Any property that **We** pay for or replaces becomes **Our** property.

Includes copyrighted material of Insurance Services Offices, Inc., with its permission.

**Hiscox Insurance Company Inc**



<u>**Endorsement 1**</u>

NAMED INSURED: Ernst & Haas Management Company Inc.

<u>**E9703.1 California Amendatory Endorsement**</u>                              Page 1 of 2

In consideration of the premium charged, it is understood and agreed that the policy is modified as follows:

1.  In the **CONDITIONS** Clause, paragraph (ii) and (iii) of B. **Cancellation** are replaced by the following:

    (ii)  **All Policies In Effect For 60 Days Or Less**
          If this policy has been effect for 60 days or less, and is not a renewal of a policy **We** have previously issued, **We** may cancel this policy by mailing or delivering to the first Named Insured at the mailing address shown in the policy and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:
          a.  10 days before the effective date of cancellation if **We** cancel for:
              (1)  Nonpayment of premium; or
              (2)  Discovery of fraud by:
                   (i)   Any insured or his or her representative in obtaining this policy; or
                   (ii)  **You** or **Your** representative in pursuing a claim under this policy.
          b.  30 days before the effective date of cancellation if **We** cancel for any other reason.
    (iii) **All Policies In Effect For More Than 60 Days**
          a.  If this policy has been in effect for more than 60 days, or is a renewal of a policy **We** issued, **We** may cancel this policy only upon the occurrence, after the effective date of the policy, of one or more of the following:
              (1)  Nonpayment of premium, including payment due on a prior policy **We** issued and due during the current policy term covering the same risks.
              (2)  Discovery of fraud or material misrepresentation by:
                   (i)   Any insured or his or her representative in obtaining this policy; or
                   (ii)  **You** or **Your** representative in pursuing a claim under this policy.
              (3)  A judgment by a court or an administrative tribunal that **You** have violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.
              (4)  Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by **You** or **Your** representative, which materially increase any of the risks insured against.
              (5)  Failure by **You** or **Your** representative to implement reasonable loss control requirements, agreed to by **You** as a condition of policy issuance, or which were conditions precedent to **Our** use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.
              (6)  A determination by the Commissioner of Insurance that the:
                   (i)   Loss of, or changes in, **Our** reinsurance covering all or part of the risk would threaten **Our** financial integrity or solvency; or
                   (ii)  Continuation of the policy coverage would:
                         1.  Place **Us** in violation of California law or the laws of the state where **We** are domiciled; or
                         2.  Threaten **Our** solvency.
              (7)  A change by **You** or **Your** representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

**Hiscox Insurance Company Inc**



**Endorsement 1**

NAMED INSURED: Ernst & Haas Management Company Inc.

**E9703.1 California Amendatory Endorsement**                                    Page 2 of 2

    b.  **We** will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, at least:

        (1)  10 days before the effective date of cancellation if **We** cancel for nonpayment of premium or discovery of fraud; or

        (2)  30 days before the effective date of cancellation if **We** cancel for any other reason listed in Paragraph (iii)a.

2.  In the **CONDITIONS** Clause, the following is added to B. **Cancellation** and supersedes any other provision to the contrary:

    (vii) **Nonrenewal**

        a.  Subject to the provisions of Paragraph b., if **We** elect not to renew this policy, **We** will mail or deliver written notice stating the reason for nonrenewal to the first Named Insured shown in the Declarations and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.
            **We** will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the policy.

        b.  **We** are not required to send notice of nonrenewal in the following situations:

            (1)  If the transfer or renewal of a policy, without any changes in terms, conditions, or rates, is between **Us** and a member of **Our** insurance group.

            (2)  If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph a.

            (3)  If **You** have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

            (4)  If the policy is for a period of no more than 60 days and **You** are notified at the time of issuance that it will not be renewed.

            (5)  If the first Named Insured requests a change in the terms and conditions or risks covered by the policy within 60 days of the end of the policy period.

            (6)  If **We** have made a written offer to the first Named Insured, in accordance with the time frames shown in Paragraph a., to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

3.  In the **CONDITIONS** Clause, the following is added to paragraph W. **Valuation - Settlement**:

    Actual cash value is calculated as the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence.  Actual cash value applies to valuation of covered property regardless of whether that property has sustained partial or total loss or damage.
    The actual cash value of the lost or damaged property may be significantly less than its replacement cost.

All other terms and conditions remain unchanged.

CRI E9703 CA (06/10)    Includes copyrighted material of Insurance Services Offices, Inc., with its permission.

**Hiscox Insurance Company Inc**



Endorsement effective: 01/18/2012        Policy No.:        UC21253080.12
Endorsement No:            1                    Processed Date: 01/18/2012

By : Ed Donnelly
(Appointed Representative)



# ECONOMIC AND TRADE SANCTIONS POLICYHOLDER NOTICE

Hiscox is committed to complying with the U.S. Department of Treasury Office of Foreign Assets Control (OFAC) requirements. OFAC administers and enforces economic sanctions policy based on Presidential declarations of national emergency. OFAC has identified and listed numerous foreign agents, front organizations, terrorists, and narcotics traffickers as Specially Designated Nationals (SDN's) and Blocked Persons. OFAC has also identified Sanctioned Countries. A list of Specially Designated Nationals, Blocked Persons and Sanctioned Countries may be found on the United States Treasury's web site http://www.treas.gov/offices/enforcement/ofac/.

Economic sanctions prohibit all United States citizens (including corporations and other entities) and permanent resident aliens from engaging in transactions with Specially Designated Nationals, Blocked Persons and Sanctioned Countries. Hiscox may not accept premium from or issue a policy to insure property of or make a claim payment to a Specially Designated National or Blocked Person. Hiscox may not engage in business transactions with a Sanctioned Country.

A Specially Designated National or Blocked Person is any person who is determined as such by the Secretary of Treasury.

A Sanctioned Country is any country that is the subject of trade or economic embargoes imposed by the laws or regulations of the United States.

In accordance with laws and regulations of the United States concerning economic and trade embargoes, this policy may be rendered void from its inception with respect to any term or condition of this policy that violates any laws or regulations of the United States concerning economic and trade embargoes including, but not limited to the following:

(1) Any insured under this Policy, or any person or entity claiming the benefits of such insured, who is or becomes a Specially Designated National or Blocked Person or who is otherwise subject to US economic trade sanctions;

(2) Any claim or suit that is brought in a Sanctioned Country or by a Sanctioned Country government, where any action in connection with such claim or suit is prohibited by US economic or trade sanctions;

(3) Any claim or suit that is brought by any Specially Designated National or Blocked Person or any person or entity who is otherwise subject to US economic or trade sanctions;

(4) Property that is located in a Sanctioned Country or that is owned by, rented to or in the care, custody or control of a Sanctioned Country government, where any activities related to such property are prohibited by US economic or trade sanctions; or

(5) Property that is owned by, rented to or in the care, custody or control of a Specially Designated National or Blocked Person, or any person or entity who is otherwise subject to US economic or trade sanctions.

Please read your Policy carefully and discuss with your broker/agent or insurance professional. You may also visit the US Treasury's website at http://www.treas.gov/offices/enforcement/ofac/.

The Renewed insurance policy, C21253080.19.
Policy Period 01/18/2019 to 01/18/2020.

**EXHIBIT 2**   Complaint page 48 of 119



# CSG Insurance Services, Inc.
*License #0F09638*

1026 W; El Norte Pkwy. #136
Escondido, CA 92026
Phone 760-746-0693
Fax 760-746-0694
csgins@sbcglobal.net

January 11, 2019

Ernst & Haas Property Management
4000 Long Beach Blvd.
Long Beach, CA 90807
Attn: David Haas

**RE: Ernst & Haas Property Management - Crime Insurance Policy**

Dear David,

Thank you for considering our agency for your insurance needs.  We are pleased to enclose the Crime Insurance Policy for Ernst & Haas Property Management.

Hiscox Insurance Company (Admitted A+XI) has issuing this policy for the annual term from January 18, 2019 through January 18, 2020.

The annual premium for this policy is $1,702.00. Attached you will find our Invoice #9301, which is due by January 31, 2019.

**<u>LIMITS:</u>  $250,000 (Employee Theft, Clients Property, Computer Fund and Transfer Fraud) - $5,000 Deductible**

Please review the attached policy for limits of liability, coverages and endorsements afforded by this coverage.

After your review of the preceding and/or the attached should you have any questions or wish a more in-depth review, please contact our office. Once again, thank you for considering our agency for your insurance needs.

Sincerely,

Craig Camenson

Enclosures



**Independent Insurance Agent**

*INVOICE*

**CSG INSURANCE SERVICES, INC.**
**1026 W. El Norte Pkwy. #136**
**Escondido, CA   92026**
Phone (760) 746-0693   Fax (760) 746-0694

License #0F09638

TO:

**Ernst & Haas Property Management**

**4000 Long Beach Blvd.**

**Long Beach, CA 90807**

**INVOICE DATE:**   January 11, 2019

**INVOICE NO.:**   9301

| PROJECT/PROPERTY | AMOUNT NOW DUE | PAYMENT TERMS | DUE DATE |
|---|---|---|---|
| Ernst & Haas Property Management | $1,702.00 | Full | 1/31/2019 |

| DESCRIPTION | POLICY NUMBER | INSURANCE COMPANY | EFFECTIVE DATES | PREMIUM |
|---|---|---|---|---|
| Crime Insurance Policy | UC21253080.19 | Hiscox Ins. Co. | 1/18/19-1/18/20 | $1,702.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | Subtotal | $1,702.00 |
| | | | Taxes & Fees | |
| | | Amount Now Due | | $1,702.00 |

Make all checks payable to CSG Insurance Services, Inc.
Thank you for your business!

 **Commercial Crime Insurance Policy**

---

## A modern insurance solution for fraud risks faced by businesses.

Please read this wording, together with any endorsements and the declarations, very carefully. If anything is not correct, please notify **us** immediately. The policy describes **your** and **our** rights and duties.

---

## Our promise to you

In return for the premium **you** have paid, we agree to insure **you** in accordance with the terms and conditions of the policy.

---

## Your policy documents

**Declarations Page**
This contains a summary of policy information including the limits of liability and **retention** amounts **you** have selected.

**General Terms and Conditions**
This contains terms and conditions which apply to the policy in its entirety.

**Coverage Parts**
These contain terms and conditions which apply only to the coverage part in which they appear.

**Endorsements**
These modify the declarations page, general terms and conditions, and/or coverage parts.

**Notices**
These provide information that may affect **your** coverage as required by **your** state.

---

## Reporting a claim

Please inform **us** immediately if **you** have a **claim** or loss to report. Additional details on **claim** reporting provisions can be found on the declarations page and/or coverage parts.

Email: C-SuiteClaims@Hiscox.com

---

Hiscox Inc.
520 Madison Avenue 32nd Floor
New York, NY 10022
Administered by Hiscox Inc. d/b/a Hiscox Insurance
Agency in CA License No. 0F09668

T (646) 452-2353
F (212) 922-9652
E hiscox.usa@hiscox.com
www.hiscoxbroker.com

Page 1 of 1

CR1COVADREN5



# HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue Suite 600 Chicago, IL 60603

(646) 452-2353

## Commercial Crime Insurance Policy

## DECLARATIONS

| | | |
|---|---|---|
| **Broker no.:** | US 0000215 | RT Specialty, LLC (Irvine CA) |
| **Policy no.:** | UC21253080.19 | 2601 Main Street Ste 450 |
| **Renewal of:** | UC21253080.18 | Irvine, CA 92614 |

**1. Named insured:** Ernst & Haas Management Company Inc.
   **Address:** 4120 Atlantic Ave
   Long Beach, CA 90807-2910

**2. Policy period:** **Inception date: 01/18/2019**     **Expiration date: 01/18/2020**
   Inception date shown shall be at 12:01 A.M. (Standard Time) to expiration date shown above at 12:01 A.M. (Standard Time) at the address of the named insured.

**3. General terms and conditions wording:** CSU P0001A CW (07-17)
   The General Terms and Conditions applies to this policy in conjunction with the specific wording detailed in each section below.

**4. Endorsements:** E2507.1 – Nuclear Incident Exclusion Clause - Liability-Direct (Broad) Endorsement
   E2624.1 – War and Civil War Exclusion Endorsement
   E1075.1 – California Amendatory Endorsement

**5. Notification of claims to:** Hiscox Claims
   520 Madison Avenue, 32nd floor
   New York, NY 10022
   Fax: 212-922-9652
   Email: C-SuiteClaims@Hiscox.com

**6. Total premium:** $ 1,702
   **State surcharge:** N/A

# HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue Suite 600 Chicago, IL 60603
(646) 452-2353



## Commercial Crime Insurance Policy
## DECLARATIONS

### Crime Coverage Part: CSUCRI P0001A CW (07-17)

| | Limit | Deductible |
|---|---|---|
| **Insuring Agreement A: Fidelity** | | |
| (1) Employee Theft | $ 250,000 Per Occurrence | $ 5,000 Per Occurrence |
| (2) Third Parties' Property | $ 250,000 Per Occurrence | $ 5,000 Per Occurrence |
| (3) Vendor Theft | Not Covered | N/A |
| (4) Executives' Property | Not Covered | N/A |
| (5) ERISA (Limit Applies Per Plan) | Not Covered | N/A |
| | | |
| **Insuring Agreement B: Forgery** | | |
| (1) Checks | $ 250,000 Per Occurrence | $ 5,000 Per Occurrence |
| (2) Payment Cards | $ 250,000 Per Occurrence | $ 5,000 Per Occurrence |
| (3) Executives' Accounts | Not Covered | N/A |
| (4) Counterfeit | $ 250,000 Per Occurrence | $ 5,000 Per Occurrence |
| | | |
| **Insuring Agreement C: Inside and Outside Loss** | | |
| (1) Inside Premises | $ 250,000 Per Occurrence | $ 5,000 Per Occurrence |
| (2) Outside Transit | $ 250,000 Per Occurrence | $ 5,000 Per Occurrence |
| (3) Extortion | Not Covered | N/A |
| | | |
| **Insuring Agreement D: Tech Fraud** | | |
| (1) Computer | $ 250,000 Per Occurrence | $ 5,000 Per Occurrence |
| (2) Funds Transfer | $ 250,000 Per Occurrence | $ 5,000 Per Occurrence |
| (3) Cyber Deception | Not Covered | N/A |
| (4) Customers' Accounts | Not Covered | N/A |
| (5) Erroneous Transfer | Not Covered | N/A |
| (6) Telephone Toll | Not Covered | N/A |
| (7) Virus Restoration | Not Covered | N/A |
| (8) Licensing Violation | Not Covered | N/A |
| | | |
| Claim Expenses | Not Covered | |
| | | |
| Identity Fraud Expenses | Not Covered | N/A |
| | | |
| Crime Premium: | $ 1,702 | |

IN WITNESS WHEREOF, the Insurer indicated above has caused this Policy to be signed by its President and Secretary, but this Policy shall not be effective unless also signed by the Insurer's duly authorized representative.

# HISCOX INSURANCE COMPANY INC. (A Stock Company)

HISCOX C-Suite®

104 South Michigan Avenue Suite 600 Chicago, IL 60603
(646) 452-2353

## Commercial Crime Insurance Policy

## DECLARATIONS

President

Secretary

Authorized Representative
Kevin Kerridge
December 19, 2018
Hiscox Inc.

CR1DECADREN54



**HISCOX C-Suite®**    520 Madison Avenue 32nd Floor, New York, NY 10022
(646) 452-2353

---

### Endorsement 1

NAMED INSURED: Ernst & Haas Management Company Inc.

**E2507.1 Nuclear Incident Exclusion Clause – Liability-Direct (Broad) Endorsement**

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed:

**We** will have no obligation to pay any sums under this policy, including any **claim expenses** or any other **loss**, for any **claim**, **occurrence**, **breach**, **event**, or **coverage enhancement**:

A.  Under any liability coverage, for injury, sickness, disease, death, or destruction:
   1.  for which **you** are also insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for exhaustion of its limit of liability; or
   2.  resulting from the **hazardous properties** of **nuclear material** and with respect to which:
      a.  any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, as amended; or
      b.  **you** are, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.
B.  Under any Medical Payments coverage, or under any Supplementary Payments provision relating to immediate medical or surgical relief, for expenses incurred with respect to bodily injury, sickness, disease, or death resulting from the **hazardous properties** of **nuclear material** and arising out of the operation of a **nuclear facility** by any person or organization.
C.  Under any liability coverage, for injury, sickness, disease, death, or destruction resulting from the **hazardous properties** of **nuclear material**, if:
   1.  the **nuclear material** is at any **nuclear facility** owned or operated by **you** or on **your** behalf, or has been discharged or dispersed from such a facility;
   2.  the **nuclear material** is contained in spent fuel or **waste** which is or was at any time possessed, handled, used, processed, stored, transported, or disposed of by **you** or on **your** behalf; or
   3.  the injury, sickness, disease, death, or destruction arises out of the furnishing by **you** of services, materials, parts, or equipment in connection with the planning, construction, maintenance, operation, or use of any **nuclear facility**, but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion (3) applies only to injury to or destruction of property at such **nuclear facility**.
D.  Under a Crime coverage, any loss, damage, or injury resulting from nuclear reaction or radiation, however caused.

As used in this endorsement:

**Hazardous properties** includes radioactive, toxic, or explosive properties;

**Nuclear material** means **source material**, **special nuclear material**, or **byproduct material**;

**Nuclear reactor** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

**Source material**, **special nuclear material**, **nuclear reactor**, and **byproduct material** have the meanings given them in the Atomic Energy Act of 1954, as amended;

**Spent fuel** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **nuclear reactor**;

 **HISCOX C-Suite®**   520 Madison Avenue 32nd Floor, New York, NY 10022
(646) 452-2353

---

### Endorsement 1

NAMED INSURED: Ernst & Haas Management Company Inc.

**Waste** means any waste material:

1. containing **byproduct material**; and

2. resulting from the operation by any person or organization of any **nuclear facility** included in paragraph 1 or 2 of the definition of **nuclear facility**;

**Nuclear facility** means:

1. any any **nuclear reactor**;

2. any any equipment or device designed or used for:

   a. separating the isotopes of uranium or plutonium;

   b. processing or utilizing spent fuel; or

   c. handling, processing, or packaging **waste**;

3. any equipment or device used for the processing, fabricating, or alloying of **special nuclear material**, if at any time the total amount of such material in **your** custody at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or

4. any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of **waste**.

**Nuclear facility** includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations;

With respect to injury to or destruction of property, "injury" or "destruction" includes all forms of radioactive contamination of property.

## All other terms and conditions remain unchanged.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/18/2019 | Certificate No.: | UC21253080.19 |
| Endorsement No: | 1 | Processed Date: | 12/17/2018 |
| Hiscox Inc. | | | |

**Authorized Representative**
Kevin Kerridge



HISCOX C-Suite®    520 Madison Avenue 32nd Floor, New York, NY 10022
(646) 452-2353

---

**Endorsement 2**

NAMED INSURED: Ernst & Haas Management Company Inc.

**E2624.1 War and Civil War Exclusion Endorsement**

[ ] **Declarations**
[X] **General Terms and Conditions**
[ ] **D&O Coverage Part**
[ ] **Public Officials Liability Coverage Part**
[ ] **Educators Legal Liability Coverage Part**
[ ] **EPL Coverage Part**
[ ] **Fiduciary Coverage Part**
[ ] **Employed Lawyers Coverage Part**

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the Coverage Part(s) selected above is amended as follows:

This policy does not apply to and **we** will have no obligation pay any sums under this policy, including any **damages, claim expenses,** or other **loss,** for any **claim, breach, event,** or **occurrence** directly or indirectly occasioned by, happening through, or in consequence of:

1.  war, invasion, acts of foreign enemies, hostilities (whether war is declared or not), civil war, rebellion, revolution, insurrection, military, or usurped power; or

2.  confiscation, nationalization, requisition, destruction of, or damage to property by or under the order of any government, public, or local authority.

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/18/2019 | Certificate No.: | UC21253080.19 |
| Endorsement No: | 2 | Processed Date: | 12/17/2018 |
| Hiscox Inc. | | | |

Authorized Representative
Kevin Kerridge



**HISCOX C-Suite®**   520 Madison Avenue 32nd Floor, New York, NY 10022
(646) 452-2353

<u>**Endorsement 3**</u>

NAMED INSURED: Ernst & Haas Management Company Inc.

<u>**E1075.1 California Amendatory Endorsement**</u>

In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the Crime Coverage Part is amended as follows:

I.  In Section IV. Limits of liability and settlement, the following is added to the end of F. Valuation:

    AC-A   Actual cash value

        Actual cash value is calculated as the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence. Actual cash value applies to valuation of covered property regardless of whether that property has sustained partial or total loss or damage.

        The actual cash value of the lost or damaged property may be significantly less than its replacement cost.

II.  In Section VIII. Other provisions affecting coverage, A. Cancellation, part 2 is deleted in its entirety and replaced with the following:

    2.   This Coverage Part may be cancelled by the by **us** by mailing to the **named insured** by registered, certified or other first class mail (or by email where allowed by applicable law), at the **named insured's** address (or email address) stated in Item 1 of the Declarations and to the agent or broker of record, written notice which must include the reason for cancellation and the date the cancellation will be effective.

        If this Coverage Part has been in effect for 60 days or less, the effective date of the cancellation will be no less than:

        a.   60 days after the date of the notice of cancellation; or

        b.   15 days after the date of the notice of cancellation if the cancellation is due to:

            i.   Non-payment of premium; or

            ii.   Discovery of fraud by:

                (a)   The **insured** or the **insured's** representative in obtaining this insurance; or

                (b)   The **insured** or the **insured's** representative in pursuing a **claim** under this Coverage Part.

        If this Coverage Part has been in effect for more than 60 days, **we** may cancel this Coverage Part for one or more of the following reasons:

        a.   Non-payment of premium, including payment due on a prior policy issued by **us** and due during the current **policy period** covering the same risks;

        b.   Discovery of fraud or material misrepresentation by:

            i.   The **insured** or the **insured's** representative in obtaining this insurance; or

            ii.   The **insured** or the **insured's** representative in pursuing a **claim** under this Coverage Part.

        c.   A judgment by a court or an administrative tribunal that the **insured** has violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against;

        d.   Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by the **insured** or the **insured's** representative, which materially increase any of the risks insured against;



**HISCOX C-Suite**  520 Madison Avenue 32nd Floor, New York, NY 10022
(646) 452-2353

---

### Endorsement 3

NAMED INSURED: Ernst & Haas Management Company Inc.

e.   Failure by the **Insured** or the **Insured's** representative to implement reasonable loss control requirements, agreed to by the **Insured** as a condition of policy issuance, or which were conditions precedent to **our** use of a particular rate or rating plan, if that failure materially increases any of the risks insured against;

f.   A determination by the Commissioner of Insurance that the:

   i.   Loss of, or changes in, **our** reinsurance covering all or part of the risk would threaten **our** financial integrity or solvency; or

   ii.   Continuation of this Coverage Part would:

      (a)   Place **us** in violation of California law or the laws of the state where **we** are domiciled; or

      (b)   Threaten **our** solvency.

g.   A change by the **Insured** or the **Insured's** representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, is included in this Coverage Part.

**We** will mail (or email) or deliver advance written notice of cancellation, stating the reason for cancellation, to the first **named insured**,

| | | | |
|---|---|---|---|
| Endorsement effective: | 01/18/2019 | Certificate No.: | UC21253080.19 |
| Endorsement No: | 3 | Processed Date: | 12/17/2018 |

Hiscox Inc.

Authorized Representative
Kevin Kerridge



# HISCOX

## ECONOMIC AND TRADE SANCTIONS POLICYHOLDER NOTICE

Hiscox is committed to complying with the U.S. Department of Treasury Office of Foreign Assets Control (OFAC) requirements. OFAC administers and enforces economic sanctions policy based on Presidential declarations of national emergency. OFAC has identified and listed numerous foreign agents, front organizations, terrorists, and narcotics traffickers as Specially Designated Nationals (SDN's) and Blocked Persons. OFAC has also identified Sanctioned Countries. A list of Specially Designated Nationals, Blocked Persons and Sanctioned Countries may be found on the United States Treasury's web site http://www.treas.gov/offices/enforcement/ofac/.

Economic sanctions prohibit all United States citizens (including corporations and other entities) and permanent resident aliens from engaging in transactions with Specially Designated Nationals, Blocked Persons and Sanctioned Countries. Hiscox may not accept premium from or issue a policy to insure property of or make a claim payment to a Specially Designated National or Blocked Person. Hiscox may not engage in business transactions with a Sanctioned Country.

A Specially Designated National or Blocked Person is any person who is determined as such by the Secretary of Treasury.

A Sanctioned Country is any country that is the subject of trade or economic embargoes imposed by the laws or regulations of the United States.

In accordance with laws and regulations of the United States concerning economic and trade embargoes, this policy may be rendered void from its inception with respect to any term or condition of this policy that violates any laws or regulations of the United States concerning economic and trade embargoes including, but not limited to the following:

(1) Any insured under this Policy, or any person or entity claiming the benefits of such insured, who is or becomes a Specially Designated National or Blocked Person or who is otherwise subject to US economic trade sanctions;

(2) Any claim or suit that is brought in a Sanctioned Country or by a Sanctioned Country government, where any action in connection with such claim or suit is prohibited by US economic or trade sanctions;

(3) Any claim or suit that is brought by any Specially Designated National or Blocked Person or any person or entity who is otherwise subject to US economic or trade sanctions;

(4) Property that is located in a Sanctioned Country or that is owned by, rented to or in the care, custody or control of a Sanctioned Country government, where any activities related to such property are prohibited by US economic or trade sanctions; or

(5) Property that is owned by, rented to or in the care, custody or control of a Specially Designated National or Blocked Person, or any person or entity who is otherwise subject to US economic or trade sanctions.

Please read your Policy carefully and discuss with your broker/agent or insurance professional. You may also visit the US Treasury's website at http://www.treas.gov/offices/enforcement/ofac/.

Complaint page 60 of 119

**HISCOX C-Suite®**   **General Terms and Conditions**

| | | |
|---|---|---|
| **I. Our promise to you** | | In consideration of the premium charged, and in reliance on the statements made and information provided to **us**, we will pay **covered amounts** as defined in this policy, provided **you** properly notify **us** of **claims**, **breaches**, **events**, **coverage enhancements**, or losses, and meet **your** obligations to **us** in accordance with the terms of this policy. |

**II. Limits of liability**

Regardless of the number of Coverage Parts **you** have purchased, the maximum **we** will pay for all **covered amounts** will be as follows:

Coverage part limit

A. Each Coverage Part purchased will be subject to a **coverage part limit** (if one is stated in the Declarations), which is the maximum amount **we** will pay for all **covered amounts** under that Coverage Part, other than **coverage enhancements** or other items **we** have expressly agreed to pay in addition to the limit. The **coverage part limit** will be in excess of any applicable **retention**.

Each claim limit

B. The Each Claim Limit stated in the Declarations is the maximum amount **we** will pay for all **covered amounts** for each covered **claim**, unless a lower sublimit is specified, in which case the sublimit is the maximum amount **we** will pay for the type of covered **claim** to which the sublimit applies. The Each Claim Limit, or any sublimit, will be in excess of any applicable **retention** and will be a part of, and not in addition to, any applicable **coverage part limit**.

Each breach limit

C. The Each Breach Limit stated in the Declarations (if **you** have purchased a relevant Coverage Part) is the maximum amount **we** will pay for all **covered amounts** for each covered **breach**, unless a lower sublimit is specified, in which case the sublimit is the maximum amount **we** will pay for the type of covered **breach** or costs to which the sublimit applies. The Each Breach Limit, or any sublimit, will be in excess of any applicable **retention** and will be a part of, and not in addition to, any applicable **coverage part limit**.

Multiple Coverage Parts

D. If the same **claim** or **related claims**, **breach**, **event**, or **coverage enhancement** is covered under more than one Coverage Part (other than under the **Management Liability Coverage Parts**), **we** will pay only under one Coverage Part, which will be the Coverage Part that provides the most favorable coverage.

If the same **claim** or **related claims** or **coverage enhancement** is covered under more than one **Management Liability Coverage Part**, **we** will pay under all applicable Coverage Parts, up to the combined **coverage part limits** of the triggered Coverage Parts. However:

1. if **loss** is payable under two or more Coverage Parts subject to separate **coverage part limits**, the **retentions** under each triggered Coverage Part will apply separately and one **retention** will not be eroded by payment of the **retention** applicable to another Coverage Part; and

2. if **loss** is payable under two or more Coverage Parts subject to a shared **coverage part limit**, **you** will be responsible only for the payment of one **retention**, which will be the highest applicable **retention** of the triggered Coverage Parts.

**III. Your obligations to us**

Your duty to cooperate

A. **You** must cooperate with **us** in the defense, investigation, and settlement of any **claim**, **potential claim**, **breach**, **event**, or **coverage enhancement** notified to **us**, including but not limited to:

1. notifying **us** immediately if **you** receive any settlement demands or offers, and sending **us** copies of any demands, notices, summonses, or legal papers;

2. submitting to examination and interrogation under oath by **our** representative and giving **us** a signed statement of **your** answers;

3. attending hearings, depositions, and trials as **we** request;

**HISCOX C-Suite®**          **General Terms and Conditions**

4. assisting in securing and giving evidence and obtaining the attendance of witnesses;

5. providing written statements to **our** representative and meeting with such representative for the purpose of investigation and/or defense;

6. providing all documents and information **we** may reasonably request, including authorizing **us** to obtain records; and

7. pursuing **your** right of recovery from others.

Your obligation not to incur any expense or admit liability

B. **You** must not make any payment, incur any expense, including any **claim expenses**, admit any liability, or assume any obligation without **our** prior consent. If **you** do so, it will be at **your** own cost and expense.

Your representations

C. **You** warrant that all representations made and all materials submitted by **you** or on **your** behalf in connection with the **application** for this policy are true, accurate, and not misleading, and agree they were relied on by **us** in **our** decision to issue this policy to **you**. In the event the representations or materials are not true, accurate, and complete, **we** will not impute the knowledge of one **insured** to any other **insured**, and only the knowledge of any past, present, or future Chief Executive Officer, Chief Financial Officer, or Risk Manager (or equivalent positions) of the **named insured** will be imputed to the **named insured**. However, other than the Crime Coverage Part, to which this subsection C will not apply, **we** will not rescind this policy in whole or in part for any reason.

## IV. Discovery period

A. If **we** or the **named insured** cancel or non-renew this policy, then the **named insured** will have the right to purchase a **discovery period** for the duration and at the percentage of the expiring premium stated in Item 4 of the Declarations.

The **discovery period**, if purchased, will start on the effective date of cancellation or non-renewal. However, the right to purchase a **discovery period** will not apply if:

1. this policy is canceled by **us** for nonpayment of premium; or

2. the total premium for this policy has not been fully paid.

Notice of election and full payment of the additional premium for the **discovery period** must be received by **us** within 30 days after the effective date of cancellation or non-renewal, otherwise any right to purchase the **discovery period** will lapse.

B. If an **insured organization** experiences a change in control as described in Section V. Other provisions affecting coverage, D. Change in control, the **named insured** will have the right to request an offer of a **discovery period** from **us** within 30 days of the change in control event. The duration and percentages stated in Item 4 of the Declarations will not apply to any **discovery period** purchased under this subsection B. Instead, **we** and the **insured organization** will agree to the duration of and premium to be charged for the **discovery period** at the time of the change in control event. In the event of a change in control, the **named insured** will have no other right to purchase a **discovery period** except as described in this subsection B.

C. Regardless of how it is purchased, the **discovery period** will apply only to **claims** that:

1. are first made against **you** and reported to **us** during the **discovery period**; and

2. arise from:

   a. **wrongful acts** that take place prior to the effective date of the (i) cancellation or non-renewal of this policy, or (ii) change in control; or

   b. a **breach** that takes place on or after the **retroactive date** but prior to the effective date of the (i) cancellation or non-renewal of this policy, or (ii) change in control.

The **discovery period** will not apply to any **reputation risk event** which occurs during the **discovery period**.

D. The additional premium will be fully earned at the inception of the **discovery period**.

**HISCOX C-Suite®**   **General Terms and Conditions**

The limits of liability applicable during any purchased **discovery period** will be the remaining available **coverage part limit**. There will be no new or additional limit of liability available for any purchased **discovery period**.

The right to purchase a **discovery period** will apply only to Coverage Parts **you** have purchased that include coverage written on a claims-made basis, and will not apply to the Crime Coverage Part.

---

## V. Other provisions affecting coverage

**Alteration and assignment**   A.   No change in, modification of, or assignment of interest under this policy will be effective unless made by written endorsement to this policy signed by **our** authorized representative.

**Bankruptcy or insolvency**   B.   **Your** bankruptcy or **insolvency** will not relieve **us** of any of **our** obligations under this policy.

**Cancellation**   C.   1.   This policy may be canceled by the **named insured** by giving written notice, which must include the date the cancellation will be effective, to **us** at the address stated in the Declarations.

2.   This policy may be canceled by **us** only if **you** fail to pay the premium. **We** will mail to the **named insured** by registered, certified, or other first-class mail (or by email where allowed by applicable law), at the **named insured's** address (or email address) stated in Item 1 of the Declarations, written notice which must include the date the cancellation will be effective. The effective date of the cancellation will be no less than fifteen days after the date of the notice of cancellation.

3.   The mailing (or emailing) of the notice will be sufficient proof of notice, and this policy will terminate at the date and hour specified in the notice.

4.   If this policy is canceled by the **named insured**, **we** will return a pro rata proportion of the premium.

5.   Payment or tender of any unearned premium by **us** will not be a condition precedent to the cancellation, but such payment will be made as soon as possible.

6.   If **you** have purchased a Crime Coverage Part, the rules for cancellation contained in Section VIII. Other provisions affecting coverage, A. Cancellation of that Coverage Part will govern its cancellation.

**Change in control**   D.   If, during the policy period stated in Item 2 of the Declarations:

1.   any other person or entity acquires **management control** of an **insured organization**; or

2.   any **insured organization** changes its status from nonprofit to for-profit,

as to that **insured organization**, this policy will cover only **claims** arising from **wrongful acts**, **breaches**, or **events** that took place prior to the effective date of change in control, unless **you** and **we** agree in writing otherwise.

If the **named insured** undergoes a change in control, the **named insured** must provide **us** with written notice no later than 30 days after the effective date of such change in control, together with any other information **we** may require.

This subsection D. Change in control does not apply to the Crime Coverage Part.

**Coverage territory**   E.   This policy will apply to **wrongful acts**, **breaches**, **events**, **coverage enhancements**, or losses that take place anywhere in the world.

However, with respect to **claims** brought outside the United States, its territories or possessions, or Canada, this policy will not apply:

1.   to any **claim** brought in any country in which the United States (or any of its

HISCOX C-Suite®     **General Terms and Conditions**

        departments, agencies, or subdivisions) administers or enforces economic or trade sanction laws; or

  2.   if it would otherwise be in violation of the laws of the United States.

**Estates, heirs, legal representatives, spouses, and domestic partners**

F.    If this policy is triggered by a **claim** brought against an **employee**, it will also apply to the **employee's**:

  1.   estates, heirs, executors, administrators, trustees in bankruptcy, assignees, and legal representatives; or

  2.   lawful spouse or lawful domestic partner;

but only:

  a.   for a covered **claim** arising from the scope of the **employee's** work for **you**; or

  b.   in connection with their ownership interest in property which the claimant seeks as recovery in a covered **claim** arising from the scope of the **employee's** work for **you**.

**Other insurance**

G.   Any payment due under this policy is specifically excess of and will not contribute with any other valid and collectible insurance, unless such other insurance is written specifically as excess over this policy.

However, if **you** have purchased:

  1.   an EPL Coverage Part, that Coverage Part will be primary with respect to and will not contribute with any other valid and collectible insurance, except when such other insurance is expressly written to be excess over other applicable insurance.

  2.   a Crime Coverage Part, rules for how that Coverage Part will be treated when there is other valid and collectible insurance are contained in Section VIII. Other provisions affecting coverage, I. Other insurance of that Coverage Part.

**Related claims/wrongful acts**

H.   All **related claims**, regardless of when made, will be treated as one **claim**, and all subsequent **related claims** will be deemed to have been made against **you** on the date the first such **claim** was made.

However, if more than one **claim** is made against **you** resulting from the same **breach**, and such **claims** trigger both a **Management Liability Coverage Part** and another Coverage Part, the **claim(s)** triggering any **Management Liability Coverage Part** will be treated as one **claim**, and the **claim(s)** triggering any other Coverage Part(s) will be treated as another **claim**.

If, by operation of this provision, the **claim** is deemed to have been made during any period when **we** insured **you**, it will be subject to only one **retention** and one limit of liability regardless of the number of claimants, **insureds**, or **claims** involved..

**Subrogation**

I.   In the event of any payment by **us** under this policy, **we** will be subrogated to all of **your** rights of recovery to that payment. **We** will not, however, subrogate against any **insured person**, unless such **insured person** has been convicted of a criminal act, or been determined by a final, non-appealable adjudication to have committed a dishonest or fraudulent act, or obtained any profit or advantage to which such **insured** was not legally entitled.

**You** will do everything necessary to secure and preserve **our** subrogation rights, including but not limited to the execution of any documents necessary to allow **us** to bring suit in **your** name.

**You** will do nothing to prejudice **our** subrogation rights without **our** prior written consent.

With the exception of any recovery under the Crime Coverage Part, any recovery first will be paid to **you** up to the amount of any **retention you** have paid, and then to **us** up to the amount of any **covered amounts we** have paid.

In the event **we** pay **indemnifiable loss** on behalf of an **insured person**, **our** subrogation rights will also include the assertion of indemnification or contribution rights with respect to any such payments **we** make. Additionally, at the point **we** make any payment of **loss** within the **retention**, **we** will have a direct contractual right under this policy to recover from the **insured organization**, or in the event of the bankruptcy of the **insured organization**, from

HISCOX C-Suite®        **General Terms and Conditions**

the debtor-in-possession (or equivalent position outside the United States), **loss we** paid within the **retention**. This contractual right of recovery will be in addition to and independent of **our** subrogation rights under this subsection I and any other rights **we** may have under applicable law.

Solely with respect to the Fiduciary Coverage Part, **we** will not exercise **our** subrogation rights unless required to exercise **our** recourse rights under **ERISA**, in which case any amounts **we** recover based on such recourse rights will be added back to the **coverage part limit** applicable to the Fiduciary Coverage Part, accounting for any costs, expenses, or reimbursements **we** incurred in pursuing such recovery.

With respect to any loss under the Crime Coverage Part, **you** must transfer to **us** all of **your** rights of recovery against any person or organization for any loss **you** sustain and which **we** have paid. Additional rules governing the payment of recoveries under the Crime Coverage Part are contained in Section IV. Limits of liability and settlement, E. Recoveries, of that Coverage Part.

| | | |
|---|---|---|
| Titles | J. | Titles of sections of and endorsements to this policy are inserted solely for convenience of reference and will not be deemed to limit, expand, or otherwise affect the provisions to which they relate. |

---

## VI. Definitions applicable to all Coverage Parts

The following definitions apply to all Coverage Parts **you** have purchased. If the same term is defined here and in a Coverage Part, then the definition in the Coverage Part will govern the coverage provided under that Coverage Part.

**Application** means the signed application for the policy, any attachments and materials submitted with that application, and any other information that is filed by an **insured** or otherwise publicly available. If this policy is a renewal or replacement of a previous policy issued by **us**, **application** also includes all previous signed applications, attachments, and materials. With respect to the Fiduciary Coverage Part (if purchased), **application** will also mean any public documents filed by the **named insured** or any **subsidiary** with any federal, state, local, or foreign regulatory agency, during the one-year period prior to the inception of the **policy period**. The **application** forms a part of this policy.

**Continuity date** means the date stated as such in the Declarations with respect to each Coverage Part **you** have purchased which includes a **continuity date**.

**Coverage part limit** means the amount stated in the Declarations as the aggregate limit applicable to each Coverage Part **you** have purchased which is subject to an aggregate limit.

**Covered amounts** means any amounts **we** have expressly agreed to pay under any Coverage Part **you** have purchased.

**Discovery period** means the time period described in Section IV. Discovery period of these General Terms and Conditions which is purchased by the **named insured** to extend the length of time **you** have to report **claims** arising from otherwise covered **wrongful acts** committed, or **breaches** that take place, before the inception of the **discovery period**.

**Employee** means an **employee** as defined in each Coverage Part **you** have purchased.

**Foreign jurisdiction** means any jurisdiction other than the United States or any of its territories or possessions.

**Insolvency** means the:

1. appointment by any government official, agency, commission, court, or other governmental authority of a receiver, conservator, liquidator, trustee, rehabilitator, or similar official to take control of, supervise, manage, or liquidate an insolvent **insured organization**;

2. filing of a petition under the bankruptcy laws of the United States; or

3. foreign equivalent of 1 or 2 above.

**HISCOX C-Suite®**      **General Terms and Conditions**

| | |
|---|---|
| **Management control** | means having:<br>1.   an ownership interest of more than 50%;<br>2.   an ownership interest representing more than 50% of the voting, appointment, or designation power for the selection of a majority of the board of directors, the management committee members, or the members of the management board, whichever is applicable; or<br>3.   the right, whether by law, contract, or otherwise, to elect, appoint, or designate a majority of the board of directors, the management committee, or the management board, whichever is applicable. |
| **Management Liability Coverage Part** | means any D&O Coverage Part, the Public Officials Liability Coverage Part, the Educators Legal Liability Coverage Part, the EPL Coverage Part, the Fiduciary Coverage Part, and/or the Employed Lawyers Coverage Part. |
| **Policy period** | means the period of time stated in Item 2 of the Declarations, and any **discovery period**, if purchased. |
| **Related claims** | means all **claims** that are based upon, arise out of, or allege:<br>1.   the same **wrongful act** or **related wrongful acts**; or<br>2.   the same **breach**.<br>The determination of whether a **claim** is related to another **claim** will not be affected by the number of claimants or **insureds** involved, causes of action asserted, or duties involved. |
| **Related wrongful acts** | means **wrongful acts** that:<br>1.   are based upon, arise out of, or allege the same, repeated, or continuous breach of duty, neglect, error, misstatement, misleading statement, omission, or act;<br>2.   are based upon, arise out of, or allege a common fact, circumstance, situation, event, service, transaction, cause, or origin, or the same or related damages; or<br>3.   have as a common nexus or nucleus any facts or series of facts. |
| **Retention** | means the amount or time stated as such in the Declarations. Any references to "**deductible**" in any Coverage Part **you** have purchased will have the same meaning as **retention**. |
| **Retroactive date** | means the date stated as such in the Declarations with respect to each Coverage Part **you** have purchased which includes a **retroactive date**. |
| **We, us,** or **our** | means the Company stated in the Declarations as issuing this policy. |
| **Wrongful act** | means **wrongful act** (as defined in any D&O Coverage Part, the Public Officials Liability Coverage Part, or the Educators Legal Liability Coverage Part), **employment practices wrongful act** (as defined in the EPL Coverage Part), **fiduciary wrongful act** (as defined in the Fiduciary Coverage Part), or **employed lawyers wrongful act** (as defined in the Employed Lawyers Coverage Part). |
| **You, your,** or **insured** | means any individual or entity expressly described as an **insured** in any Coverage Part **you** have purchased. |

Complaint page 66 of 119

CRIME COVERAGE PART [2019 – 2020], 23 pp.
**EXHIBIT 3**

**HISCOX C-Suite°**

**Crime Coverage Part**
Loss Discovered Policy

---

| | |
|---|---|
| **I. Insuring agreements** | If a limit appears on the Declarations indicating **you** have purchased the coverage, **we will pay up** to the stated limit for any loss which exceeds the applicable **deductible** (except no **deductible** will apply to Insuring agreement A.5. ERISA) for: |
| Fidelity | A.  loss of or damage to **money**, **securities**, or **other property**: |

1. Employee Theft: sustained by **you** resulting directly from **theft** or **forgery** committed by an **employee**, whether identified or not, acting alone or in collusion with other persons;

2. Third Parties' Property: sustained by **your client** or **vendor**, or other persons with whom **you** or **your employees** interact in connection with the performance of **your** business operations, resulting directly from **theft** or **forgery** committed by an identified **employee**, acting alone or in collusion with other persons, including an **employee** in collusion with an employee of **your client** or **vendor** or other persons;

3. Vendor Theft: sustained by **you** resulting directly from **theft** committed by an identified employee of **your vendor**, other than an employee with an ownership interest greater than 25% in the **vendor**, acting alone or in collusion with other persons, but only to the extent **you** cannot recover under **your** contract with the **vendor** or from any insurance or indemnity carried by the **vendor**;

4. Executives' Property: sustained by an **executive employee** resulting directly from **theft** or **forgery** committed by an **employee**, whether identified or not, acting alone or in collusion with other persons; or

5. ERISA: sustained by an **employee benefit plan** resulting directly from fraudulent or dishonest acts, including larceny, **theft**, embezzlement, **forgery**, misappropriation, wrongful abstraction or conversion, wrongful misapplication, or any other fraudulent or dishonest act prohibited under 18 U.S.C. § 1954, committed by a **fiduciary** of any **employee benefit plan**, whether identified or not, acting alone or in collusion with other persons.

The coverage provided under this Insuring agreement A. Fidelity will terminate:

a. as to any loss, once **you** or an **executive employee** not acting in collusion with any person who committed the act in question **discovers** the **theft**, **forgery**, or other dishonest act.

b. as to an **employee**, once an **executive employee** not acting in collusion with the **employee** learns the **employee** committed the **theft**, **forgery**, or other dishonest act, but only if the **employee** committed such act after becoming employed by **you** or, if committed before becoming employed by **you**, the resulting loss exceeded $10,000.

The coverage provided under Insuring agreement A.3. Vendor Theft will apply only if there is a written agreement between **you** and **your vendor** requiring the **vendor** to provide Crime or Fidelity Insurance with limits of liability equal to or greater than those available under this Coverage Part, and which covers **your** property in the care, custody, and control of the **vendor** and/or its employees.

| | |
|---|---|
| Forgery | B.  loss: |

1. Checks: sustained by **you** resulting directly from **forgery**, alteration, or counterfeiting of any negotiable instruments that are made or drawn by **you** (or by **your** agent) or purported to have been so made or drawn;

2. Payment Cards: sustained by **you** resulting directly from the fraudulent use of any credit, debit, convenience, stored-value, charge, gas, p-, purchase, or procurement card, or a similar instrument issued to **you** or any **employee** for business purposes, and which is not reimbursed by the issuing bank, so long as **you** or the **employee** have complied fully with the provisions, conditions, or other terms under which the card or instrument was issued;

3. Executives' Accounts: sustained by an **executive employee** resulting directly from **forgery**, alteration, or counterfeiting of any negotiable instruments made or drawn by the **executive employee** or purported to have been so made or drawn; or

---

Complaint page 68 of 119

**HISCOX C-Suite**®

## Crime Coverage Part
**Loss Discovered Policy**

4. <u>Counterfeit</u>: sustained by **you** resulting directly from **your** good faith exchange of merchandise, **money**, or services for:

    a. money orders issued by any post office, express company, or **financial institution**, and that are not paid upon presentation; or

    b. counterfeit **money** received during the regular course of business,

provided:

    i. a substitute check as defined in the Check Clearing for the 21st Century Act will be treated the same as the original it replaced;

    ii. signatures produced or reproduced electronically, mechanically, or by other means will be treated the same as handwritten signatures; and

    iii. **you** include with **your** proof of loss any instrument involved in the loss or an affidavit stating the amount and cause of loss if **you** cannot provide the instrument.

**Inside and outside loss**

C. 1. <u>Inside Premises</u>:

    a. loss of **money** or **securities** inside the **premises** or **financial institution premises** resulting directly from:

        i. **theft** committed by a person present inside the **premises** or **financial institution premises**; or

        ii. disappearance or destruction of such **money** or **securities**;

    b. loss of or damage to **other property**:

        i. inside the **premises** resulting directly from an actual or attempted **robbery** of a **custodian**; or

        ii. in a safe or vault inside the **premises** resulting directly from an actual or attempted **safe burglary**;

    c. damage to the **premises** or its exterior resulting directly from an act described in parts a or b above if **you** are the owner of the **premises** or are liable for damage to it; or

    d. loss of or damage to a locked safe, vault, cash register, cash box, or cash drawer located inside the **premises** resulting directly from an actual or attempted **theft** of or unlawful entry into such containers;

2. <u>Outside Transit</u>:

    a. loss of **money** or **securities** outside the **premises** or **financial institution premises** in the care and custody of a **messenger** or armored motor vehicle company, regardless of whether such **messenger** or vehicle is in transit, and resulting directly from **theft**, disappearance, or destruction; or

    b. loss of or damage to **other property** outside the **premises** or **financial institution premises** in the care and custody of a **messenger** or armored motor vehicle company, regardless of whether such **messenger** or vehicle is in transit, and resulting directly from an actual or attempted **robbery**; or

3. <u>Extortion</u>: loss of **money**, **securities**, or **other property** resulting directly from **extortion** outside the **premises**.

However, **we** will only pay:

    a. for the amount of loss **you** cannot recover under **your** contract with the armored motor vehicle company and from any insurance or indemnity carried by or for the benefit of customers of the company; or

    b. up to $10,000 for any one **occurrence** of loss of or damage to:

        i. precious metals, precious or semi-precious stones, pearls, furs, or completed or partially completed articles made of or containing such materials constituting the principal value of such articles; or

---

**HISCOX C-Suite®**

**Crime Coverage Part**
Loss Discovered Policy

    ii.    manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

Tech fraud        D.   1.    <u>Computer</u>: loss of or damage to **money, securities,** or **other property** resulting directly from **computer fraud,** but **we** will only pay up to $10,000 for any one **occurrence** of loss of or damage to manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them;

    2.    <u>Funds Transfer</u>: loss of or damage to **money** or **securities** contained in **your transfer account** sustained by **you** resulting directly from **funds transfer fraud;**

    3.    <u>Cyber Deception</u>: loss of or damage to **money** or **securities** sustained by **you** resulting directly from **cyber deception;**

    4.    <u>Customers' Accounts</u>: loss of or damage to:

        a.    **money, securities,** or **other property** sustained by **your client** or **vendor,** or other persons with whom **you** or **your employees** interact in connection with the performance of **your** business operations, resulting directly from **computer fraud, funds transfer fraud,** or **cyber deception,** provided such loss is asserted against **you** by the **client, vendor,** or other person based on **your** access to that **client's, vendor's,** or other person's **money, securities,** or **other property** maintained in a **financial institution premises** or **transfer account;** or

        b.    **money** sustained by **your client** or **vendor** resulting directly from the intentional use of **your** computer system to mislead or deceive **your client** or **vendor** and which results in **your client's** or **vendor's** transfer of **money** intended for **you** to another person or entity;

    5.    <u>Erroneous Transfer</u>: loss of or damage to **money** or **securities** sustained by **you** resulting directly from an **erroneous funds transfer** by an **employee** or **executive employee,** provided **you** must notify and request reimbursement from the **financial institution** from which the **money** or **securities** were transferred within two business days after **discovery** of the error, and such loss will not be covered until the **financial institution** has:

        a.    attempted to recover the **money** or **securities** from the **financial institution** to which they were transferred; and

        b.    formally denied **your** request to return the **money** or **securities** to **you;**

    6.    <u>Telephone Toll</u>: loss from long distance telephone charges incurred by **you** resulting directly from fraudulent use or manipulation of an account code or system password required to gain access into **your voice computer system,** provided such loss did not result from the failure to:

        a.    install and maintain in operating condition a call disconnect feature to terminate a caller's access after three unsuccessful attempts to enter an account code;

        b.    incorporate a system password; or

        c.    change a system password every 60 days.

        **We** will only pay for loss resulting from telephone toll charges for a period of not more than 30 days, beginning on the date on which the first such charges were incurred, for all telephone lines directly controlled by one **voice computer system.**

    7.    <u>Virus Restoration</u>: costs **you** incur to restore or replace damaged or destroyed electronic data or computer programs stored within **your** computer system resulting directly from:

        a.    a virus directed solely against **you** designed to damage or destroy electronic data or computer programs and introduced maliciously by a natural person; or

        b.    vandalism by a natural person who has gained unauthorized access to **your** computer system,

        including reasonable costs **you** incur to:

Includes copyrighted material of
Insurance Services Offices, Inc., with its permission

HISCOX C-Suite°

**Crime Coverage Part**
Loss Discovered Policy

i. restore **your** computer system to the level of operational capability that existed before the virus or vandalism occurred; or

ii. identify and remediate errors or vulnerabilities in **your** computer system in order to prevent future similar incidents.

8. Licensing Violation: fines and penalties for which **you** are legally liable as a direct result of the unauthorized reproduction of computer software, sound recordings, or visual media by an **employee** in violation of a licensing agreement with a third party vendor, provided the unauthorized reproduction is done:

a. without **your** or an **executive employee's** knowledge; and

b. without the knowledge of any other person having responsibility for compliance with the terms of the software licensing agreement.

**We** will pay loss under this Coverage Part only if the loss results directly from an **occurrence** that is **discovered** by **you** or an **executive employee** during the **policy period**, and is reported to **us** in accordance with Section V. Your obligations, B. Notifying us of losses.

## II. Coverage enhancements

**We** will also make the following payments:

Additional premises or employees

A. If, while this policy is in force, **you** establish any additional **premises** or hire additional **employees**, other than through consolidation, merger, purchase, or acquisition with or of another entity, such **premises** and **employees** will automatically be covered under this Coverage Part. **You** will not be required to notify **us** of such increase in the number of **premises** or **employees**, and **we** will not charge any additional premium for the remainder of the **policy period** for this coverage.

Claim expenses

B. **We** will reimburse **you** up to the limit stated in the Declarations for the reasonable costs, fees, and other expenses incurred by **you** with **our** prior written consent to pay an independent accounting, auditing, or other service, that is not a **client**, to determine the existence or amount of a loss covered under this Coverage Part.

**We** will not make any payment under this subsection B unless there is a covered loss which exceeds the **deductible**, and any amounts **we** pay will be a part of, and not in addition to, the limit of liability applicable to such loss.

Forgery claim expenses

C. If **you** or an **executive employee** are sued because of the refusal to pay any instrument described in Section I. Insuring agreement B. Forgery on the basis it has been forged, altered, or counterfeited, and if **you** have **our** prior written consent to defend against the suit, **we** will pay for the reasonable legal expenses that **you** or the **executive employee** incur for that defense.

No **deductible** will apply to this subsection C, and any amounts **we** pay will be in addition to, and not a part of, the limit of liability applicable to Section I. Insuring agreement B. Forgery.

Identity fraud expenses

D. **We** will pay up to the limit stated in the Declarations for **identity fraud expenses** incurred by **you** or an **executive employee** resulting directly from **identity fraud**, provided the **identity fraud** results from an **occurrence** that is **discovered** by **you** or an **executive employee** during the **policy period**, and the loss is reported to **us** in accordance with Section V. Your obligations, B. Notifying us of losses.

**We** will not make any payment under this subsection D unless there is a covered loss which exceeds the **deductible**.

## III. Who is an insured

For purposes of this Coverage Part, **you**, **your**, or **insured** means a **named insured**, **subsidiary**, **employee benefit plan**, or **acquired entity**, as defined below:

Includes copyrighted material of
Insurance Services Offices, Inc., with its permission

Complaint page 71 of 119

 **HISCOX C-Suite**

**Crime Coverage Part**
Loss Discovered Policy

| | |
|---|---|
| **Named Insured** | means the entity identified in Item 1 of the Declarations. |
| **Subsidiary** | means any entity of which the **named insured** has **management control**, either directly or indirectly through one or more other **subsidiaries**, before or during the **policy period**, but only for losses that take place while under the **named insured's management control** and are **discovered** by **you** or an **executive employee** during the **policy period**. |
| **Employee benefit plan** | means any welfare or pension benefit plan that is sponsored by the **named insured**, a **subsidiary**, or an **acquired entity**, whether or not such plan is subject to the Employee Retirement Income Security Act of 1974 (ERISA), as may be amended. |
| **Acquired entity** | means an entity in which the **named insured**, during the **policy period**: |

1. acquires substantially all of the assets;
2. acquires the majority of its voting securities, as a result of which it becomes a **subsidiary**; or
3. merges and leaves the **named insured** as the surviving entity.

This Coverage Part will cover losses sustained by an **acquired entity** at any time, including prior to such **acquired entity's** acquisition, provided the loss is **discovered** by **you** or an **executive employee** during the **policy period**.

With respect to an **acquired entity** whose total assets exceed 35% of the **named insured's** total assets (as reflected in **your** most recent quarterly consolidated financial statements prior to the inception of this policy) at the time of its acquisition, any coverage under this Coverage Part will expire 90 days after the effective date of its acquisition unless, within such 90 day period:

1. the **named insured** provides **us** with written notice of such acquisition;
2. the **named insured** provides **us** with information related to such acquisition as **we** may reasonably require;
3. the **named insured** accepts any special terms, conditions, exclusions, or additional premium charge as **we** may reasonably require; and
4. **we** agree by written endorsement to provide such coverage.

## IV. Limits of liability and settlement

| | | |
|---|---|---|
| Employee dishonesty | A. | **We** will pay loss resulting from **theft**, **forgery**, **extortion**, or any other dishonest act committed by **your employees**, **managers**, directors, trustees, or authorized representatives only under Insuring agreements A. Fidelity or D. Tech fraud, 7. Virus Restoration or 8. Licensing Violation. There will be no coverage under any other Insuring agreements for loss resulting from such acts of employee dishonesty. |
| Limits of liability | B. | The maximum **we** will pay for all covered loss will be as follows: |

1. The maximum amount **we** will pay for all covered loss resulting directly from an **occurrence** is the applicable limit stated in the Declarations. If the same **occurrence** is covered under more than one Insuring agreement, **we** will pay only under one limit, which will be the highest applicable limit.
2. However, if the same **occurrence** is covered under Insuring agreement D.3. Cyber Deception and any other Insuring agreement(s), **we** will pay only under Insuring agreement D.3. Cyber Deception, regardless of which Insuring agreement has the highest applicable limit.
3. Solely with respect to the coverage provided by Insuring agreement A.5. ERISA, the limit will apply separately to each **employee benefit plan**. If the same **occurrence** triggers both Insuring agreements A.1. Employee Theft and A.5. ERISA, **we** will pay under both limits.



**HISCOX C-Suite®**

## Crime Coverage Part
**Loss Discovered Policy**

4. If the limit stated in the Declarations for Insuring agreement A.5. ERISA no longer complies with the minimum amount of coverage required for an **employee benefit plan** under ERISA, **we** agree to increase the limit applicable to each such **employee benefit plan** to an amount equal to the minimum amount of coverage required under ERISA, provided:

    a. the noncompliance was not due to investment in non-qualified assets; and

    b. the original limit was in compliance at the inception of the **policy period**.

5. Any payments **we** make to an **employee benefit plan** for losses it sustains must be held by that **employee benefit plan's** sponsor for the use and benefit of the **employee benefit plan**.

**Ownership of property and interests covered**

C. This Coverage Part applies to personal property only as follows:

1. With respect to Insuring agreements A.1. Employee Theft and A.3. Vendor Theft, coverage is limited to property **you** own or lease.

2. With respect to Insuring agreements A.2. Third Parties' Property and D.4. Customers' Accounts, coverage is limited to property:

    a. **your client** or **vendor**, or other person with whom **you** or **your employees** interact in connection with the performance of **your** business operations, owns or leases;

    b. **your client** or **vendor**, or other person with whom **you** or **your employees** interact in connection with the performance of **your** business operations, holds for others, whether or not anyone described in this part b is legally liable for the loss of such property; or

    c. that is owned, leased, or held by any individual or entity (other than **you** or an **employee**) for which **you** are legally liable.

3. With respect to Insuring agreements, A.4. Executives' Property, B.3. Executives' Accounts, coverage is limited to property that an **executive employee** owns, leases, or holds for others.

4. With respect to all other Insuring agreements, coverage is limited to property:

    a. **you** own or lease; or

    b. **you** hold for others whether or not **you** are legally liable for the loss of such property.

However, this policy is for **your** benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss under this Coverage Part must be presented by **you**.

**Policy Bridge – Discovery replacing loss sustained**

D. If this policy replaces insurance that provided **you** with an extended period of time after cancellation to **discover** loss, which did not terminate at the time this policy became effective, **we** will not pay for any loss that occurred during the prior policy's policy period which **you** or an **executive employee discover** during that extended period to discover loss.

However, **we** will pay the amount of any loss which exceeds the combined total of the limit and deductible of that prior policy if the loss would otherwise be covered under this Coverage Part. Any such payments will not be greater than the difference between the limit of that prior policy and the applicable limit of this Coverage Part. No **deductible** will apply to this excess loss.

**Recoveries**

E. 1. Any recoveries, whether made before or after any payment under this Coverage Part, or by **you** or **us**, will be applied as follows:

    a. first, to the expenses incurred by **you** or **us** to pursue the recovery, whoever incurred it;

    b. second, to **you** for **your** loss in excess of the amount of loss **we** paid under this Coverage Part, if the excess loss would otherwise be covered;

**HISCOX C-Suite®**

## Crime Coverage Part
**Loss Discovered Policy**

c.   third, to **us** for all amounts **we** paid in settlement of **your** claim;

d.   fourth, to **you** for the amount of any applicable **deductible you** paid; and

e.   fifth, to **you** for any loss not covered under this Coverage Part resulting from the same **occurrence**.

2.   Accelerated Deductible Recovery:

A percentage of all recoveries under part 1 above will be paid to **you** in satisfaction of any **deductible**. This percentage is the relationship between such **deductible** and the amount paid under this Coverage Part (e.g. a $50,000 payment with a $5,000 **deductible** will result in a 10% recovery percentage).

3.   Recoveries under this subsection D do not include any recovery:

a.   from insurance, suretyship, reinsurance, security, or indemnity taken for **our** benefit; or

b.   of original **securities** after duplicates of them have been issued.

**Valuation**   **F.**   **We** will determine the value of any loss as follows:

1.   **Money**:

**We** will pay for loss of **money** issued by the United States up to its face value.

At **your** option, **we** will pay for loss of **money** issued by any country other than the United States at face value in the **money** issued by that country or in the United States dollar equivalent.

With respect to Bitcoin or any other digital currency, crypto currency, or electronic currency, **we** will pay for loss of such **money** in the United States dollar equivalent determined by the exchange rate published by the exchange in which **you** held such currency on the date the loss was **discovered**.

2.   **Securities**:

**We** will pay for loss of **securities** up to their face value at the close of business on the date the loss was **discovered**. At **our** option, **we** may pay:

a.   the market value of such **securities** or replace them in kind, and in return **you** must assign to **us** all of **your** rights, title, and interest in those **securities**; or

b.   the cost of any Lost Securities Bond required in connection with issuing duplicates of the **securities**. However, **we** will pay only up to the amount of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of:

i.   the market value of the **securities** at the close of business on the date the loss was **discovered**; or

ii.   the limit of liability applicable to the loss.

However, solely with respect to any loss of **securities** directly resulting from an **extortion**, **we** will pay the market value of such **securities** on the date they were surrendered, and not the date the **extortion** was **discovered**.

3.   **Other property**:

**We** will pay replacement cost, without deduction for depreciation, for loss of or damage to **other property**, or for loss from damage to the **premises** or its exterior.

However, **we** will not pay more than the lowest of the following:

a.   the cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose;

b.   the amount **you** actually incur that is necessary to repair or replace the lost or damaged property; or

c.   the limit of liability applicable to the loss.



**HISCOX C-Suite®**

**Crime Coverage Part**
Loss Discovered Policy

However, solely with respect to any loss of **other property** directly resulting from an **extortion**, **we** will pay the lesser of: (1) its replacement cost without deduction for depreciation at the time such **other property** was surrendered, or (2) the limit of liability applicable to the loss.

**We** will not make any payment on a replacement cost basis:

i.      until the lost or damaged property is actually repaired or replaced; and

ii.     unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, **we** will pay on an actual cash value basis.

**We** will, at **our** option, pay loss of or damage to property other than **money** in the currency of the country in which the loss or damage occurred or in the United States dollar equivalent.

If **you** sustain a covered loss in a country outside of the United States or its territories or possessions, and **you** incur additional federal or state tax liability as a result of **our** payment in the United States rather than the country in which the loss was sustained, **we** will adjust the loss to compensate **you** for such tax liabilities.

Any property **we** pay for or replace becomes **our** property.

## V.  Your obligations

Deductible             A.     Except for loss covered by Insuring agreement A.5. ERISA, **we** will have no obligation to make any payment under this Coverage Part unless the amount of the loss exceeds the applicable **deductible**. **We** will then pay the amount of loss in excess of the **deductible**, up to the applicable limit of liability.

Notifying us of losses  B.     After **you** or an **executive employee discovers** a loss of, damage to, or a situation that may result in loss of or damage to, **money, securities**, or **other property** that, in **your** best estimate, would exceed 50% of the **deductible**, **you** must:

1.      notify **us** as soon as possible after **discovery** of such loss, damage, or situation;

2.      give **us** a detailed, sworn proof of loss within 120 days after **your** notification to **us** of such loss, damage, or situation;

3.      cooperate with **us** in the investigation and settlement of any claim;

4.      produce for **our** examination all pertinent records;

5.      submit to examination under oath at **our** request and give **us** a signed statement of **your** answers;

6.      secure all of **your** rights of recovery against any person or organization responsible for the loss and do nothing to impair those rights;

7.      send **us**, within 60 days after **our** request, receipts, bills, or other records that support any claim for **Identity fraud expenses** covered under Section II. Coverage enhancements, D. Identity fraud expenses; and

8.      notify the local law enforcement authorities, but only if **you** have reason to believe any loss (except for loss covered under Insuring agreement A. Fidelity) involves a violation of law.

Records                C.     **You** must keep records of all property covered by this Coverage Part so that **we** can verify the amount of any loss.

Unreported extortion   D.     As a condition precedent to coverage under Insuring agreement C.3. Extortion, **you** must use reasonable efforts to report any threat communicated to **you** to an **executive employee**, the appropriate local law enforcement authorities, and the FBI prior to surrendering the **money, securities**, or **other property**.

✿
**HISCOX C-Suite®**    **Crime Coverage Part**
Loss Discovered Policy

---

## VI. Exclusions – What is not covered

**A. Exclusions applicable to the entire Crime Coverage Part**

**We** will have no obligation to pay any sums under this Coverage Part for any:

**Acts committed by owners**

1. loss resulting from **theft** or any other dishonest act committed by:

   a. **you**;

   b. any of **your** partners or **members**; or

   c. any natural person who has a 25% or greater ownership in any one or more **insureds**,

   whether acting alone or in collusion with other persons.

   However, this exclusion will not apply to otherwise covered acts committed by a **fiduciary** under Insuring agreement A.5. ERISA.

**Confidential or personal information**

2. loss resulting from:

   a. the disclosure or use of another person's or organization's confidential or personal information; or

   b. the disclosure of **your** confidential or personal information; however, this subsection b will not apply to otherwise covered loss directly resulting from the use of **your** confidential or personal information.

   For purposes of this exclusion, confidential or personal information includes, but is not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, social security numbers, health information, or any other type of non-public information.

**Data security breach**

3. fees, costs, fines, penalties, or other expenses arising out of or related to the acquisition, access, use, disclosure, or improper collection of, or failure to protect, any personally identifiable information or confidential corporate information, including but not limited to patents, trade secrets, processing methods, customer lists, financial information, credit card information, social security numbers, health information, or any other type of non-public information.

**Governmental action**

4. loss resulting from seizure or destruction of property by order of any governmental authority.

**Indirect loss**

5. loss that is an indirect result of a covered **occurrence**, including but not limited to:

   a. loss resulting from the inability to realize income that would have been realized had there been no loss of or damage to **money**, **securities**, or **other property**;

   b. payment of damages of any type for which **you** are legally liable; however, **we** will pay compensatory damages directly resulting from an otherwise covered loss; or

   c. payment of costs, fees, or other expenses **you** incur to establish the existence or amount of loss under this Coverage Part, except amounts covered under Section II. Coverage enhancements, B. Claim expenses or D. Identity fraud expenses.

**Legal fees, costs, and expenses**

6. fees, costs, and expenses incurred by **you** which are related to any legal action, except amounts covered under Section II. Coverage enhancements, B. Claim expenses, C. Forgery claim expenses, or D. Identity fraud expenses.

**Prior dishonesty**

7. loss caused by an **employee** if **you** or an **executive employee** who did not act in collusion with the **employee** learned, prior to the **policy period**, that the **employee** had committed any **theft**, **forgery**, or other dishonest act; however, this exclusion will not apply if the **theft**, **forgery**, or other dishonest act was committed prior to the **employee** becoming **your** **employee** and the amount involved in such act did not exceed $10,000.

---

Includes copyrighted material of
Insurance Services Offices, Inc., with its permission

# HISCOX C-Suite°

## Crime Coverage Part
**Loss Discovered Policy**

**B.  Exclusion applicable only to Insuring agreement A. Fidelity**

**We** will have no obligation to pay any sums under Insuring agreement A. Fidelity for any:

Trading

8.  loss resulting from trading, whether in **your** name or in a genuine or fictitious account; however, this exclusion will not apply to direct losses caused by **theft** or **forgery** which result in improper financial gain to an **employee**.

For purposes of this exclusion, direct losses mean only the amount of improper financial gain to the **employee** and do not include salary, commissions, fees, or other compensation, including but not limited to promotions and raises associated with employment, paid by **you** to such **employee**.

**C.  Exclusions applicable only to Insuring agreement C. Inside and outside loss**

**We** will have no obligation to pay any sums under Insuring agreement C. Inside and outside loss for any:

Accounting or arithmetic errors or omissions

9.  loss resulting from accounting or arithmetic errors or omissions.

Exchanges or purchases

10.  loss resulting from the giving or surrendering of property in any exchange or purchase; however, this exclusion will not apply to an otherwise covered **extortion**.

Fire

11.  loss or damage resulting from fire, however caused, except **we** will pay for otherwise covered:

a.  loss of or damage to **money** or **securities**; and

b.  loss from damage to a safe or vault.

Motor vehicles or equipment and accessories

12.  loss of or damage to motor vehicles, trailers or semi-trailers, or equipment and accessories attached to them.

Vandalism

13.  loss of or damage to the **premises** or its exterior, or to any safe, vault, cash register, cash box, cash drawer, or **other property** resulting from vandalism or malicious mischief.

Voluntary parting of title to or possession of property

14.  loss resulting from **you**, or anyone acting on **your** express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property; however, this exclusion will not apply to an otherwise covered **extortion**.

**D.  Exclusions applicable only to Insuring agreement D. Tech fraud**

**We** will have no obligation to pay any sums under Insuring agreement D. Tech fraud, parts 1, 2, 3, 4, or 5 for any loss resulting from:

Authorized users

15.  the use of **your** computer system by a person who is authorized to access such computer system, except **we** will pay otherwise covered loss resulting from **cyber deception** or **erroneous funds transfer**.

Credit card transactions

16.  the actual or purported use of credit, debit, charge, access, convenience, identification, stored-value, or other cards, or the information contained on such cards.

Exchanges or purchases

17.  the giving or surrendering of property in any exchange or purchase.

**We** will have no obligation to pay any sums under Insuring agreement D. Tech fraud, parts 7 or 8 for any loss resulting from:

Errors or omissions

18.  errors or omissions in the design, programming, or processing of computer programs or electronic data; however, this exclusion will not apply to loss resulting from a virus which is contracted because of an innocent mistake or omission by **you** or anyone on **your** behalf in securing **your** computer system.

---

Includes copyrighted material of
Insurance Services Offices, Inc., with its permission

**HISCOX C-Suite®**　　**Crime Coverage Part**
**Loss Discovered Policy**

| | | |
|---|---|---|
| Fraudulent preparation or input | 19. | the fraudulent preparation or input of electronic data or computer programs; however, this exclusion will not apply to loss resulting from a virus which is contracted because of an innocent mistake or omission made by **you** or anyone on **your** behalf in the course of securing **your** computer system. |

## VII.  Definitions

The following definitions apply to this Coverage Part. Additional definitions are contained in Section III, Who is an insured, and in the General Terms and Conditions, Section VI, Definitions applicable to all Coverage Parts. If a term is defined in this Coverage Part differently than defined anywhere else in this policy, the definitions in this Coverage Part will apply to the coverage afforded under this Coverage Part.

**Client**

means any individual or entity to whom **you** provide goods or services, including any client of such **client**.

**Computer fraud**

means the use of any computer system to make a fraudulent transfer of **money**, **securities**, or **other property** from inside the **premises** or **financial institution premises** to a person (other than a **messenger**) or place outside the **premises** or **financial institution premises**.

**Computer fraud** does not include any fraudulent transfer of **money**, **securities**, or **other property** which required **you**, **your employees**, **your executive employees**, or others on **your** behalf to take any action in order to complete the transfer of such **money**, **securities**, or **other property**.

**Custodian**

means **you**, any of **your** partners or **members**, or any **employee**, but only while having care and custody of property covered by this Coverage Part inside the **premises**. **Custodian** does not include any person while acting as a **watchperson** or janitor, unless such person is also an **employee**.

**Cyber deception**

means the intentional misleading or deception of an **employee** or **executive employee** by a person falsely purporting to be **your client**, **vendor**, **employee**, or **executive employee** through social engineering, pretexting, phishing, spear phishing, whaling, or any other confidence trick communicated by email, text, instant message, telephone, or other electronic means, which results in **your** transfer, payment, or delivery of **money** or **securities**.

**Deductible**

means the amount stated as such under the Crime section of the Declarations.

**Discover, discovered, or discovery**

means when **you** or an **executive employee** first becomes aware of facts which would cause a reasonable person to believe a loss has been or will be sustained, regardless of whether the exact amount or details of the loss is known.

Solely with respect to an **extortion**, **discover**, **discovered**, or **discovery** means when the threat is first communicated to **you** or an **executive employee**.

**Discover**, **discovered**, or **discovery** also means the first receipt by **you** or an **executive employee** of notice of an actual or potential claim in which it is alleged that **you** are liable to a third party under circumstances which would constitute a loss under this Coverage Part.

**Employee**

means any:

1. natural person:
   a.　while in **your** service;
   b.　whom **you** compensate directly by salary, wages, or commissions; and
   c.　whom **you** have the right to direct and control while performing services for **you**;

2. natural person independent contractor who is contracted by **you** to perform services or provide goods for or on **your** behalf;

3. natural person who is leased to **you** or who is **your** temporary employee;

4. natural person who is a former **employee**, partner, **member**, **manager**, director, or trustee retained as a consultant while performing services for **you**;

5. natural person who is a student, volunteer, or intern performing services for **you**;

**HISCOX C-Suite®**

**Crime Coverage Part**
Loss Discovered Policy

6.   natural person who is **your manager**, director, or trustee while performing acts within the usual duties of an employee;

7.   natural person who is a non-compensated officer of an **insured**;

8.   natural person who is a committee member of an **insured**; or

9.   person described in parts 1 through 8 above while on military, disability, family, medical, or similar leave.

Coverage under this Coverage Part will apply to any **employee** for the first 60 days immediately after their termination, unless such termination is due to **theft**, **forgery**, or any other dishonest act committed by the **employee**.

**Employee** does not include any agent (regardless of whether there is a written agreement as specified in the definition of **vendor**), broker, factor, commission merchant, consignee, representative, or person in a similar position unless specified in 1 through 9 above.

| | |
|---|---|
| **Erroneous funds transfer** | means the accidental and erroneous transfer of **money** or **securities** to an unauthorized account resulting directly from the inputting of an inaccurate account number, routing number, or other identifier for the account to which the **money** or **securities** are intended and authorized to be transferred. **Erroneous funds transfer** does not include the accidental and erroneous transfer of **money** or **securities** to an unauthorized account as the result of a **cyber deception**. |
| **Executive employee** | means **your** proprietor, natural person partner, member of the board of directors, member of the board of trustees, **member**, **manager**, officer, and any **employee** in a risk management, general counsel, insurance, or human resources department or function. |

Solely with respect to Insuring agreement A.5. ERISA, **executive employee** also includes a **fiduciary**.

Solely with respect to Section II. Coverage enhancements, D. Identity fraud expenses, **executive employee** also includes any spouse, child under the age of 18, or relative living in the household of the **executive employee**.

**Extortion**       means a communication directed toward **you** threatening to:

1.   inflict bodily harm on **you** (if **you** are a sole proprietorship) or any of **your employees**, **executive employees**, **members**, **managers**, or any relative(s) or invitee(s) of any of these persons, if such person was captured or allegedly captured in a country not excluded under Section VIII. Other provisions affecting coverage, C. Excluded countries for extortion;

2.   damage the **premises** or any property within the **premises**, provided such **premises** is not located in a country excluded under Section VIII. Other provisions affecting coverage, C. Excluded countries for extortion;

3.   introduce a denial of service attack into **your** computer system;

4.   contaminate, pollute, or render **your** products or goods unmarketable; or

5.   disseminate, divulge, or use **your** confidential or personal information, another person's or organization's confidential or personal information, or any weaknesses in the source code in **your** computer system,

for the purpose of inducing **you** to surrender **money**, **securities**, or **other property**.

| | |
|---|---|
| **Fiduciary** | means any natural person fiduciary, trustee, administrator, or other plan official, while in the regular service of an **employee benefit plan**, and any other natural person who handles **employee benefit plan** assets (including an employee of a TPA or other **vendor**) who is required to be bonded by the Employee Retirement Income Security Act of 1974 (ERISA), as may be amended. |
| **Financial institution** | means: |

1.   a bank, savings bank, savings and loan association, trust company, credit union, or similar thrift depository institution;

2.   an insurance company; or

3.   a stock brokerage firm, mutual fund, liquid assets fund, or similar investment company.

Includes copyrighted material of
Insurance Services Offices, Inc., with its permission

**HISCOX C-Suite®**   **Crime Coverage Part**
Loss Discovered Policy

| | |
|---|---|
| **Financial institution premises** | means the interior of that portion of any building occupied by a **financial institution**, transfer agent or registrar, or similarly recognized place of safe deposit including a night depository chute, ATM owned by such **financial institution** (wherever located), or safe of such institution. |
| **Forgery** | means signing the name of another person or organization with the intent to deceive, whether in writing or through an electronic identifier. **Forgery** does not include a signature which consists in whole or in part of one's own name, whether signed with or without authority, in any capacity, and for any purpose. |

**Funds transfer fraud**   means a:

1. telefacsimile, telephone, or other electronic instruction directing a **financial institution** to debit a **transfer account** and to transfer, pay, or deliver **money** or **securities** from that **transfer account**, which instruction purports to have been transmitted by **you**, but was in fact fraudulently transmitted by someone else without **your** knowledge or consent; or

2. written instruction (other than those described in Insuring agreement B. Forgery) issued to a **financial institution** directing such institution to debit a **transfer account** and to transfer, pay, or deliver **money** or **securities** from that **transfer account**, through an electronic funds transfer system at specified times or under specified conditions, which instruction purports to have been issued by **you**, but was in fact issued, forged, or altered by someone else without **your** knowledge or consent.

**Funds transfer fraud** does not include any transfer, payment, or delivery of **money** or **securities** which required **you**, **your employees**, **your executive employees**, or others on **your** behalf to take any action in order the complete the transfer, payment, or delivery of such **money** or **securities**.

| | |
|---|---|
| **Identity fraud** | means the unlawful and knowing transfer or use of a form of identification belonging to **your** business or any **executive employee** with the intent to commit, or to aid or abet another to commit, any unlawful activity constituting a violation of federal law or a felony under any applicable state or local law. |

**Identity fraud expense**   means:

1. advertising and public relations expenses incurred by **you** to restore **your** business reputation as a result of an **Identity fraud**;

2. costs incurred by **you** or any **executive employee** to notarize affidavits or similar documents attesting to fraud, as required by financial institutions or similar credit grantors or credit agencies;

3. costs incurred by **you** or any **executive employee** for certified mail to law enforcement agencies, credit agencies, financial institutions, or similar credit grantors;

4. costs incurred by **you** or any **executive employee** to obtain credit reports;

5. costs to provide one year of credit monitoring services to monitor, restore, and/or protect **your** or any **executive employee's** credit;

6. lost income incurred by **you** or any **executive employee** resulting from any time taken off work to complete fraud affidavits or meet with or talk to law enforcement agencies, credit agencies, and/or legal counsel, up to a maximum of $250 per day. The most **we** will pay for lost income under this part 6 will be $10,000 or the applicable limit of liability, whichever is less;

7. loan application fees incurred by **you** or any **executive employee** to reapply for a loan when the original application is rejected solely because the lender received incorrect credit information;

8. reasonable attorneys' fees to:

   a. defend lawsuits brought against **you** or any **executive employee** by merchants, vendors, suppliers, financial institutions, or their collection agencies;

   b. remove any criminal or civil judgments wrongly entered against **you** or any **executive employee**; or

---

Includes copyrighted material of
Insurance Services Offices, Inc., with its permission

**HISCOX C-Suite®**

**Crime Coverage Part**
**Loss Discovered Policy**

   c.   challenge the accuracy or completeness of any information in a consumer credit report for **you** or any **executive employee;**

9.   charges incurred by **you** or any **executive employee** for long distance telephone calls to merchants, vendors, suppliers, customers, law enforcement agencies, financial institutions, or similar credit grantors or credit agencies to report or discuss an actual **identity fraud;** and

10.   any other reasonable expense incurred by **you** or any covered individual with **our** prior written consent.

| | |
|---|---|
| **Manager** | means a natural person serving in a directorial capacity for a limited liability company. |
| **Member** | means an owner of a limited liability company represented by its membership interest, who, if a natural person, may also serve as a **manager.** |
| **Messenger** | means **you, your** relative, any of **your** partners or **members,** or any **employee** while having care and custody of property covered by this Coverage Part outside the **premises.** |
| **Money** | means: |

1.   currency, including Bitcoin or any other digital currency, crypto currency, or electronic currency, coins, or bank notes in current use anywhere in the world and having a face value;

2.   bullion;

3.   traveler's checks and money orders held for sale to the public; or

4.   funds on deposit at a **financial institution.**

**Occurrence**   means:

1.   under Insuring agreements, A. Fidelity and D.8. Licensing Violation:

   a.   an individual act;

   b.   the combined total of all separate acts whether or not related; or

   c.   a series of acts whether or not related,

   committed by an **employee, fiduciary,** or employee of a **vendor** acting alone or in collusion with other persons, prior to or during the **policy period,** or both.

2.   under Insuring agreement B. Forgery:

   a.   an individual act;

   b.   the combined total of all separate acts whether or not related; or

   c.   a series of acts whether or not related;

   committed by a person acting alone or in collusion with other persons, involving one or more instruments, prior to or during the **policy period,** or both.

3.   under all other Insuring agreements:

   a.   an individual act or event;

   b.   the combined total of all separate acts or events whether or not related; or

   c.   a series of acts or events whether or not related;

   committed by a person acting alone or in collusion with other persons, or not committed by any person, prior to or during the **policy period,** or both.

Under Insuring agreement D.7. Virus Restoration, with respect to a virus only, once **you** have restored **your** computer system to the level of operational capability that existed before the virus occurred, any recurrence of the same virus will constitute a separate **occurrence.**

**Other property**   means any tangible property other than **money** or **securities** that has intrinsic value. **Other property** does not include computer programs, electronic data, or any property specifically excluded under this Coverage Part.

---

# HISCOX C-Suite®

## Crime Coverage Part
### Loss Discovered Policy

| | |
|---|---|
| **Policy period** | means the period of time stated in Item 2 of the Declarations. |
| **Premises** | means the interior of that portion of any building **you** occupy in conducting **your** business operations. |
| | If **you** conduct **your** business operations outdoors or in an open air venue, **premises** will also mean the area **you** or **your employees**, **clients**, or **vendors** occupy in the course of such business operations. |
| **Robbery** | means the unlawful taking of property from the care and custody of a person by one who has: |
| | 1. caused or threatened to cause that person bodily harm; or |
| | 2. committed an obviously unlawful act witnessed by that person. |
| **Safe burglary** | means the unlawful taking of property from within a locked safe or vault by a person who entered the safe or vault unlawfully, as evidenced by marks of forcible entry on its exterior. **Safe burglary** includes the unlawful taking of a safe or vault from inside the **premises**. |
| **Securities** | means instruments or contracts representing **money**, property, or a debt or equity interest in an entity, including: |
| | 1. stocks and bonds, whether or not evidenced by a certificate; |
| | 2. tokens, tickets, revenue, and other stamps (whether represented by actual stamps or unused value in a meter) in current use; |
| | 3. gift certificates and gift cards; |
| | 4. casino chips issued by **you**; and |
| | 5. evidences of debt issued in connection with credit or charge cards not issued by **you**, |
| | but does not include **money**. |
| **Theft** | means the unlawful taking of property to its owner's deprivation. |
| **Transfer account** | means an account maintained at a **financial institution** from which one can initiate the transfer, payment, or delivery of **money** or **securities** by means of: |
| | 1. telefacsimile, telephone, or other electronic instruction; or |
| | 2. written instructions (other than those covered under Insuring agreement B. Forgery) establishing the conditions under which transfers are to be initiated by such **financial institution** through an electronic funds transfer system. |
| **Vendor** | means an entity that provides goods or services to **you** pursuant to a written agreement. |
| | Solely with respect to Insuring agreement A.2. Third Parties' Property, **vendor** also includes any entity that provides goods or services to **you** pursuant to an oral agreement. |
| | **Vendor** does not include any independent contractor, **financial institution**, asset manager, broker-dealer, or armored motor vehicle company. |
| **Voice computer system** | means a computer system installed in one location which provides a capability used for the direction or routing of telephone calls in a voice communications network. |
| **Watchperson** | means any person retained by **you** specifically to have care and custody of property covered by this Coverage Part inside the **premises** and who has no other duties. **Watchperson** does not include an **employee**. |
| **You, your, or insured** | means a **named insured**, **subsidiary**, **employee benefit plan**, or **acquired entity**, as defined in Section III. Who is an insured. |

---

Includes copyrighted material of
Insurance Services Offices, Inc., with its permission

**HISCOX C-Suite®**   **Crime Coverage Part**
Loss Discovered Policy

---

## VIII. Other provisions affecting coverage

Cancellation

A.  1. This Coverage Part may be canceled by the **named insured** (or, if there is more than one **named insured**, the first one listed in the Declarations) by giving written notice, which must include the date the cancellation will be effective, to **us** at the address stated in the Declarations.

2. This Coverage Part may be canceled by **us** by mailing to the **named insured** by registered, certified, or other first-class mail (or by email where allowed by applicable law), at the **named insured's** address (or email address) stated in Item 1 of the Declarations, written notice which must include the date the cancellation will be effective. The effective date of the cancellation will be no less than: (i) 60 days after the date of the notice of cancellation; or (ii) fifteen days after the date of the notice of cancellation if the cancellation is due to nonpayment of premium.

3. The mailing (or emailing) of the notice will be sufficient proof of notice, and this Coverage Part will terminate at the date and hour specified in the notice.

4. If this Coverage Part is canceled, whether by **you** or **us**, **we** will return a pro rata proportion of the premium.

5. Payment or tender of any unearned premium by **us** will not be a condition precedent to the cancellation, but such payment will be made as soon as possible.

6. If this Coverage Part is canceled as to any **insured**, loss sustained by that **insured** will be covered under this Coverage Part only if it is **discovered** by **you** or an **executive employee** pursuant to the rules contained in subsection D. Extended period to discover loss below.

Examination of your books and records

B.  **We** may examine and audit **your** books and records as they relate to this Coverage Part at any time during the **policy period** and up to three years afterward.

Excluded countries for extortion

C.  **We** will have no obligation to pay any sums under this Coverage Part for any **extortion** which involves a threat to: (i) inflict bodily injury to any person(s) who was captured or allegedly captured in; or (ii) damage a premises or any property within a premises located in, any of the countries listed in the Excluded Countries - Extortion endorsement attached to this Coverage Part.

Extended period to discover loss

D.  If this Coverage Part or any Insuring agreement is canceled as to any **insured**, or any **subsidiary** ceases to be a **subsidiary**, **we** will still pay for loss that **insured** sustained prior to the effective date of cancellation, or the date the **subsidiary** ceased to be a **subsidiary**, provided the loss is **discovered** by **you** or an **executive employee** no later than:

1. 60 days after the date of the cancellation or change in ownership or control of the **subsidiary**, provided this extended period to **discover** loss will terminate immediately on the effective date of any other similar insurance obtained by that **insured**, whether or not such other insurance provides coverage for loss sustained prior to its effective date; or

2. one year after the date of the cancellation with regard to any **employee benefit plans** under Insuring agreement A.5. ERISA.

Inventory shortages

E.  If **you** claim any loss which:

1. involves property contained in any money operated device, **we** will not be obligated to pay any sums under this Coverage Part for such loss unless the amount of **money** deposited in the device is recorded by a continuous recording instrument in the device.

2. is dependent on an inventory computation or a profit and loss computation in order to establish its existence or the amount of the loss, **we** will not be obligated to pay any sums under this Coverage Part for such loss unless **you** establish apart from such

---

**HISCOX C-Suite**

## Crime Coverage Part
**Loss Discovered Policy**

computations that **you** have sustained a loss. **You** may offer **your** inventory records and actual physical count of inventory in order to establish such loss.

| Joint insured | F. | 1. | If the **named insured** is no longer covered under this Coverage Part, then the **subsidiary** with the most assets will have the sole responsibility for acting on behalf of all other **insureds** with respect to the obligations described in this Section V. Your obligations. |
| | | 2. | Any knowledge possessed by one **insured** will be imputed to every other **insured**. |
| | | 3. | An **employee** of any **insured** is considered an **employee** of every **insured**. |
| | | 4. | **We** will only be obligated to pay up to the applicable limit of liability for any covered loss under this Coverage Part, regardless of the number of **insureds** who sustain the loss, except in the event the loss is sustained by more than one **employee benefit plan** under Insuring agreement A.5. ERISA. |
| | | 5. | Payment by **us** to the first **named insured** (or **employee benefit plan** if applicable under Insuring agreement A.5. ERISA) for loss sustained by **you** will fully release **us** from **our** obligations with respect to that loss. |
| Legal action against us | G. | | **You** may not bring any legal action against **us** involving any loss: |
| | | 1. | unless **you** have complied with all of the terms of this policy; |
| | | 2. | until 90 days after **you** have filed a proof of loss with **us**; and |
| | | 3. | unless brought within two years from the date **you** or an **executive employee discovered** the loss. |

If any limitation in this subsection G is prohibited by law, it will be deemed amended to equal the minimum period of limitation provided by applicable law.

| Liberalization | H. | To the extent **we** adopt any changes to **our** Crime insurance policies after the issuance of this Coverage Part which provide broader coverage than the coverage provided by this Coverage Part, the relevant provisions of this Coverage Part will be deemed replaced by the broader language. |
| Other insurance | I. | If other valid and collectible insurance is available to **you** for a loss covered under this Coverage Part, **we** will only pay for the amount of loss that exceeds the limit of insurance and deductible amount of that other insurance, whether **you** can collect on it or not. **Our** payment for any loss is subject to the terms and conditions of this Coverage Part. |

However, if loss covered under this Coverage Part and other insurance available to **you** is subject to a retention or deductible, **we** will recognize erosion of the **deductible** by the total of all such other insurance plus any deductible applicable to that other insurance.

Includes copyrighted material of
Insurance Services Offices, Inc., with its permission

Complaint page 84 of 119



## HISCOX

## Crime Insurance Application
### New Business Application

**General Information**

1. Name of Applicant:

   *Ernst And Haas Management Co.*

2. Address of Applicant:

   *4000 Long Beach Bl. Ste 105 Long Beach CA 90807*

   Please attach a list of all subsidiaries including operations, percent of ownership and the date acquired or created. (Note: This application is for a policy which includes coverage for all subsidiaries under the Applicant's control. The application and any attachments must include information for the first named insured and all subsidiaries and other entities to be included by endorsement.)

3. Type of Organization:

   ☐ Public   ☒ Private   ☐ Non-Profit   ☐ Governmental

4. Website Address: *ErnstandHaas.com*

5. Annual Revenues: $ *1.5m*   Date Established: *1998*

6. Description of Operations

**Current or Requested Coverage**

| Insuring Agreement | Limit | | Deductible (for excess coverage, deductible is primary coverage + primary deductible) | |
|---|---|---|---|---|
| Employee Theft | $ | *250,000* | $ | *5000* |
| Forgery or Alteration | $ | | $ | |
| Inside the Premises | $ | | $ | |
| Outside the Premises | $ | | $ | |
| Computer Fraud | $ | | $ | |
| Funds Transfer Fraud | $ | | $ | |
| Money Orders & Counterfeit | $ | | $ | |
| Other: | $ | | $ | |

Current Carrier *Hiscox*   Expiring Premium: $

**Loss History**

List all losses sustained, whether or not claimed, and if claimed, whether or not reimbursed during the past six years from the completion date of this application for any similar insurance requested in this application.   Check if none ☒

| Date of Loss | Type of Loss (Employee Theft, Forgery, etc.) | Amount of Loss |
|---|---|---|
| *-0-* | | $ |
| | | $ |
| | | $ |

Please attach full details of all losses including descriptions, corrective action taken, estimated ultimate total amount and amount covered by insurance.

**Exposure Information**

1. Domestic Employees: *20*

   Foreign Employees: *-0-*

   Grand Total: *20*

Hiscox Inc.
357 Main Street, 2nd Floor
Armonk, NY 10504
CRI A001 CW (06/10)

T 914 273 7400
F 914 273 4716
E hiscox.usa@hiscox.com
www.hiscoxusa.com

Page 1 of 6

2. Estimate the percentage of the Grand Total who have access to cash, checks and approval: **10 %**

3. Total Number of Locations: **1**   Retail Locations: **0**

4. For each foreign location, please detail the following information (attach separate sheet if necessary):   None ☑

| Country | Type of Operation | # of Employees | Revenues |
|---|---|---|---|
| 0 | | | $ |
| | | | $ |
| | | | $ |

5. Maximum cash exposure inside the premises:   $ **0**   Outside:   $ **0**

6. Do you have precious metals, precious or semi-precious stones, pearls, furs or articles containing such materials?   ☐ Yes   ☒ No

   If yes, please provide details.

7. Do you have access to your client's funds/property?   ☒ Yes   ☐ No

   If Yes, what type of property and dollar amount of value?   **Trust Funds**

   How many employees will be performing work for your client(s)?   **2**

   Total number of clients:   **500**

8. Have you or any subsidiary engaged in any mergers or acquisitions in the last three (3) years?   ☐ Yes   ☒ No

   Are there any plans for mergers or acquisitions in the next twelve (12) months?   ☐ Yes   ☒ No

9. If you provide lodging, how many guest rooms?   **0**

**Audit Controls**

1. Are your financial statements audited annually by an independent CPA?   ☑ Yes   ☐ No

2. Are all subsidiaries and locations, or similarly controlled and operated companies included in the audit?   ☑ Yes   ☐ No

3. Is there a CPA Management Letter / Response commenting on internal control weaknesses, recommendations for improvement, and a response by management?  (If Yes, please attach the most recent report)   ☐ Yes   ☑ No

4. Do you have an Internal Audit Department?  If Yes, staff size?   **1**   ☑ Yes   ☐ No

   If No, do you have someone with internal audit responsibilities?   ☐ Yes   ☑ No

5. Are surprise audits conducted?   ☑ Yes   ☐ No

6. Do you have a documented system of internal control policies / procedures?   ☑ Yes   ☐ No

**Internal Controls**

1. Are background checks performed for all new hires?   ☑ Yes   ☐ No

2. Are bank accounts reconciled monthly?   ☑ Yes   ☐ No

3. Are bank accounts reconciled by someone not authorized to deposit or withdraw?   ☑ Yes   ☐ No

4. Are at least two signatures required on checks?   ☑ Yes   ☐ No

   Above what amount?   **ALL**

5. Do vouchers or other supporting records accompany all checks to be signed?   ☑ Yes   ☐ No

6. Do you utilize a Positive Pay system?   **?**   ☐ Yes   ☐ No

7. Are internal controls designed so that no employee can control a process from beginning to end? (e.g. request a check, approve a voucher and sign the check)   ☑ Yes   ☐ No

8. Are all controls consistent among all locations (including foreign locations)?   ☑ Yes   ☐ No

9. Are employees in sensitive positions required to take annual vacations of at least 5 consecutive business days OR do you practice regular job rotation?   ☑ Yes   ☐ No

Hiscox Inc.
357 Main Street, 2nd Floor
Armonk, NY 10504
CRI A001 CW (06/10)

T 914 273 7400
F 914 273 4716
E hiscox.usa@hiscox.com
www.hiscoxusa.com

Page 2 of 6

Complaint page 86 of 119

10. Is fraud training provided to executives? ☑ managers? ☑ employees? ☑

11. Do you have a fraud hotline that is publicized to employees, vendors and customers?  ☐ Yes  ☑ No

Are all tips appropriately investigated and action taken?  ☐ Yes  ☐ No

**Vendor Controls**

1. Estimated number of active vendors utilized: `100`

2. Do you use vendors for handling financial transactions such as payroll and accounting (other than your outside auditor)?  ☑ Yes  ☐ No

3. Is an authorized vendor list utilized and updated annually for all purchases, with competitive bidding required?  ☑ Yes  ☐ No

4. Are background checks performed on vendors in order to determine ownership and financial capability?  ☑ Yes  ☐ No

5. Is the responsibility for authorizing vendors, approving invoices and processing payments segregated among different employees?  ☑ Yes  ☐ No

6. Are the duties of purchasing, receiving, storekeeping and shipping separate so that no one individual can control these functions from beginning to end?  ☑ Yes  ☐ No

**Computer Controls**

1. Are passwords required for access to sensitive information?  ☑ Yes  ☐ No

How often are passwords required to be changed?  `Annual`

2. When employees change positions and no longer require access to certain information, is access status changed?  ☑ Yes  ☐ No

3. Are daily backups made and stored securely off premises?  ☑ Yes  ☐ No

4. How long are backups kept?  `Indefinitory`

5. Do you use online banking?  ☑ Yes  ☐ No

Describe controls.

6. Are employees warned of Phishing scams and blocked from harmful websites?  ☑ Yes  ☐ No

7. Are all desktop computers protected by anti-virus software?  ☑ Yes  ☐ No

8. Does your bank require authentication of the identity of the caller before acting upon any transfer instructions?  ☑ Yes  ☐ No

9. Are verifications sent directly to a department not authorized to initiate transfers?  ☑ Yes  ☐ No

10. Are there independent checks of funds transfer records by employees not authorized to handle such transfers?  ☑ Yes  ☐ No

**Financial Information**

| | Current Year | | Prior Year | |
|---|---|---|---|---|
| Total Assets: | $ | 50K | $ | 50K |
| Total Equity / Net Assets / Fund Balance: | $ | ( | $ | ( |
| Total Revenues: | $ | $ | | |
| Net Income / Change in Net Assets: | $ | — | $ | — |

If there is any material change in the answers to the questions in this Application before the proposed policy inception date, the Applicant must notify the Insurer in writing and any outstanding quote for insurance coverage may be modified or withdrawn.

The Applicant's submission of this Application does not obligate the Insurer to issue, or the Applicant to purchase a policy. The Applicant authorizes the Insurer to make any inquiry in connection with this Application.

All written statements and materials furnished to the Insurer in conjunction with this Application are hereby incorporated into this Application and made a part hereof.

The undersigned authorized agents of the Applicant declare that to the best of their knowledge and belief, after reasonable inquiry, the statements made in this Application are true and complete. The undersigned agree that this

Hiscox Inc.
357 Main Street, 2ⁿᵈ Floor
Armonk, NY 10504
CRI A001 CW (06/10)

T 914 273 7400
F 914 273 4716
E hiscox.usa@hiscox.com
www.hiscoxusa.com

Page 3 of 6

Application shall be the basis of the insurance policy should an insurance policy providing the requested coverage be issued and that the Insurer will have relied on the Application in issuing any policy.

**NOTICE TO APPLICANTS:** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT ACT, WHICH IS A CRIME AND MAY SUBJECT SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

**NOTICE TO ARKANSAS, NEW MEXICO AND WEST VIRGINIA APPLICANTS:** ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT, OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**NOTICE TO COLORADO APPLICANTS:** IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE INSURANCE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AUTHORITIES

**NOTICE TO DISTRICT OF COLUMBIA APPLICANTS:** WARNING: IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT.

**NOTICE TO FLORIDA APPLICANTS:** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY IN THE THIRD DEGREE.

**NOTICE TO KENTUCKY APPLICANTS:** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.

**NOTICE TO LOUISIANA APPLICANTS:** ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**NOTICE TO MAINE APPLICANTS:** IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE INSURANCE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS.

**NOTICE TO MARYLAND APPLICANTS:** ANY PERSON WHO KNOWINGLY AND WILLFULLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR WHO KNOWINGLY AND WILLFULLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**NOTICE TO NEW JERSEY APPLICANTS:** ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL

Hiscox Inc.
357 Main Street, 2nd Floor
Armonk, NY 10504
CRI A001 CW (06/10)

T 914 273 7400
F 914 273 4716
E hiscox.usa@hiscox.com
www.hiscoxusa.com

Page 4 of 6

PENALTIES.

**NOTICE TO OHIO APPLICANTS:** ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD.

**NOTICE TO OREGON APPLICANTS**: ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS MATERIALLY FALSE INFORMATION IN AN APPLICATION FOR INSURANCE MAY BE GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**NOTICE TO OKLAHOMA APPLICANTS: WARNING:** ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY (365:15-1-10, 36 §3613.1).

**NOTICE TO PENNSYLVANIA APPLICANTS:** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

**NOTICE TO TENNESSEE, VIRGINIA AND WASHINGTON APPLICANTS:** IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE INSURANCE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.

**NOTICE TO VERMONT APPLICANTS**: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR, CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT ACT, WHICH MAY BE A CRIME AND MAY SUBJECT SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

**NOTICE TO NEW YORK APPLICANTS:** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

Hiscox Inc.
357 Main Street, 2nd Floor
Armonk, NY 10504
CRI A001 CW (06/10)

T 914 273 7400
F 914 273 4716
E hiscox.usa@hiscox.com
www.hiscoxusa.com

Page 5 of 6

Complaint page 89 of 119

Signature

Applicant

Date     12.19.2012

Title     CEO

Signature of Producer

Date

Address of Producer

Producer's License Number

[The balance of this page is intentionally left blank.]

Hiscox Inc.
357 Main Street, 2nd Floor
Armonk, NY 10504
CRI A001 CW (06/10)

T 914 273 7400
F 914 273 4716
E hiscox.usa@hiscox.com
www.hiscoxusa.com

Page 6 of 6

HISCOX denial of coverage letter
June 10, 2019, 7 pp.
**EXHIBIT 4**



PEABODY
&ARNOLD

ROBERT A. MCCALL
[617] 951.2061
rmccall@peabodyarnold.com

June 10, 2019

***By First Class Mail and Electronic Mail*** *(dhaas@ErnstandHaas.com)*
Mr. David L. Haas
Managing Broker
Ernst and Haas Management Company, Inc.
4120 Atlantic Avenue
Long Beach, California 90807

| | |
|---|---|
| ***Insured:*** | ***Ernst & Haas Management Company Inc.*** |
| ***Insurer:*** | ***Hiscox Inc. on behalf of certain Underwriters at Lloyd's of London ("Hiscox")*** |
| ***Policy:*** | ***C-Suite, Crime Coverage Part (the "Policy")*** |
| ***Policy No.:*** | ***UC21253080.19*** |
| ***Policy Period:*** | ***01/18/2019 to 01/18/2020*** |
| ***Hiscox Ref. No.*** | ***194002052*** |

Dear Mr. Haas:

As you know, this firm has been investigating the above-referenced matter regarding an alleged loss whereby the Insured's email was hacked, directing an employee to wire $200,000 to an unknown account (the "Wire Matter"). As discussed in more detail below, Hiscox must respectfully advise you that coverage is not available under the Policy for the Wire Matter as the alleged loss does not fall within any of the Insuring Agreements of the Policy.

### THE POLICY

Hiscox issued to Ernst & Haas Management Company, Inc. ("Ernst") Policy No. UC21253080.19, with a Policy Period of January 19, 2019 to January 19, 2020. The Policy provides coverage under each of the four Insuring Agreements. Insuring Agreements A(1) and (2), B(1), (2), and (4), C(1) and (2), and D(1) and (2), each have a $250,000 Limit of Insurance with a $5,000 Deductible Amount. The Policy does not contain any coverage under Insuring Agreement D(3), Cyber Deception.

**PEABODY & ARNOLD** LLP

Mr. David L. Haas
June 10, 2019
Page 2

## SUMMARY OF THE CLAIM

Ernst is a property management company.  On March 12, 2019, Krystale Allen ("Allen"), Ernst's Accounts Payable Clerk, received an email from who she thought was David Haas, Managing Broker of Ernst ("Real David"), but was actually an unknown person(s) pretending to be him ("Fake David").  The email attached an invoice for $50,000 to be sent to Zang Investments, LLC.  Allen processed the payment by wire transfer, with the payment going to an account at Fifth Third Bank.  On March 18, 2019, Allen received a second email from Fake David, this time with an invoice attached for $150,000, also to be sent to Zang Investments, LLC.  Fake David requested that the payment to be made in the same manner as the prior payment completed by Allen.  Allen processed the payment.  On March 20, 2019, Allen received a third request from Fake David, this time requesting a payment of $470,000 to Zang Investments, LLC.  At this point, Allen became concerned as to the authenticity of the request and forwarded the email to Real David asking him if the request was legitimate.  Real David then called Allen and told her that the email had not been sent by him.  At this point, Allen realized the fraud and that the prior emails were likewise also fraudulent.  Allen called immediately Ernst's bank, Farmers & Merchants Bank, informed it of the fraud, and asked for the wires to be stopped.  The bank said that the wires had already been sent and could not be recalled.  When Allen discovered what had happened, she began crying and shaking.  An incident report written by Annette Martin, Ernst's Operations Manager, stated the following:

> [Martin] reminded her that E&H do not sent out wire transfers – who trained you regarding wire transfers? (Her response was no.) Have you done one before? (Her response was no.) Also, asked why didn't she speak with [Martin] regarding such emails? Couldn't you pick up the phone and contact [Real David] since these requests were out of protocol? Employee was visibly shaken and distraught, could not answer any other questions other than "I don't know."

Ernst determined that the fraudster was using an email address that was similar to, but different from, Real David's actual email address.  The fraudulent party used the address of dhaas@ernsthas.com, while Real David's email address is dhaas@ernstandhaas.com.

The Insured has concerns that Allen may be connected with the loss, stating as follows:

> I'm not in a position to make allegations that Krystal embezzled funds from our company, however the circumstances are curious. She had been with our company for approximately 5 months and was very familiar with our protocols for funds disbursement, yet she by-passed all standard procedures and sent funds to an unknown out of state bank account without any accounting. When

**PEABODY & ARNOLD** LLP

Mr. David L. Haas
June 10, 2019
Page 3

asked, she did not have any answer whatsoever as to why she did not follow known procedures and practices. We have never issued payment in this manner, or for such large amounts in the past, so it raises concerns. Within days of this incident she left the company on leave and has not returned.

Ernst claims a total loss amount of $200,000, representing the first wire in the amount of $50,000 and the second wire in the amount of $150,000. On its proof of loss form, the Insured described the loss as "Email was compromised and funds were wired to fraudulent account." Ernst reported the matter to the Long Beach Police Department and to the Internet Crime Complaint Center. In its written report to law enforcement, and in the written recall request to the bank, the Insured described the loss as resulting from an email hack and compromise.

## ANALYSIS

As explained further herein, coverage is not available for the Wire Matter as the loss does not fall within any of the Insuring Agreements of the Policy.

### Insuring Agreement A: Fidelity

Insuring Agreement A(1), Employee Theft, provides coverage for loss "sustained by **you** resulting directly from **theft** or **forgery** committed by an **employee**, whether identified or not, acting alone or in collusion with other persons[.]" Theft is defined as "the unlawful taking of property to its owner's deprivation." Coverage under Insuring Agreement A(1) is not triggered as it does not appear that the loss resulted directly from a theft committed by an employee. Although the Insured has questions as to whether Allen may have been involved in the fraud, there does not appear to be any evidence that Allen was so involved. To the contrary, upon receiving the third wire request for $470,000, Allen grew concerned and contacted Real David to confirm whether the request was legitimate. This does not indicate that Allen was trying to defraud the Insured. While it appears that Allen did not follow the protocols for such payments that the Insured had in place, this does not evidence theft, but rather, a failure to follow proper procedures. *If the Insured has any evidence of an actual theft by Allen, please forward the same for our review.*

Insuring Agreement A(2), Third Parties' Property, provides coverage for loss "sustained by **your client** or **vendor** . . . " Coverage under Insuring Agreement A(2) is not triggered for the reasons described in the preceding paragraph, and as this matter does not involve loss to a client or vendor of the Insured, as those terms are defined by the Policy.

Federal Reserve Plaza   |   600 Atlantic Avenue   |   Boston, MA 02210   |   **T** 617.951.2100   |   **F** 617.951.2125   |   peabodyarnold.com

Complaint page 94 of 119

**PEABODY & ARNOLD** LLP

Mr. David L. Haas
June 10, 2019
Page 4

## Insuring Agreement B: Forgery

Insuring Agreement B(1), Checks, provides coverage for loss "sustained by **you** resulting directly from **forgery**, alteration, or counterfeiting of any negotiable instruments that are made or drawn by **you** (or by **your** agent) or purported to have been so made or drawn[.]"  There is no coverage under this provision as, among other reasons, the loss at issue did not involve a negotiable instrument.

## Insuring Agreement B(2): Payment Cards

Insuring Agreement B(2), Payment Cards, provides coverage for loss "sustained by **you** resulting directly from the fraudulent use of any credit, debit, convenience, stored-value, charge, gas, p-, purchase, or procurement card, or a similar instrument issued to **you** or any **employee** for business purposes, and which is not reimbursed by the issuing bank, so long as **you** or the **employee** have complied fully with the provisions, conditions, or other terms under which the card or instrument was issued."  There is no coverage under this provision as, among other reasons, the loss at issue did not involve one of the aforementioned instruments.

## Insuring Agreement C: Inside and Outside Loss

Insuring Agreement C(1), Inside the Premises, provides coverage, in relevant part, for "loss of **money** or **securities** inside the **premises** or **financial institution premises** resulting directly from: i. **theft** committed by a person present inside the **premises** or **financial institution premises**; or ii. disappearance or destruction of such **money** or **securities**[.]"  Coverage under this provision is not triggered as, among other reasons, the loss at issue did not involve a loss of money inside the Insured's premises or financial institution premises, resulting directly from a theft committed by a person inside the Insured's premises or financial institution premises, or from disappearance or destruction, as those terms are defined by the Policy.  Rather, it appears that the loss occurred by the acts of an unknown actor at an unknown location.

Insuring Agreement C(2), Outside Transit, provides coverage, in relevant part, for "loss of or damage to **other property** outside the **premises** or **financial institution premises** in the care and custody of a **messenger** or armored motor vehicle company, regardless of whether such **messenger** or vehicle is in transit, and resulting directly from an actual or attempted **robbery** . . . "  Coverage under this provision is not triggered as, among other reasons, the loss at issue did not involve other property, as defined by the Policy, and did not involve property in the care and custody of a messenger or from an actual or attempted robbery, as defined by the Policy.

PEABODY & ARNOLD LLP

Mr. David L. Haas
June 10, 2019
Page 5

**Coverage D:  Tech Fraud**

Insuring Agreement D(1), Computer Fraud, provides in relevant part that Hiscox will pay for "loss of or damage to **money**, **securities**, or **other property** resulting directly from **computer fraud** . . . "  Computer Fraud is defined as "the use of any computer system to make a fraudulent transfer of **money**, **securities**, or **other property** from inside the **premises** or **financial institution premises** to a person (other than a **messenger**) or place outside the **premises** or **financial institution premises**."  (emphasis added in underline).  While it does appear that Fake David used a computer as part of the scheme, the computer use does not fall within the ambit of coverage under Insuring Agreement D(1).  This is because the computer must be used directly to perpetrate the fraud—and not as a mere instrumentality—as was the case here.  *See, e.g.*, Apache Corp. v. Great Am. Ins. Co., 662 Fed. Appx. 252, 253 (5th Cir. 2016) (Insured's loss not a covered occurrence where"[t]he [fraudulent] email was part of the scheme; but, the email was merely incidental to the occurrence of the authorized transfer of money."); Pestmaster Servs., Inc. v. Travelers Cas. & Sur. Co. of Am., 656 Fed. Appx. 332, 333 (9th Cir. 2016) ("Because computers are used in almost every business transaction, reading this provision to cover all transfers that involve both a computer and fraud at some point in the transaction would convert this Crime Policy into a 'General Fraud' Policy.").  Here, there was no direct loss resulting from the use of a computer.  Rather, the computer was used as a tool in Fake David's scheme which involved a number of steps after any purported fraudulent use of a computer by the fraudster.  Notably, the computer did not directly cause the transfer of any funds from inside the Insured's premises or the Insured's financial institution premises.  Instead, the loss was caused by action that Allen was duped into taking.

Insuring Agreement D(2), Funds Transfer, provides that Hiscox will pay for "loss of or damage to **money** or **securities** contained in **your transfer account** sustained by **you** resulting directly from **funds transfer fraud**[.]"  Transfer Account is defined in part as "an account maintained at a **financial institution** from which one can initiate the transfer, payment, or delivery of **money** or **securities** . . . " Funds Transfer Fraud is defined in relevant part as:

1. telefacsimile, telephone, or other electronic instruction directing a **financial institution** to debit a **transfer account** and to transfer, pay, or deliver **money** or **securities** from that **transfer account**, which instruction purports to have been transmitted by **you**, but was in fact fraudulently transmitted by someone else without **your** knowledge or consent; or

2. written instruction . . . issued to a **financial institution** directing such institution to debit a **transfer account** and to transfer, pay, or deliver **money** or **securities** from that **transfer account**, through an electronic funds transfer system at specified times or under specified conditions, which instruction

Federal Reserve Plaza  |  600 Atlantic Avenue  |  Boston, MA 02210  |  **T** 617.951.2100  |  **F** 617.951.2125  |  peabodyarnold.com

Complaint page 96 of 119

PEABODY & ARNOLD LLP

Mr. David L. Haas
June 10, 2019
Page 6

purports to have been issued by **you**, but was in fact issued, forged, or altered by someone else without **your** knowledge or consent.

**Funds transfer fraud** does not include any transfer, payment, or delivery of **money** or **securities** which required **you**, **your employees**, **your executive employees**, or others on **your** behalf to take any action in order the complete the transfer, payment, or delivery of such **money** or **securities**.

Insuring Agreement D(2) is not triggered as there was no funds transfer fraud. Neither the first or second parts of the definition of funds transfer fraud is satisfied as there was no instruction to a financial institution purporting to have been transmitted by the Insured. Rather, the instruction to the Insured's bank was from the actual Insured (Krystale Allen). Further, funds transfer fraud does not include any transfer or payment which required an employee "to take any action in order the complete the transfer, payment, or delivery of such money or securities." Here, Allen had to take action in order to complete the transfer of money.

As noted above, the Policy does not contain any coverage under Insuring Agreement D(3), Cyber Deception.

## **CONCLUSION**

Hiscox trusts that Ernst & Haas Management Company, Inc. understands and appreciates the basis and import of the foregoing. This position is based upon the information available to Hiscox at this time. Hiscox expressly reserves all of its rights and coverage defenses under the Policy, including but not limited to its right to supplement or amend its coverage position should circumstances so warrant. If you wish to submit additional information which may bear on Hiscox's insurance coverage determination in this matter, we invite you to relay that information for possible reconsideration of this determination. If you have any questions or comments regarding this matter, please do not hesitate to contact me.

If you believe that coverage for this claim has been wrongfully denied, you may have the matter reviewed by the California Department of Insurance as follows:

California Department of Insurance
Claims Service Bureau
300 South Spring Street, 11th Floor
Los Angeles, CA  90013
(800) 927-4357 (in state)
(213) 877-8921 (out of state)

PEABODY & ARNOLD LLP

Mr. David L. Haas
June 10, 2019
Page 7

Very truly yours,

Robert A. McCall

cc:   Maney Sopheak (by electronic mail)
      *maney.sopheak@rtspecialty.com*
      Rita Pancham (by electronic mail)
      *rpancham@rtspecialty.com*
      Craig Camenson (by electronic mail)
      *csgins@sbcglobal.net*
      Joseph Quinn, Esq. (by electronic mail)
      *Joseph.Quinn@hiscox.com*

Correspondence from insurer's counsel,
dated December  20, 2019
## EXHIBIT 5



ROBERT A. MCCALL
[617] 951.2061
rmccall@peabodyarnold.com

December 20, 2019

***By First Class Mail and Electronic Mail*** (*robbastian@aol.com*)
Attorney Robert L. Bastian, Jr.
Law Offices of Bastian & Dini
9025 Wilshire Blvd., Penthouse Suite
Beverly Hills, California 90211

| | |
|---|---|
| ***Insured:*** | ***Ernst & Haas Management Company Inc.*** |
| ***Insurer:*** | ***Hiscox Inc. on behalf of certain Underwriters at Lloyd's of London ("Hiscox")*** |
| ***Policy:*** | ***C-Suite, Crime Coverage Part (the "Policy")*** |
| ***Policy Nos.:*** | ***UC21253080.19*** |
| ***Policy Period:*** | ***01/18/2019 to 01/18/2020*** |
| ***Hiscox Ref. No.*** | ***194002052*** |

Dear Attorney Bastain:

I am in receipt of your letter dated November 21, 2019, with enclosures, and write in response. After careful review, and as discussed in more detail below, Hiscox must respectfully advise you that its position remains the same— coverage is not available under the Policy for the Wire Matter as the alleged loss does not fall within any of the Insuring Agreements of the Policy. As your materials appear to dispute the availability of coverage under Insuring Agreement D(1) only, we address that policy provision herein. However, please do note that our prior correspondence to Mr. Haas of June 10, 2019 is incorporated herein by reference.

*The Plain Language of the Hiscox Policy Precludes Any Possibility of Coverage*

At the outset, we note that the plain language of the Policy is dispositive as to coverage. The definition of Computer fraud in the Policy is as follows:

> **Computer fraud** means the use of any computer system to make a fraudulent transfer of **money**, **securities**, or **other property** from inside the **premises** or **financial institution premises** to a person (other than a **messenger**) or place outside the **premises** or **financial institution premises**.

**PEABODY & ARNOLD** LLP
Attorney Robert L. Bastian, Jr.
December 20, 2019
Page 2

> <u>**Computer fraud**</u> <u>does not include any fraudulent transfer of</u>
> <u>**money, securities**, or **other property** which required **you**, **your**</u>
> <u>**employees**, **your executive employees**, or others on **your** behalf</u>
> <u>to take any action in order to complete the transfer of such **money**,</u>
> <u>**securities**, or **other property**</u>.

(emphasis added in underline). The definition of Computer fraud specifically carves out any fraudulent transfer which required an employee to take any action in order to complete the transfer of money. This is the *precise* situation that happened in this matter—the Insured's employee, Ms. Allen, took action to complete the transfers of money. It is without dispute that this is what Ms. Allen did. This fact is dispositive.

The Policy language above is clear, unequivocal, and explicit. Under California law, the plain language of an insurance policy governs coverage. *Ash v. Gainsco, Inc.*, No. C 00-0046 MJJ, 2000 WL 1262655, at *2 (N.D. Cal. Aug. 24, 2000) (" . . . the plain language of an insurance policy governs its interpretation . . . "); *Mayer Hoffman McCann, P.C. v. Camico Mut. Ins. Co.*, 161 F. Supp. 3d 858, 864 n.2 (N.D. Cal. 2016) ("the Court finds that the plain language of the policy controls."). While the plain language of the Policy is conclusive on the question of coverage, for the sake of completeness, we address briefly the arguments put forth in your recent submission.

*<u>Medidata and American Tooling Involve Different Policy Language</u>*

Your letter references correspondence sent to the California Department of Insurance in July 2019. The main argument put forth in the referenced correspondence is that *Medidata Solutions, Inc. v. Federal Insurance Co.* (a case from the Southern District of New York) and *American Tooling Center, Inc. v. Travelers Casualty and Surety Company of America* (a case from the Sixth Circuit Court of Appeals, which encompasses Kentucky, Michigan, Ohio and Tennessee) "are better guidance for how a California court will likely resolve the dispute" than the caselaw decided in our very jurisdiction—California. *Medidata* and *American Tooling* cannot apply where the Policy has specific additional language—not present in either of these cases—that specifically removes the Wire Matter from coverage (and your assertion that *American Tooling* has identical language to the Policy is untrue).

In *Medidata*, the policy at issue defined Computer Fraud as "the unlawful taking or the fraudulently induced transfer of Money, Securities or Property resulting from a Computer Violation." 268 F. Supp. 3d 471, 474 (S.D.N.Y. 2017), <u>aff'd</u>, 729 F. App'x 117 (2d Cir. 2018). In *American Tooling*, the policy at issue defined Computer Fraud as "[t]he use of any computer to fraudulently cause a transfer of **Money**, **Securities** or **Other Property** from inside the **Premises** or **Financial Institution Premises**: 1. to a person (other than a **Messenger**) outside the **Premises** or **Financial Institution Premises**; or 2. to a place outside the **Premises** or

Federal Reserve Plaza | 600 Atlantic Avenue | Boston, MA 02210 | **T** 617.951.2100 | **F** 617.951.2125 | peabodyarnold.com

Complaint page 101 of 119

**PEABODY & ARNOLD** LLP
Attorney Robert L. Bastian, Jr.
December 20, 2019
Page 3

**Financial Institution Premises**." 895 F.3d 455, 463 (6th Cir. 2018).  Neither case involves a policy with the language in underline above, which you ignore.  The definition of Computer fraud in the Policy specifically carves out from coverage any fraudulent transfer which required an employee to take any action in order to complete the transfer of money.  As stated above, this is the precise situation at hand here.

<u>*Case Law of Foreign Jurisdictions is Irrelevant Where There is Settled Case Law in California*</u>

The Insured puts forth that two cases decided by other jurisdictions (*Medidata* and *American Tooling*), with similar facts, resolved in favor of coverage.  This argument is seriously flawed.  Both of these jurisdictions (New York and Michigan) use a "proximate cause" analysis of loss to determine whether a loss is caused by the direct use of a computer.  The "proximate cause" analysis used in each case led the courts to find coverage.  Critically, California does not use "proximate cause" in determining whether a loss is caused by the direct use of a computer.  California courts follow the "direct means direct" line of reasoning, rather than the "direct means proximate cause" line of case law.  A California court will ask whether the loss resulted directly from the use of a computer without any intervening steps, as espoused in the Ninth Circuit decision of *Pestmaster Servs., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 656 Fed. Appx. 332 (9th Cir. 2016), and as cited in Hiscox's coverage determination.

Ninth Circuit cases applying California law have consistently "rejected arguments that 'loss resulting directly from' should be construed to mean 'loss proximately caused by,' instead finding that 'direct means direct' and was narrower than proximate cause."  *Valley Cmty. Bank v. Progressive Cas. Ins. Co.*, 854 F. Supp. 2d 697, 709 (N.D. Cal. 2012).  *See also United Sec. Bank v. Fid. & Deposit Co. of Maryland*, 125 F.3d 860 (9th Cir. 1997) ("We agree with the many cases which reason that 'direct' means 'direct.'"); *Vons Co., Inc. v. Fed. Ins. Co.*, 212 F.3d 489, 492–493 (9th Cir. 2000) ("We hold that 'direct' means 'direct.'").  Here, the Insured's loss was entirely contingent on a series of events and decisions, including Ms. Allen's decision to process two transfers of money in response to communications she received from who she thought was her superior.  In such a situation, under California law, there can be no coverage under an insurance policy provision that requires that the loss of money "result[ ] directly from computer fraud . . . " (emphasis added in underline).  The *Pestmaster* case remains good law in the state of California and California courts continue cite it with support.  *See, e.g.*, *Taylor & Lieberman v. Fed. Ins. Co.*, No. CV 14-3608 RSWL SHX, 2015 WL 3824130, at *4 (C.D. Cal. June 18, 2015), *aff'd*, 681 F. App'x 627 (9th Cir. 2017).  There is no indication that California courts may change course in following the "direct means direct" line of cases.

Moreover, California simply will not look to the law of other jurisdictions where there is settled law in the state on this issue.  The fact that other jurisdictions rejected a California decision means that the other jurisdictions happen to not follow California law on the particular issue.  This has no bearing on the legitimacy of the law in California.  A California court will not consider cases cited from outside jurisdictions where there is settled law within its own

**PEABODY & ARNOLD** LLP
Attorney Robert L. Bastian, Jr.
December 20, 2019
Page 4

jurisdiction.  *See, e.g.*, *In re First Am. Corp. ERISA Litig.*, No. SACV 07-01357-JVSRNB, 2008 WL 5666635, at *2 (C.D. Cal. Sept. 12, 2008) ("the fact that there is non-binding precedent in jurisdictions other than the Ninth Circuit is insufficient to show a 'substantial ground' for difference of opinion in light of the apposite and controlling precedent of [a Ninth Circuit decision]").

## *The Insured Did Not Purchase The Coverage That Could Have Afforded Coverage For This Loss*

The real issue here is that the Insured did not purchase the coverage that could have provided coverage for this loss.  Insuring Agreement D(3) of the Policy, Cyber Deception, typically affords coverage in situations similar to the loss at issue here—where an Insured is tricked into sending money to a fraudulent party.  Insuring Agreement D(3) provides coverage, in part, for a loss of money resulting directly from cyber deception.  Cyber deception means the intentional deception of an employee by a person falsely purporting to be an employee of the Insured through a confidence trick communicated by email which results in the Insured's transfer of money.  Insuring Agreement D(3) was written specifically to provide coverage in situations where, as here, an employee is tricked into making a transfer of money.  The Insured could have purchased this coverage, but did not.  While it is unfortunate that the Insured did not buy this coverage, this is not the fault of Hiscox.  The Insured cannot now rewrite the Policy to fix the ills caused by its own decision.

## *Any Bad Faith Allegation Against Hiscox Is Without Any Basis*

Any attempt to bring a bad faith claim (or any claim) against Hiscox will be unsuccessful and readily disposed of by a California court.  Where there is a genuine issue as to the insurer's liability under a policy, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute.  *Esparza v. Burlington Ins. Co.*, 866 F. Supp. 2d 1185, 1206 (E.D. Cal. 2011); *Casey v. Metro. Life Ins. Co.*, 688 F. Supp. 2d 1086, 1098 (E.D. Cal. 2010) ("Under California law, bad faith liability does not exist for a legitimate dispute of an insurer's liability under the policy.").  Here, it cannot be said that there is even a genuine, legitimate dispute.  The Policy language is clear and unequivocal—computer fraud does not include any fraudulent transfer of money which required the employee to take any action in order to complete the transfer.

Hiscox trusts that the Insured understands and appreciates the basis and import of the foregoing.  Hiscox expressly reserves all of its rights and coverage defenses under the Policy and at law.  If you have any questions or comments regarding this matter, please do not hesitate to contact me.

PEABODY & ARNOLD LLP
Attorney Robert L. Bastian, Jr.
December 20, 2019
Page 5

Very truly yours,

Robert A. McCall

cc:     Maney Sopheak (by electronic mail)
        *maney.sopheak@rtspecialty.com*
        Rita Pancham (by electronic mail)
        *rpancham@rtspecialty.com*
        Craig Camenson (by electronic mail)
        *csgins@sbcglobal.net*
        Joseph Quinn, Esq. (by electronic mail)
        *Joseph.Quinn@hiscox.com*

Correspondence from the insured's counsel,
February 4, 2020, 4 pp.

**EXHIBIT 6**          Complaint page 105 of 119

LAW OFFICES OF
## BASTIAN & DINI

9025 WILSHIRE BLVD. · PENTHOUSE SUITE · BEVERLY HILLS, CALIFORNIA 90211 · TEL: 310/789-1955 · FAX 310/822-1989

February 4, 2020

Robert A. McCall
PEABODY & ARNOLD LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210

*by first class mail
and by electronic mail to:*
rmccall@peabodyarnold.com

| | |
|---|---|
| **Insured:** | Ernst & Haas Management Company Inc. |
| **Insurer:** | Hiscox Inc. on behalf of certain Underwriters at Lloyd's of London ("Hiscox") |
| **Policy:** | C-Suite, Crime Coverage Part (the "Policy") |
| **Policy No.:** | UC21253080.19 |
| **Policy Period:** | 01/18/2019 to 01/18/2020 |
| **Hiscox Ref. No.:** | 194002052 |

Dear Mr. McCall:

Hiscox blames its insured for its denial of the subject claim in your latest correspondence, December 20, 2019.

You state, "[w]hile it is unfortunate that the Insured did not buy this coverage," referring to coverage for loss due to computer fraud, "this is not the fault of Hiscox."

Actually, under California law, it quite clearly is.

A copy of Ernst & Haas' original insurance policy, which took effect January 18, 2012 states in pertinent part:

> **Coverage D: Computer and Funds Transfer Fraud**
> **(1) Computer Fraud**
> We will pay for loss of or damage to Money, Securities and/or Other Property resulting directly from the use of any computer to fraudulently cause a transfer of that

Robert A. McCall
PEABODY & ARNOLD LLC
February 4, 2020
Page Two

property from inside the Premises or Banking Premises:
(i) to a person (other than a Messenger) outside those
Premises or Banking Premises; or (ii) to a place outside
those Premises or Banking Premises.

"Coverage D" of page 4 of 24 of policy form CRI P001 CW (06/10), issued to Ernst & Haas, coverage commencing January 18, 2012.

This coverage is clear. It is what Ernst & Haas purchased. It covers Ernst & Haas' loss.

The limited definition of computer fraud, found on page 11 of 17 of policy form CSUCRI P0001A CW (07/17), which you cited in your prior correspondence as the basis of Hiscox's denial, is nowhere found in the policy issued in 2012.

As I am sure you are aware, California, as many other states, places limitations on an insurer's freedom to "skinny down" renewed policies, *i.e.*, add new limitations on coverage when renewing policies.

An insurance company is bound by a greater coverage in an earlier policy when a renewal policy is issued but the insured is not notified of the specific reduction in coverage. *Industrial Indem. Co. v. Ind. Acc. Com.* (1949) 34 Cal.2d 500, 506; *Sorensen v. Farmers Ins. Exch.* (1976) 56 Cal.App.3d 328, 333.

"[A]n insurer when renewing a policy may not change the terms of the policy, without first notifying the insured ...." *Zito v. Firemen's Ins. Co.* (1973) 36 Cal.App.3d 277, 282.

When an insurance company changes, reduces, or limits the coverage or benefits of a policy upon renewal, the notice of such change must "be provided in a 'plain, clear and conspicuous writing'." *Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649, 663.

Robert A. McCall
PEABODY & ARNOLD LLC
February 4, 2020
Page Three

To be conspicuous, the notice must be "displayed or presented" in a way that it would be "noticed" by a reasonable person. *Broberg v. Guardian Life Ins. Co. of Am.* (2009) 171 Cal.App.4th 912, 922-23.

Examples of conspicuous notice "includes . . . a heading in capitals . . . larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size . . ." *Id.* at 923.

Moreover, the notice of reduction in coverage must be "specific." *Davis v. United Services Auto Ass'n* (1990) 223 Cal.App.3d 1322, 1332.

**"[A] general admonition to read the policy for changes is insufficient."** *Ibid.* [Emphasis added]

The failure to provide "adequate notice" renders the attempted reduction or limitation in coverage "ineffective." *Id.* at 1333.

Neither Ernst & Haas, nor its insurance agents are aware of, or could produce any kind of notice, much less notice in the form of "plain, clear and conspicuous writing" from Hiscox, that Hiscox was reducing its coverage from that contained in "Coverage D" issued January 18, 2012 to coverage consistent only with the restrictive definition of "Computer Fraud" of the policy "renewed" in 2018 and 2019.

Unless Hiscox can provide a factual basis that it gave actual notice of the reduction noted above, compliant with California law, demand is hereby made that Hiscox pay its insured's claim.

Otherwise, Ernst & Haas will file a claim alleging, *inter alia*, Hiscox's bad faith breach of the insurance contract.

Regarding bad faith, we would add that changes in language in the 7/2017 form appear to be an effort to match other insurers' efforts across the nation to write language into insurance contracts so as to reduce coverage regarding computer fraud claims.

Robert A. McCall
PEABODY & ARNOLD LLC
February 4, 2020
Page Four

Both the 7/2017 form and the cases you have cited in your correspondence which address the same or similar language have all occurred well after January 2012, when Ernst & Haas purchased its original policy.

This raises an inference of precisely the type of insurer bad faith which would support an award of punitive damages under California law.

This is not to mention the attorneys' fees associated with the considerable trouble Hiscox has and is poised to put Ernst & Haas through for what should have been a straightforward satisfaction of a straightforward claim.

Please provide Hiscox's response to this letter no later than March 4, 2020.

Thank you for your anticipated response.

Sincerely,

/s/ *Robert L. Bastian, Jr.*
Robert L. Bastian, Jr.


Encl.:  CRI P001 CW (06/10)

cc:     Maney Sopheak (by electronic mail)
        maney.sopheak@rtspecialty.com
        Rita Pancham (by electronic mail)
        rpancham@rtspecialty.com
        Craig Camenson (by electronic mail)
        csgins@sbcglobal.net
        Joseph Quinn, Esq. (by electronic mail)
        Joseph.Quinn@hiscox.com

Correspondence from the Insurer's counsel,
March 4, 2020, 4 pp.
**EXHIBIT 7**



ROBERT A. MCCALL
[617] 951.2061
rmccall@peabodyarnold.com

March 4, 2020

**_By First Class Mail and Electronic Mail_** (*robbastian@aol.com*)
Attorney Robert L. Bastian, Jr.
Law Offices of Bastian & Dini
9025 Wilshire Blvd., Penthouse Suite
Beverly Hills, California 90211

| | |
|---|---|
| ***Insured:*** | ***Ernst & Haas Management Company Inc.*** |
| ***Insurer:*** | ***Hiscox Inc. on behalf of certain Underwriters at Lloyd's of London ("Hiscox")*** |
| ***Policy:*** | ***C-Suite, Crime Coverage Part*** |
| ***Policy No.:*** | ***UC21253080.19*** |
| ***Policy Period:*** | ***01/18/2019 to 01/18/2020*** |
| ***Hiscox Ref. No.*** | ***194002052*** |

Dear Attorney Bastian:

I am in receipt of your letter dated February 4, 2020 and write in response. After careful review, and as discussed in more detail below, Hiscox must respectfully advise you that its position remains the same— coverage is not available under the Policy for the Wire Matter as the alleged loss does not fall within any of the Insuring Agreements of the Policy. While we address the new argument made in your most recent letter, please do note that all prior correspondences to both you and to the Insured are incorporated herein by reference.

The new argument put forth in your most recent letter is that the language of Insuring Agreement D(1) of Policy No. UC21253080.19 (the "Policy" or the "2019 – 2020 Policy"), "skinnied down" the coverage that was available to the Insured under prior policy period(s). You stated that an insurer is bound by a greater coverage in an earlier policy when a renewal policy is issued but the insured is not notified of the specific reduction in coverage. The fatal flaw with this argument is that even under the language contained in the prior policy, Policy No. UC21253080.18 (the "2018 – 2019 Policy"), coverage would not have been available for the Wire Matter under Insuring Agreement D(1). Stated otherwise, any purported "reduction" in coverage in the 2019 – 2020 Policy to an earlier policy is irrelevant to the conclusion reached in this matter. This is explained in further detail below.

PEABODY & ARNOLD LLP
Attorney Robert L. Bastian, Jr.
March 4, 2020
Page 2

Insuring Agreement D(1) of the 2019 – 2020 Policy provides that Hiscox will pay for: "loss of or damage to **money**, **securities**, or **other property** resulting directly from **computer fraud**[.]"  Computer fraud is defined as:

> the use of any computer system to make a fraudulent transfer of **money**, **securities**, or **other property** from inside the **premises** or **financial institution premises** to a person (other than a **messenger**) or place outside the **premises** or **financial institution premises**.
>
> <u>**Computer fraud** does not include any fraudulent transfer of **money**, **securities**, or **other property** which required **you**, **your employees**, **your executive employees**, or others on **your** behalf to take any action in order to complete the transfer of such **money**, **securities**, or **other property**.</u>

Insuring Agreement D(1) of the 2018 – 2019 Policy provides that Hiscox will pay for "loss of or damage to **Money**, **Securities** and/or **Other Property** resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the **Premises** or **Banking Premises**: (i) to a person (other than a **Messenger**) outside those **Premises** or **Banking Premises**; or (ii) to a place outside those **Premises** or **Banking Premises**." The difference between the language in the 2019 – 2020 Policy and the 2018 – 2019 Policy is the language in underline above.  The underlined language specifically clarifies that computer fraud will not include any transfer which required the Insured to take any action to complete the transfer.  This is not a reduction in coverage.  This language clarified the decision reached by the Ninth Circuit Court of Appeals in the seminal case of *Pestmaster Servs., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 656 Fed. Appx. 332 (9th Cir. 2016).  In *Pestmaster*, the Court specifically interpreted the phrase "fraudulently cause a transfer" to require an unauthorized transfer of funds ("When Priority 1 transferred funds pursuant to authorization from Pestmaster, the transfer was not fraudulently caused.").  Just like in *Pestmaster*, the subject funds in this matter were transferred pursuant to authorization from the Insured.

Notably, under the "old" language of the 2018 – 2019 Policy, coverage would still have been precluded under Insuring Agreement D(1).  As stated in our original coverage determination of June 10, 2019, while Fake David appeared to use a computer as part of the scheme, the computer use did not fall within the ambit of coverage under Insuring Agreement D(1).  This is because the computer must be used directly to perpetrate the fraud—and not as a mere instrumentality—as was the case in the Wire Matter.  *See, e.g.*, *Apache Corp. v. Great Am. Ins. Co.*, 662 Fed. Appx. 252, 253 (5th Cir. 2016) (Insured's loss not a covered occurrence where "[t]he [fraudulent] email was part of the scheme; but, the email was merely incidental to the occurrence of the authorized transfer of money."); *Pestmaster*, 656 Fed. Appx. at 333 ("Because computers are used in almost every business transaction, reading this provision to cover all

Federal Reserve Plaza   |   600 Atlantic Avenue   |   Boston, MA 02210   |   **T** 617.951.2100   |   **F** 617.951.2125   |   peabodyarnold.com

Complaint page 112 of 119

PEABODY & ARNOLD LLP
Attorney Robert L. Bastian, Jr.
March 4, 2020
Page 3

transfers that involve both a computer and fraud at some point in the transaction would convert this Crime Policy into a 'General Fraud' Policy."). In the Wire Matter, there was no direct loss resulting from the use of a computer. Rather, the computer was used as a tool in Fake David's scheme which involved a number of steps after any purported fraudulent use of a computer by the fraudster. Notably, the computer did not directly cause the transfer of any funds from inside the Insured's premises or financial institution premises. Instead, the loss was caused by action that the Insured's employee, Ms. Allen, was duped into taking. In fact, in our original coverage determination, we did not even cite to the underlined language above. As you are aware, California is a "direct means direct" jurisdiction rather than a "direct means proximate cause" jurisdiction. Ninth Circuit cases applying California law have consistently "rejected arguments that 'loss resulting directly from' should be construed to mean 'loss proximately caused by,' instead finding that 'direct means direct' and was narrower than proximate cause." *Valley Cmty. Bank v. Progressive Cas. Ins. Co.*, 854 F. Supp. 2d 697, 709 (N.D. Cal. 2012). See also *United Sec. Bank v. Fid. & Deposit Co. of Maryland*, 125 F.3d 860 (9th Cir. 1997); *Vons Co., Inc. v. Fed. Ins. Co.*, 212 F.3d 489, 492–493 (9th Cir. 2000). Here, there was no direct loss resulting from the use of a computer.

As noted in our prior correspondence, any attempt to bring a bad faith claim (or any claim) against Hiscox will be unsuccessful and readily disposed of by a California court. Where there is a genuine issue as to the insurer's liability under a policy, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute. *Esparza v. Burlington Ins. Co.*, 866 F. Supp. 2d 1185, 1206 (E.D. Cal. 2011); *Casey v. Metro. Life Ins. Co.*, 688 F. Supp. 2d 1086, 1098 (E.D. Cal. 2010) ("Under California law, bad faith liability does not exist for a legitimate dispute of an insurer's liability under the policy."). Here, it cannot be said that there is even a genuine, legitimate dispute. The Policy language is clear and unequivocal—computer fraud does not include any fraudulent transfer of money which required the employee to take any action in order to complete the transfer. This is the result whether you look at the "old" language of prior policies or the clarified language of the 2019 – 2020 Policy.

Hiscox trusts that the Insured understands and appreciates the basis and import of the foregoing. Hiscox expressly reserves all of its rights and coverage defenses under the Policy and at law. If you or the Insured have any questions or comments regarding this matter, please do not hesitate to contact me.

Very truly yours,

Robert A. McCall

PEABODY & ARNOLD LLP
Attorney Robert L. Bastian, Jr.
March 4, 2020
Page 4


cc:     Maney Sopheak (by electronic mail)
        *maney.sopheak@rtspecialty.com*
        Rita Pancham (by electronic mail)
        *rpancham@rtspecialty.com*
        Craig Camenson (by electronic mail)
        *csgins@sbcglobal.net*
        Joseph Quinn, Esq. (by electronic mail)
        *Joseph.Quinn@hiscox.com*

Federal Reserve Plaza  |  600 Atlantic Avenue  |  Boston, MA 02210  |  **T** 617.951.2100  |  **F** 617.951.2125  |  peabodyarnold.com

Complaint page 114 of 119

Correspondence from the Insurer's counsel,
March 13, 2020, 4 pp.
**EXHIBIT 8**    Complaint page 115 of 119


**PEABODY & ARNOLD**

ROBERT A. MCCALL
[617] 951.2061
rmccall@peabodyarnold.com

March 13, 2020

**By First Class Mail and Electronic Mail** (*robbastian@aol.com*)
Attorney Robert L. Bastian, Jr.
Law Offices of Bastian & Dini
9025 Wilshire Blvd., Penthouse Suite
Beverly Hills, California 90211

| | |
|---|---|
| **Insured:** | **Ernst & Haas Management Company Inc.** |
| **Insurer:** | **Hiscox Inc. on behalf of certain Underwriters at Lloyd's of London ("Hiscox")** |
| **Policy:** | **C-Suite, Crime Coverage Part** |
| **Policy Nos.:** | **UC21253080.19** |
| **Policy Period:** | **01/18/2019 to 01/18/2020** |
| **Hiscox Ref. No.** | **194002052** |

Dear Attorney Bastian:

I am in receipt of your letter dated March 5, 2020 and write in response. The essence of your letter is that Hiscox's prior correspondence referenced the 2018 – 2019 Policy as the "original policy," while the original policy was actually Policy No. UC21253080.12 (the "2012 – 2013 Policy"). Thus, the purpose of this letter is to address specifically the 2012 – 2013 Policy. *In summary, any purported obligation by Hiscox to provide notice of any supposed reduction in coverage from the 2012 – 2013 to subsequent policies is immaterial to this analysis where there would have been no coverage for the Wire Matter under the old language contained in the 2012 – 2013 Policy.*

**No Coverage Under the "Old" Language of the 2012 – 2013 Policy**

Specifically, you requested that "Hiscox respond as to why it is not relying upon the June 2012 policy in making its determination." The answer is as follows: even if, for the sake of your argument only, we considered coverage for the Wire Matter under the 2012 – 2013 Policy, *there still would not be any coverage under the terms of this prior policy.* Stated otherwise, any purported "reduction" in coverage in the 2019 – 2020 Policy from the 2012 – 2013 Policy is irrelevant to the conclusion reached in this matter. This is explained in further detail below.

PEABODY & ARNOLD LLP
Attorney Robert L. Bastian, Jr.
March 13, 2020
Page 2

Insuring Agreement D(1) of the 2019 – 2020 Policy provides that Hiscox will pay for: "loss of or damage to **money**, **securities**, or **other property** resulting directly from **computer fraud**[.]"  Computer fraud is defined as:

> the use of any computer system to make a fraudulent transfer of **money**, **securities**, or **other property** from inside the **premises** or **financial institution premises** to a person (other than a **messenger**) or place outside the **premises** or **financial institution premises**.
>
> <u>**Computer fraud** does not include any fraudulent transfer of **money**, **securities**, or **other property** which required **you**, **your employees**, **your executive employees**, or others on **your** behalf to take any action in order to complete the transfer of such **money**, **securities**, or **other property**.</u>

Insuring Agreement D(1) of the 2012 – 2013 Policy provides that Hiscox will pay for:

> . . . loss of or damage to **Money**, **Securities** and/or **Other Property** resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the **Premises** or **Banking Premises**:
>
> (i)      to a person (other than a **Messenger**) outside those **Premises** or **Banking Premises**; or
>
> (ii)     to a place outside those **Premises** or **Banking Premises**.

The difference between the language in the 2019 – 2020 Policy and the 2012 – 2013 Policy is the language in underline above.  The underlined language specifically clarifies that computer fraud will not include any transfer which required the Insured to take any action to complete the transfer.  **This is not a reduction in coverage.**  This language clarified the decision reached by the Ninth Circuit Court of Appeals in the seminal case of *Pestmaster Servs., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 656 Fed. Appx. 332 (9th Cir. 2016).  In *Pestmaster*, the Court specifically interpreted the phrase "fraudulently cause a transfer" to require an unauthorized transfer of funds ("When Priority 1 transferred funds pursuant to authorization from Pestmaster, the transfer was not fraudulently caused.").  Just like in *Pestmaster*, the subject funds in this matter were transferred pursuant to authorization from the Insured.

Notably, under the "old" language of the 2012 – 2013 Policy, coverage would still have been precluded under Insuring Agreement D(1).  As stated in our original coverage determination of June 10, 2019, while Fake David appeared to use a computer as part of the

Federal Reserve Plaza  |  600 Atlantic Avenue  |  Boston, MA 02210  |  **T** 617.951.2100  |  **F** 617.951.2125  |  peabodyarnold.com

Complaint page 117 of 119

**PEABODY & ARNOLD** LLP
Attorney Robert L. Bastian, Jr.
March 13, 2020
Page 3

scheme, the computer use did not fall within the ambit of coverage under Insuring Agreement
D(1).  This is because the computer must be used directly to perpetrate the fraud—and not as a
mere instrumentality—as was the case in the Wire Matter.  *See, e.g.*, *Apache Corp. v. Great Am.
Ins. Co.*, 662 Fed. Appx. 252, 253 (5th Cir. 2016) (Insured's loss not a covered occurrence where
"[t]he [fraudulent] email was part of the scheme; but, the email was merely incidental to the
occurrence of the authorized transfer of money."); *Pestmaster*, 656 Fed. Appx. at 333 ("Because
computers are used in almost every business transaction, reading this provision to cover all
transfers that involve both a computer and fraud at some point in the transaction would convert
this Crime Policy into a 'General Fraud' Policy.").  In the Wire Matter, there was no direct loss
resulting from the use of a computer.  Rather, the computer was used as a tool in Fake David's
scheme which involved a number of steps after any purported fraudulent use of a computer by
the fraudster.  Notably, the computer did not directly cause the transfer of any funds from inside
the Insured's premises or financial institution premises.  Instead, the loss was caused by action
that the Insured's employee, Ms. Allen, was duped into taking.  In fact, in our original coverage
determination, we did not even cite to the underlined language above.  As you are aware,
California is a "direct means direct" jurisdiction rather than a "direct means proximate cause"
jurisdiction.  Ninth Circuit cases applying California law have consistently "rejected arguments
that 'loss resulting directly from' should be construed to mean 'loss proximately caused by,'
instead finding that 'direct means direct' and was narrower than proximate cause."  *Valley Cmty.
Bank v. Progressive Cas. Ins. Co.*, 854 F. Supp. 2d 697, 709 (N.D. Cal. 2012).  See also *United
Sec. Bank v. Fid. & Deposit Co. of Maryland*, 125 F.3d 860 (9th Cir. 1997); *Vons Co., Inc. v.
Fed. Ins. Co.*, 212 F.3d 489, 492–493 (9th Cir. 2000).  Here, there was no direct loss resulting
from the use of a computer.

## A Claim Against Hiscox Will be Unsuccessful

As noted in our prior correspondence, Hiscox believes that any attempt to bring a bad
faith claim (or any claim) will be unsuccessful and readily disposed of by a California court.
Where there is a genuine issue as to the insurer's liability under a policy, there can be no bad
faith liability imposed on the insurer for advancing its side of that dispute.  *Esparza v. Burlington
Ins. Co.*, 866 F. Supp. 2d 1185, 1206 (E.D. Cal. 2011); *Casey v. Metro. Life Ins. Co.*, 688 F.
Supp. 2d 1086, 1098 (E.D. Cal. 2010) ("Under California law, bad faith liability does not exist
for a legitimate dispute of an insurer's liability under the policy.").  Here, it cannot be said that
the Insured can raise a genuine, legitimate dispute.  The Policy language is clear and
unequivocal—computer fraud does not include any fraudulent transfer of money which required
the employee to take any action in order to complete the transfer.  This is the result whether you
look at the "old" language of prior policies or the clarified language of the 2019 – 2020 Policy.

Hiscox trusts that the Insured understands and appreciates the basis and import of the
foregoing.  Hiscox expressly reserves all of its rights and coverage defenses under the Policy and
at law.  If you or the Insured have any questions or comments regarding this matter, please do
not hesitate to contact me.

PEABODY & ARNOLD LLP
Attorney Robert L. Bastian, Jr.
March 13, 2020
Page 4

Very truly yours,

Robert A. McCall

cc:     Maney Sopheak (by electronic mail)
        *maney.sopheak@rtspecialty.com*
        Rita Pancham (by electronic mail)
        *rpancham@rtspecialty.com*
        Craig Camenson (by electronic mail)
        *csgins@sbcglobal.net*
        Joseph Quinn, Esq. (by electronic mail)
        *Joseph.Quinn@hiscox.com*