UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNST AND HAAS MANAGEMENT COMPANY, INC., <br><br> Plaintiff, <br><br> v. <br><br> HISCOX, INC., and DOES 1-10, <br><br> Defendants. | Case No. CV 20-04062-AB (PVCx) <br><br> **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS [DKT NO. 11]** |

## I. INTRODUCTION

Before the Court is Defendant Hiscox Insurance Company, Inc.'s[1] ("Defendant" or "Hiscox") Motion to Dismiss (the "Motion," Dkt. No. 11) the Complaint. ("Compl.," Dkt. No. 1.)  Plaintiff Ernst and Haas Management Company, Inc. ("Plaintiff" or "E&H") opposed the Motion and Hiscox replied. ("Opp'n," Dkt. No. 17; "Reply," Dkt. No. 18.) Finding this matter appropriate for resolution without oral argument, pursuant to Federal Rule of Civil Procedure 58 and Local Rule 7-15, the Court vacated the hearing set for September 18, 2020 and took the matter under submission. (Dkt. No. 21.) For the reasons stated below, the Court **GRANTS** the Motion.

---

[1] Defendant contends that it was erroneously sued as Hiscox, Inc. (Dkt. No. 11 at 1.)

## II.   BACKGROUND

### A.   Factual Background

#### 1.   Parties and Pertinent Policies

This is an insurance coverage dispute concerning a policy issued to E&H, a property management company located in Long Beach, California. (Compl. ¶ 3.) From 2012 through 2020, Hiscox insured E&H under a Commercial Crime Insurance Policy that E&H renewed annually (the "Policy"). (*Id.* ¶¶ 7–8.) The initial Policy, No. UC 21253080.12, covered E&H from January 18, 2012 to January 18, 2013 (the "2012 Policy"). (*Id.* ¶ 7, Ex. 1 (Dkt. No. 1 at 18).) The 2012 Policy provides "Coverage D: Computer and Funds Transfer Fraud," including coverage for "(1) Computer Fraud" up to $250,000 per occurrence subject to a $5,000 deductible and coverage for "(2) Funds Transfer Fraud" up to $250,000 per occurrence subject to a $5,000 deductible. (*Id.*)

With regards to "(1) Computer Fraud," the 2012 Policy provides that Hiscox "will pay for loss of or damage to **Money**, **Securities** and/or **Other Property** resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the **Premises** or **Banking Premises**: (i) to a person (other than a **Messenger**) outside those **Premises** or **Banking Premises**; or (ii) to a place outside those **Premises** or **Banking Premises**." (*Id.* ¶ 7, Ex. 1 (Dkt. No. 1 at 23) (alterations in original).) As defined in the 2012 Policy, the term "premises" means

> the interior of that portion of any building **You** occupy in conducting **Your** business.

(*Id.* ¶ 7, Ex. 1 (Dkt. No. 1 at 30) (alterations in original).) The term "banking premises" means

> the interior of that portion of any building occupied by a financial institution or similar safe depository including a night depository chute, ATM machine owned by such financial institution (wherever located) or safe of such institution.

(*Id.* ¶ 7, Ex. 1 (Dkt. No. 1 at 25) (alterations in original).)

Case 2:20-cv-04062-AB-PVC Document 26 Filed 11/05/20 Page 3 of 15 Page ID #:368

With regards to "(2) Funds Transfer Fraud," the 2012 Policy provides that Hiscox "will pay for loss of **Money** and **Securities** resulting directly from a **Fraudulent Instruction** directing a financial institution to transfer, pay or deliver **Money** and **Securities** from **Your Transfer Account**." (*Id.*) The 2012 Policy defines "fraudulent instruction," in pertinent part, as

> an electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by **You** which purports to have been transmitted by an **Employee** but which was in fact fraudulently transmitted by someone else without **Your** or the **Employee's** knowledge or consent.

(*Id.* ¶ 7, Ex. 1 (Dkt. No. 1 at 27) (alterations in original).)

The latest iteration of the Policy, No. UC 21253080.19, covered E&H from January 18, 2019 to January 18, 2020 (the "2019 Policy"). (*Id.* ¶ 8, Ex. 2 (Dkt. No. 1 at 49).) The 2019 Policy provides "Insuring Agreement D: Tech Fraud," including coverage for "(1) Computer" fraud up to $250,000 per occurrence subject to a $5,000 deductible and coverage for "(2) Funds Transfer" fraud up to $250,000 per occurrence subject to a $5,000 deductible. (*Id.* ¶ 8, Ex. 2 (Dkt. No. 1 at 53).) The 2019 Policy specifically provides "(1) Computer" fraud coverage for "loss of or damage to **money**, **securities**, or **other property** resulting directly from **computer fraud**," and "(2) Funds Transfer" fraud coverage for "loss of or damage to **money** or **securities** contained in **your transfer account** sustained by **you** resulting directly from **funds transfer fraud**." (*Id.* ¶ 8, Ex. 2 (Dkt. No. 1 at 70) (alterations in original).) The 2019 Policy does not include coverage for "(3) Cyber Deception" which it describes as "loss of or damage to **money** or **securities** sustained by **you** resulting directly from **cyber deception**." (*Id.* ¶ 8, Ex. 2 (Dkt. No. 1 at 53, 70) (alternations in original).)

The 2019 Policy defines "computer fraud" as

> the use of any computer system to make a fraudulent transfer of **money**, **securities**, or **other property** from inside the **premises** or **financial institution premises** to a person (other than a **messenger**) or place outside the **premises** or **financial institution premises**.

> **Computer fraud** does not include any fraudulent transfer of **money**, **securities**, or **other property** which required **you**, **your employees**, **your executive employees**, or others on **your** behalf to take any action in order to complete the transfer of such **money**, **securities**, or **other property**.

(*Id.* ¶ 8, Ex. 2 (Dkt. No. 1 at 78) (alterations in original).)

The 2019 Policy defines "funds transfer fraud" as a

> 1. telefacsimile, telephone, or other electronic instruction directing a **financial institution** to debit a **transfer account** and to transfer, pay, or deliver **money** or **securities** from that **transfer account**, which instruction purports to have been transmitted by **you**, but was in fact fraudulently transmitted by someone else without **your** knowledge or consent; or
>
> 2. written instruction (other than those described in Insuring agreement B. Forgery) issued to a **financial institution** directing such institution to debit a **transfer account** and to transfer, pay, or deliver **money** or **securities** from that **transfer account**, through an electronic funds transfer system at specified times or under specified conditions, which instruction purports to have been issued by **you**, but was in fact issued, forged, or altered by someone else without **your** knowledge or consent.
>
> **Funds transfer fraud** does not include any transfer, payment, or delivery of **money** or **securities** which required **you**, **your employees**, **your executive employees**, or others on **your** behalf to take any action in order the complete the transfer, payment, or delivery of such **money** or **securities**.

(*Id.* ¶ 8, Ex. 2 (Dkt. No. 1 at 80) (alterations in original).)

Finally, the 2019 Policy defines "cyber deception" as

> the intentional misleading or deception of an **employee** or **executive employee** by a person falsely purporting to be **your client**, **vendor**, **employee**, or **executive employee** through social engineering, pretexting, phishing, spear phishing, whaling, or any other confidence trick communicated by email, text, instant message, telephone, or other electronic means, which results in **your** transfer, payment, or delivery of **money** or **securities**.

(*Id.* ¶ 8, Ex. 2 (Dkt. No. 1 at 78) (alterations in original).)

### 2. Alleged Fraudulent Transfer

On March 12, 2019, Krystale Allen ("Allen"), an Accounts Payable Clerk at E&H, received an email from someone whom she thought was David Haas ("Haas"), a Managing Broker at E&H, but was, in fact, from an unknown person(s) posing as Haas ("Haas imposter"). (*Id.* ¶ 10.) The email attached an invoice for $50,000 to be sent to Zang Investments, LLC ("Zang"), which Allen processed and paid by wire transfer. (*Id.* ¶ 11.) On March 18, 2019, Allen received a second email from the Haas imposter attaching an invoice for $150,000 to be sent to Zang, which Allen processed in the same manner as the prior payment. (*Id.* ¶ 12.) On March 20, 2019, Allen received a third request from the Haas imposter requesting that a payment of $470,000 be sent to Zang. (*Id.* ¶ 13.) Allen forwarded the third email to Haas to confirm its authenticity and discovered that Haas had not sent the email or the two prior payment requests. (*Id.* ¶¶ 13–14.) Allen attempted to cancel the first two wire transfers but E&H's bank informed her that the wires had already been sent and could not be recalled. (*Id.* ¶ 14.) In a subsequent incident report, Annette Martin ("Martin"), E&H's Operations Manager, noted that Allen was reminded that E&H did not make payments by wire transfer and that Allen should have contacted Martin or Haas when she received payment requests that did not follow E&H's protocol. (*Id.* ¶ 15.) E&H determined that the Haas imposter used an email address (dhaas@ernsthas.com) that resembled Haas's real email address (dhaas@ernstandhaas.com) to communicate with Allen. (*Id.*) E&H claims a total loss of $200,000, representing the first wire in the amount of $50,000 and the second wire in the amount of $150,000. (*Id.* ¶ 17.)

### B. Procedural Background

On May 1, 2020, E&H filed the instant suit against Hiscox asserting five causes of action for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) tortious breach of the implied covenant of good faith and fair dealing; (4) bad faith; and (5) unfair trade practices. (*Id.* ¶¶ 35–62.) Hiscox moves to dismiss the Complaint in its entirety arguing that E&H cannot plausibly allege the applicable Policy provides coverage for E&H's pecuniary loss. (*See generally* Motion.)

5.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure ("Rule") 8 requires a plaintiff to present a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), a defendant may move to dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

To defeat a Rule 12(b)(6) motion to dismiss, the complaint must provide enough factual detail to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must also be "plausible on its face," that is, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Labels, conclusions, and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

A complaint may be dismissed under Rule 12(b)(6) for the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When ruling on a Rule 12(b)(6) motion, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (2009) (internal quotation marks omitted).

A court generally may not consider materials other than facts alleged in the complaint and documents that are made a part of the complaint. *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996). However, a court may consider materials if (1) the authenticity of the materials is not disputed and (2) the plaintiff has alleged the existence

of the materials in the complaint or the complaint "necessarily relies" on the materials. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (citation omitted). The court may also take judicial notice of matters of public record outside the pleadings and consider them for purposes of the motion to dismiss. *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Lee*, 250 F.3d at 689–90.

Typically, when a district court considers evidence outside the pleadings while ruling on a Rule 12(b)(6) motion to dismiss, it must convert that motion into a Rule 56 motion for summary judgment and allow both parties the opportunity to "present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003) (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 n.4 (9th Cir. 1998)). However, a court may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Ritchie*, 342 F.3d at 908.

## IV. DISCUSSION

### A. Breach of Contract

A claim for breach of contract requires the following elements: (1) the existence of a valid contract, (2) the plaintiff's performance or excuse for nonperformance, (3) the defendant's breach, and (4) resulting damages to the plaintiff. *Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). E&H argues that Hiscox is in breach because the "Computer Fraud" and "Funds Transfer Fraud" provisions of the 2012 Policy cover E&H's insurance claim and Hiscox failed to provide E&H adequate notice before "skinnying down" those Policy provisions upon renewal. (Opp'n at 5–16.) E&H further argues that Allen's failure to follow internal fund transfer protocols does not trigger a coverage exclusion under the 2012 Policy. (*Id.* at 17.) Hiscox counters that neither the 2012 Policy nor the 2019 Policy covers E&H's loss, and even though not required, Hiscox provided E&H ample notice of available coverage options when E&H renewed the Policy. (Motion

at 19–26.) According to Hiscox, coverage is also barred under the Policy because Allen did not follow E&H's standard procedures for paying vendor invoices. (*Id.* at 26.) E&H's breach theory thus turns on the scope of the 2012 Policy's coverage.

"Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation." *MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 647 (2003). The starting point for the interpretation of any contract, including insurance policies, is the plain language of the agreement. *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) ("Whenever possible, the plain language of the contract should be considered first"). If the language of the contract is clear, the intent of the parties should be determined from the contract itself. *Id.* "[L]anguage used in an insurance contract must be given its plain and ordinary meaning, and when it is unambiguous it must be given effect." *Travelers Indem. Co. v. Kowalski*, 233 Cal. App. 2d 607, 610 (1965) (citation omitted). When a dispute centers on a contract's terms, a breach of contract claim may be dismissed for failure to state a claim if the contract's terms are unambiguous. *See Consul, Ltd. v. Solide Enters., Inc.*, 802 F.2d 1143, 1149 (9th Cir. 1986). "Whether an insurance policy is ambiguous turns on whether it creates reasonable expectations of coverage as drafted." *Rood v. Liberty Ins. Underwriters, Inc.*, No. 19-15920, 2020 WL 4932149, at *2 (9th Cir. Aug. 24, 2020) (citation omitted).

Applying these principles, the Court determines that E&H has not plausibly pled that its claim falls within the 2012 Policy's "Computer Fraud" or "Funds Transfer Fraud" provisions. Because the Court finds that E&H's claim is not covered under the 2012 Policy's language, the Court does not reach Hiscox's coverage-exclusion arguments for dismissal.

### 1. Computer Fraud

The 2012 Policy's Computer Fraud provision covers the "loss of or damage to **Money**, **Securities** and/or **Other Property** resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the **Premises** or **Banking Premises**: (i) to a person (other than a **Messenger**) outside those **Premises** or **Banking**

**Premises**; or (ii) to a place outside those **Premises** or **Banking Premises**." (Compl. ¶ 7, Ex. 1 (Dkt. No. 1 at 23) (alterations in original).) Hiscox contends that E&H's allegations are insufficient to demonstrate that its losses resulted directly from the use of a computer to fraudulently cause the subject wires and, therefore, the Complaint should be dismissed.

As an initial matter, the Court notes that there is sparse binding legal authority interpreting comparable computer fraud provisions in other insurance coverage cases. However, the Ninth Circuit's decision in *Pestmaster Servs., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 656 F. App'x 332, 333 (9th Cir. 2016) ("*Pestmaster II*") where the appellate court affirmed an insurer's coverage denial under a similarly worded computer fraud provision appears to be relatively on point. In that case, the applicable policy defined "computer fraud" as "[t]he use of any computer to fraudulently cause a transfer of Money, Securities or Other Property." *Id.*; *see also Pestmaster Services, Inc. v. Travelers Cas. and Sur. Co. of America*, No. CV 13-5039-JFW, 2014 WL 3844627, at *4 (C.D. Cal. July 8, 2014) ("*Pestmaster I*"). Although the underlying facts of *Pestmaster* are not factually identical to the case at bar, the district court's reasoning and the Ninth Circuit's affirmance are instructive.

In *Pestmaster*, the underlying fraud was committed by a payroll contractor against the insured. *Pestmaster I*, 2014 WL 3844627, at *1. The contractor was responsible for withholding and submitting payments for the insured's payroll taxes. *Id.* To that end, the contractor prepared invoices for the insured, and was authorized to initiate transfers of funds from the insured to the contractor's bank account, in order to pay invoices approved by the insured. *Id.* Rather than paying the approved invoices, the contractor fraudulently used the insured's funds to pay for personal expenses, ultimately leaving the insured indebted to the Internal Revenue Service for unpaid payroll taxes. *Id.* at *2, 7–8. The district court considered the contractor's initiating the transfer of funds as the relevant "use of a computer" and found that the insurance policy containing similar language to the Policy at issue here was not applicable because the subject transfers had actually been authorized. *Id.* at *5, 7–8. Specifically, the district court reasoned that the "claimed losses

did not 'flow immediately' and 'directly' from [the contractor's] use of a computer." *Id*. at *8. Indeed, "there was no loss when funds were initially transferred to [the contractor] because the transfers were authorized by [the insured]." *Id*. In affirming, the Ninth Circuit interpreted "the phrase 'fraudulently cause a transfer' to require an unauthorized transfer of funds." *Pestmaster II*, 2016 WL 4056068, at *1. The circuit panel explained that "[b]ecause computers are used in almost every business transaction, reading this provision to cover all transfers that involve both a computer and fraud at some point in the transaction would convert this Crime Policy into a 'General Fraud' Policy," essentially covering losses from all forms of electronic fraud rather than a specified risk category. *Id.*

In this case, the alleged facts show that E&H authorized its bank to initiate the wire transfers from its account, albeit through an unwitting employee. E&H does not allege that Allen was an unauthorized user or hacker, or that the Haas imposter somehow subverted E&H's computer system in the transfer of funds to Zang. Although the Haas imposter's fraudulent email was likely sent through a computer, E&H's "claimed losses did not 'flow immediately' and 'directly' from [the Haas' imposter's] use of a computer." *Pestmaster I*, 2014 WL 3844627, at *8. Therefore, the Haas imposter's conduct does not constitute "Computer Fraud" as defined by the 2012 Policy because the relevant wire transfers were authorized and the Haas imposter's fraudulent emails did not directly cause the transfer of any funds. *See Pestmaster II*, 2016 WL 4056068, at *1.

### 2.     Funds Transfer Fraud

The 2012 Policy's Funds Transfer Fraud provision covers losses "resulting directly from a **Fraudulent Instruction** directing a financial institution to transfer, pay or deliver **Money** and **Securities** from **Your Transfer Account**." (Compl. ¶ 7, Ex. 1 (Dkt. No. 1 at 23) (alterations in original).) The 2012 Policy defines "fraudulent instruction," in pertinent part, as a "written instruction initially received by **You** which purports to have been transmitted by an **Employee** but which was in fact fraudulently transmitted by someone else without **Your** or the **Employee's** knowledge or consent." (*Id.* ¶ 7, Ex. 1 (Dkt. No. 1

at 27) (alterations in original).)

E&H argues that the Funds Transfer Fraud provision should apply here because the emails from the Haas imposter constitute fraudulent instructions directing a financial institution to transfer funds. (Opp'n at 8–13.) The Court agrees that the emails from the Haas imposter qualify as "fraudulent instructions" based on the term's specific definition in the 2012 Policy. The Haas imposter's emails were "written," they were "initially received by [E&H]," and they "purport[ed] to have been transmitted by an [employee, i.e. Haas]" even though they were "in fact fraudulently transmitted by someone else." However, as noted above, the Funds Transfer Fraud provision only covers losses "*resulting directly*" from a fraudulent instruction "*directing a financial institution*" to transfer funds from an E&H account. (Compl. ¶ 7, Ex. 1 (Dkt. No. 1 at 23) (emphasis added).) Here, the Haas imposter's emails did not direct a financial institution to transfer any funds. Rather, E&H alleges that the imposter directed an E&H employee, Allen, to process invoice payments by wire transfer. (*Id.* ¶¶ 11–13.) Thus, E&H's losses did not "result directly" from the Haas imposter's "fraudulent instructions" because those communications did not direct E&H's bank to transfer the $200,000 E&H now seeks to recover. The transfer instructions that directly caused E&H's losses came instead from Allen, and E&H cannot allege that Allen's transfer instructions were fraudulent because they were transmitted by an employee, and were sent with Allen's knowledge and consent. Had the Haas imposter sent the fraudulent payment requests to E&H, and subsequently to E&H's bank, the 2012 Policy's Funds Transfer Fraud provision may have applied here. But those are not the alleged facts before this Court; therefore, Hiscox properly denied E&H's insurance claim and E&H's claim for breach of contract cannot survive dismissal. *See Lindsey v. Admiral Ins. Co.*, 804 F. Supp. 47, 52 (N.D. Cal. 1992) ("there can be no breach of contract . . . in the absence of a covered claim").

Accordingly, the Court **GRANTS** the Motion with respect to E&H's first cause of action.

### B. Unfair Trade Practices

In its fifth cause of action, E&H alleges that Hiscox has engaged in "unfair trade practices" including by failing "to properly settle [E&H's] claim." (Compl. ¶ 59.) E&H recites a lengthy list of alleged violations including the "unreasonable interpretation of the relevant policy provisions," "delay in approving coverage," "intentionally skinnying down coverage in [a] way designed to escape the attention of brokers and insureds," and denying coverage in an "oppressive, fraudulent, malicious, vexatious, deliberate, cold, callous or intentional manner, or in conscious disregard of [E&H's] protected rights." (*Id.* ¶¶ 60–61.) To the extent E&H's unfair trade practices cause of action is alleged under California's Unfair Competition Law ("UCL"), the Court finds that E&H has failed to state a valid claim.

California Business & Professions Code § 17200 "establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (internal quotations omitted). "Because the statute is written in the disjunctive, it is violated where a defendant's act or practice violates any of the foregoing prongs." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012). An action brought under the "unlawful" prong of this statute "borrows" violations of other laws when committed pursuant to business activity. *Farmers Ins. Exchange v. Superior Court*, 2 Cal. 4th 377, 383 (1992). "Unfair" conduct must be violative of a public policy "tethered to specific constitutional, statutory, or regulatory provisions." *Drum v. San Fernando Valley Bar Ass'n,* 106 Cal. Rptr. 46, 53 (2010); *see also Cel-Tech*, 20 Cal. 4th at 186–87 (requiring finding of unfairness under UCL be tethered to legislation). Lastly, under the fraudulent prong, a plaintiff must "show deception to some members of the public . . . [or] allege that members of the public are likely to be deceived." *Herrejon v. Ocwen Loan Servicing, LLC*, 980 F. Supp. 2d 1186, 1207 (E.D. Cal. 2013) (internal quotations and citations omitted). Fraudulent conduct must be pled with particularity. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009) (noting that Rule 9(b) applies to claims in

federal court under the UCL).

Here, it is unclear which prong(s) of the UCL E&H relies upon in asserting its "unfair trade practices" cause of action. Regardless, E&H's UCL claim fails under all three prongs. With respect to any alleged UCL claim sounding in fraud, the Court finds that E&H fails to plead sufficient facts to meet its burden under Rule 9(b). *See* Fed. R. Civ. P. 9(b). E&H's allegations lack any specificity surrounding "the who, what, when, where, and how" of its conclusory fraud allegations. *Kearns*, 567 F.3d at 1124–25. Without more, a UCL claim sounding in fraud necessarily fails. Additionally, the Court finds that E&H fails to sufficiently allege that it has standing to challenge the fairness of Hiscox's business practices. To establish standing under the UCL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice." *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 322 (2011) (italics in original); *see also* Cal. Bus. & Prof. Code § 17204. E&H's allegation that it has "sustained damages in excess of the policy limits" because Hiscox refused to pay an uncovered claim is insufficient to confer standing. (Compl. ¶ 60.) E&H also requests "contractual and/ or statutory attorneys' fees and costs" for pursuing this action but this allegation similarly fails to satisfy the UCL's standing requirement. *Cordon v. Wachovia Mortg., a Div. of Wells Fargo Bank, N.A.*, 776 F. Supp. 2d 1029, 1039 (N.D. Cal. 2011) (holding that legal expenses do not confer standing under the UCL because then "a private plaintiff bringing a UCL claim automatically would have standing merely by filing suit.").

Accordingly, the Court **GRANTS** the Motion with respect to E&H's fifth cause of action.

### C. Remaining Causes of Action

The causes of action against Hiscox for breach of the implied covenant of good faith and fair dealing and bad faith necessarily depend upon the cause of action for breach of contract. If Hiscox was not bound or required to cover E&H's losses under the Policy, its denial of coverage could not have been in bad faith. *Love v. Fire Ins. Exch.*, 221 Cal. App.

3d 1136, 1153 (1990) ("Our conclusion that a bad faith claim cannot be maintained unless policy benefits are due is in accord with the policy in which the duty of good faith is rooted"); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1032 (9th Cir. 2008) (finding that "without a breach of the insurance contract, there can be no breach of the implied covenant of good faith and fair dealing"); *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 36 (1995) ("It is clear that if there is no potential for coverage and, hence . . . there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer."). Because there is no coverage for its claim, E&H's remaining causes of action equally fail.

Accordingly, the Court **GRANTS** the Motion with respect to E&H's second, third, and fourth causes of action.

### D. Leave to Amend

In general, a court should liberally allow a party leave to amend its pleading. *See* Fed. R. Civ. P. 15(a). However, the Court may deny leave to amend where amendment would be futile. *Gardner v. Martino*, 563 F.3d 981, 990 (9th Cir. 2009). When "any amendment would be futile, there is no need to prolong the litigation by permitting further amendment." *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1088 (9th Cir. 2002) (affirming the trial court's denial of leave to amend where plaintiffs could not cure a basic flaw).

The Court has reviewed the Policy and concludes that its provisions are unambiguous, and provide no coverage for the losses sustained by E&H as alleged. However, the Court **GRANTS** E&H **leave to amend** its breach of contract cause of action in the event E&H can plausibly show that the subject wire payments were unauthorized, or that the Haas imposter somehow subverted its or its bank's computer system in the transfer of funds to Zang. E&H's unfair trade practices, breach of the implied covenant of good faith and fair dealing, and bad faith causes of action are likewise **DISMISSED with leave to amend**.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion to Dismiss the Complaint (Dkt. No. 11) and **DISMISSES** Plaintiff's five causes of action **with leave to amend**.

If E&H chooses to amend its pleadings, E&H shall file a First Amended Complaint ("FAC") in conformance with this Order no later than **twenty-one (21) days** from the date of this Order. If E&H files a FAC, Hiscox shall file a response no later than **fourteen (14) days** from the date of the FAC filing.

If no amended complaint is filed by the deadline, the action will be deemed dismissed with prejudice and Defendant should file a Proposed Judgment within 5 days thereafter.

**IT IS SO ORDERED.**

DATED: November 5, 2020

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE